# United States Court of Appeals for the Ninth Circuit

BEVERLY SEVCIK, ET AL., *Plaintiffs-Appellants*,

v.

BRIAN SANDOVAL, ET AL., *Defendants-Appellees*, and
COALITION FOR THE PROTECTION OF MARRIAGE,
*Intervenor-Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA

NATASHA N. JACKSON, ET AL., *Plaintiffs-Appellants*,

v.

NEIL S. ABERCROMBIE, GOVERNOR, STATE OF HAWAI'I, *Defendant-Appellant*,
LORETTA J. FUDDY, DIRECTOR, DEPARTMENT OF HEALTH, STATE OF HAWAI'I,
*Defendant-Appellee*, and HAWAII FAMILY FORUM,
*Intervenor-Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF HAWAII

**BRIEF OF MASSACHUSETTS, CALIFORNIA, CONNECTICUT,
DELAWARE, DISTRICT OF COLUMBIA, ILLINOIS, IOWA, MAINE,
MARYLAND, NEW HAMPSHIRE, NEW MEXICO, NEW YORK, OREGON,
VERMONT, AND WASHINGTON AS *AMICI CURIAE* IN SUPPORT OF
APPELLANTS**

MARTHA COAKLEY
  Attorney General

GENEVIEVE C. NADEAU *
JONATHAN B. MILLER
  Assistant Attorneys General
COMMONWEALTH OF MASSACHUSETTS
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
(617) 727-2200
genevieve.nadeau@state.ma.us
  *Counsel of Record*

*(Additional counsel listed on next page)*

# ADDITIONAL COUNSEL

KAMALA D. HARRIS
Attorney General of California
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, California 94244

GEORGE JEPSEN
Attorney General of Connecticut
5 Elm Street
Hartford, Connecticut 06106

JOSEPH R. BIDEN, III
Attorney General of Delaware
Department of Justice
820 N. French Street
Wilmington, Delaware 19801

IRVIN B. NATHAN
Attorney General for the
District of Columbia
One Judiciary Square
441 4th Street, N.W.
Washington, District of Columbia
20001

LISA MADIGAN
Attorney General of Illinois
100 W. Randolph St., 12th Floor
Chicago, IL  60601

TOM MILLER
Attorney General of Iowa
1305 E. Walnut Street
Des Moines, Iowa 50319

JANET T. MILLS
Attorney General of Maine
Six State House Station
Augusta, Maine 04333

DOUGLAS F. GANSLER
Attorney General of Maryland
200 Saint Paul Place
Baltimore, Maryland 21202

JOSEPH A. FOSTER
Attorney General of New Hampshire
33 Capitol Street
Concord, New Hampshire 03301

GARK K. KING
Attorney General of New Mexico
P.O. Drawer 1508
Santa Fe, New Mexico 87504

ERIC T. SCHNEIDERMAN
Attorney General of New York
120 Broadway, 25th Floor
New York, New York 10271

ELLEN F. ROSENBLUM
Attorney General of Oregon
1162 Court Street N.E.
Salem, Oregon 97301

WILLIAM H. SORRELL
Attorney General of Vermont
109 State Street
Montpelier, Vermont 05609

ROBERT W. FERGUSON
Attorney General of Washington
1125 Washington Street SE
P.O. Box 40100
Olympia, Washington 9850

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………….……..iii

INTEREST OF *AMICI CURIAE*……………………………………………..… 1

SUMMARY OF ARGUMENT………………………………………………......2

I.    CIVIL MARRIAGE ADVANCES MANY IMPORTANT STATE
      INTERESTS, ALL OF WHICH ARE ADVANCED BY
      INCLUDING SAME-SEX COUPLES IN THE INSTITUTION ……..........4

      A.    State Interests In Marriage Are Furthered By Ending The
            Exclusion Of Same-Sex Couples ..………………………………….. 5

      B.    The History And Evolving Tradition Of Civil Marriage Are
            Not Solely About Promoting Procreation And Do Not
            Justify Continued Discrimination ……………………………………8

II.   NEVADA AND HAWAII MARRIAGE LAWS ARE NOT
      RATIONALLY RELATED TO INTERESTS IN PROCREATION
      AND CHILDBEARING BY DIFFERENT-SEX COUPLES ……………12

      A.    Excluding Same-Sex Couples From Marriage Does Not
            Promote The Well-Being Of Children ..………………………….13

      B.    Same-Sex Parents Are As Capable As Different Parents
            Of Raising Healthy, Well-Adjusted Children ..……………..……….15

      C.    Promoting Responsible Procreation Does Not Justify
            Restricting Marriage To Different-Sex Couples ….......……….…….18

III.  SPECULATION ABOUT THE EROSION OF THE INSTITUTION
      OF MARRIAGE IS DEMONSTRABLY FALSE ………………………...22

      A.    The Institution Of Marriage Remains Strong In States
            That Allow Same-Sex Couples To Marry ………………….............22

i

B.    Allowing Same-Sex Couples To Marry Does Not Threaten
        The States' Ability To Regulate Marriage ...……………………… 28

CONCLUSION …………………………………………….....................32

# TABLE OF AUTHORITIES

## Cases

*Andersen v. King County*, 138 P.3d 963 (Wash. 2006) ………………………... 15

*Baker v. State*, 744 A.2d 864 (Vt. 1999) …………………………….......... 5, 15

*Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001) ……………………. 20

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ………….. 8, 20, 21

*Fla. Dep't of Children & Families v. Adoption of X.X.G.*,
  45 So.3d 79 (Fla. Dist. Ct. App. 2010) ...……………………………………... 16

*Frontiero v. Richardson*, 411 U.S. 677 (1973) ………………………………….. 29

*Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941 (Mass. 2003) ……........ *passim*

*Griswold v. Connecticut*, 381 U.S. 479 (1965) ………………………….… 10, 20-21

*Heller v. Doe*, 509 U.S. 312 (1993) …………………………………………….... 20

*In re Marriage Cases*, 183 P.3d 384 (Cal. 2008) ……………………… 5, 9, 18-19

*Jackson v. Abercrombie*, 884 F. Supp. 2d 1065 (D. Haw. 2012) …………….......28

*Johnson v. Robinson*, 415 U.S. 361 (1974) ……………………………………… 7

*Lapides v. Lapides*, 171 N.E. 911 (N.Y. 1930) …………………………….….... 19

*Lawrence v. Texas*, 539 U.S. 558 (2003) …………………………………..... 10, 20

*Loving v. Virginia*, 388 U.S. 1 (1967) …………………………....3, 15, 28, 30-31

*Martin v. Otis*, 124 N.E. 294 (Mass. 1919) …………………………………... 19

*Maynard v. Hill*, 125 U.S. 190 (1888) …………………………………………… 4

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981) ………………… 22

*M.L.B. v. S.L.J.*, 519 U.S. 102 (1996) ……………………………………...……10, 20

*Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (2003) ……………………17

*Plyler v. Doe*, 457 U.S. 202 (1982) ……………………………………... 8, 22

*Romer v. Evans*, 517 U.S. 620 (1996) …………………………………………11, 20

*Ryder v. Ryder*, 28 A. 1029 (Vt. 1894) ………………………………………….. 19

*Stanley v. Illinois*, 405 U.S. 645 (1972) ………………………………………… 17

*Troxel v. Granville*, 530 U.S. 57 (2000) ………………………………………… 17

*Turner v. Safley*, 482 U.S. 78 (1987) …………………………………………... 18-19

*United States v. Virginia*, 518 U.S. 515 (1996) ……………………………... 13, 17

*United States v. Windsor*, 133 S. Ct. 2675 (2013) …………………….……… 8, 13

*United States v. Yazell*, 382 U.S. 341 (1966) …………………………………… 11

*U.S. Dep't of Agriculture v. Moreno*, 413 U.S. 528 (1973) ………….…..…… 21

*Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009) ……………………………... 16

*Zablocki v. Redhail*, 434 U.S. 374 (1978) ……………………………... ..10, 19, 20

**Statutes**

Il. St. Ch. 765 § 305/4(c)(3) ………………………………………………... 19

N.Y. Est. Powers & Trusts Law § 9-1.3(e) ……………………………………… 19

**Other Authorities**

Brief for Appellee, *Loving v. Virginia*, 388 U.S. 1 (1967) (No. 395),
1967 WL 113931…………………………………………………….. 15-16

Centers for Disease Control and Prevention, National Vital Statistics
System, *Divorce Rates by State: 1990, 1995, and 1999-2011*,
http://www.cdc.gov/nchs/data/dvs/divorce_rates_90_95_99-11.pdf ...…… 26, 27

Centers for Disease Control and Prevention, National Vital Statistics
System, *National Marriage and Divorce  Rate Trends 2000-2011*,
http://www.cdc.gov/nchs/nvss/marriage_divorce_tables.htm………... 23-24, 27

Centers for Disease Control and Prevention, National Vital Statistics
System, *Marriage Rates by State: 1990, 1995, and 1999-2011*,
http://www.cdc.gov/nchs/data/dvs/marriage_rates_90_95_99-11.pdf ….... 23, 24

Alexis Dinno & Chelsea Whitney, *Same Sex Marriage and the Perceived
Assault on Opposite Sex Marriage*, PloS ONE, Vol. 8, No. 6 (June 2013),
http://www.plosone.org/article/info%3Adoi%2F10.1371%2Fjournal.
pone.0065730 ...…………………………………………………... 25

Brady E. Hamilton, Joyce A. Martin, & Stephanie J. Ventura, *National Vital
Statistics Reports, Birth:  Preliminary Data for 2009*, Vol. 59, No. 3, Dec.
21, 2010, http://www.cdc.gov/nchs/data/nvsr/nvsr59/nvsr59_03.pdf ............... 28

Brady E. Hamilton, Joyce A. Martin, & Stephanie J. Ventura, *National
Vital Statistics Reports, Birth:  Preliminary Data for 2011*, Vol. 61,
No. 5, Oct. 3, 2012 http://www.cdc.gov/nchs/data/nvsr/nvsr61/
nvsr61_05.pdf……... …………………………………………………... 27, 28

Mark L. Hatzenbuehler et al., *Effect of Same-Sex Marriage Laws on Health
Care Use and Expenditures in Sexual Minority Men: A Quasi-Natural
Experiment*, Am. J. Pub. Health, Feb. 2012 …....……………………………..… 6

Mark L. Hatzenbuehler, et al., *State-Level Policies and Psychiatric Morbidity
in Lesbian, Gay, and Bisexual Populations*, Am. J. Pub. Health,
Dec. 2009…………………………………………………………... …….. 6

Iowa Department of Public Health, Bureau of Vital Statistics, *2010 and 2011 Vital Statistics of Iowa* http://www.idph.state.ia.us/apl /health_ statistics.asp#vital......................................................................................25

Chris Kirk & Hanna Rosin, *Does Gay Marriage Destroy Marriage? A Look at the Data*, Slate.com, May 23, 2012, http://www.slate.com/articles/ double_x/doublex/2012/05/does_gay_marriage_affect_marriage_or_ divorce_rates_.html ……………………................................................ 24, 26, 27, 21

Rod Boshart Lee, *Marriages Up, Divorces Down in Iowa*, Sioux City Journal, July 23, 2010 …………………………………………………………… 26

Lisa Leff, *Defense Lawyers Rest Case at Gay Marriage Trial*, Associated Press, Jan. 27, 2010, http://www.boston.com/news/nation/articles/ 2010/01/27/witness_says_gay_marriage_would_help_children/………......…… 14

Christopher Ramos, et al., *The Effects of Marriage Equality in Massachusetts: A Survey of the Experiences and Impact of Marriage on Same-Sex Couples*, The Williams Institute, May 2009, http://williamsinstitute. law.ucla.edu/experts/lee-badgett/effects-marriage-equality-masurvey/ ……... 14

Sabrina Tavernise, *Parenting by Gays More Common in the South, Census Shows*, N.Y. Times, Jan. 19, 2011 …………………………………………… ..14-15

Michael Wald, *Same-Sex Couple Marriage: A Family Policy Perspective*, 9 Va. J. Soc. Pol'y & L. 291 (2001) …...……………………….……………... 7

The Williams Institute, *United States Census Snapshot*: *2010*, http://williamsinstitute.law.ucla.edu/wp-content/uploads/Census 2010Snapshot-US-v2.pdf…………….. ……………………………………… 14

## INTEREST OF *AMICI CURIAE*

*Amici* States Massachusetts, California, Connecticut, Delaware, the District of Columbia, Illinois, Iowa, Maine, Maryland, New Hampshire, New Mexico, New York, Oregon, Vermont, and Washington[1] file this brief in support of Appellants Beverly Sevcik, et al. (No. 12-17668) and Natasha H. Jackson, et al. (Nos. 12-16995, 12-16998) as a matter of right pursuant to Fed. R. App. P. 29(a).[2]

The *Amici* States share a compelling interest in ensuring that all citizens have equal opportunity to participate in civic life. To that end, each of the *Amici* States has taken steps to eliminate discrimination in employment, housing, education, and the provision of government services and benefits. In addition, the *Amici* States all license marriage to advance many important governmental interests, and are committed to ensuring that the institution of marriage is strengthened by removing unnecessary and harmful barriers.

---

[1] The District of Columbia, which sets its own marriage rules, is referred to as a state for ease of discussion.

[2] The *Amici* States recognize that the Court has extended the briefing schedule in *Jackson v. Abercrombie*, Nos. 12-16995 and 12-16998, and that the case may be stayed and/or dismissed, pending the outcome of Hawaii's special legislative session.

1

Based on our shared goals of promoting marriage, protecting families, and eliminating discrimination, we join in asking the Court to reverse the judgments of the district courts below.

## SUMMARY OF ARGUMENT

Civil marriage in the United States is an important and enduring institution. Throughout our Nation's history, marriage has maintained its essential role in society and has been strengthened, not weakened, by removing barriers to access and by creating greater equality between spouses. Over the past decade, this evolution has continued as same-sex couples have been permitted to marry. Against that history of greater inclusion and equality, Nevada and Hawaii marriage laws single out same-sex couples and consign them to second-class status.

The exclusion of same-sex couples from marriage is unconstitutional. Denying gay men and lesbians the fundamental right to wed the partner of their choosing offends basic principles of due process and equal protection, and fails to advance any legitimate governmental interest. Since the Founding, states have sanctioned marriages to support families, strengthen communities, and facilitate governance. Because same-sex couples form families, raise children, and avail themselves of the benefits and abide by the obligations of marriage in the same manner as different-sex couples, the states' interests in marriage are furthered by allowing same-sex couples to marry.

2

Attempts to justify exclusionary laws by recasting the states' interests in marriage as singularly focused on the procreative potential of different-sex couples are misguided. Neither the laws of the several states, nor applicable jurisprudence, supports such a narrow understanding of marriage. Moreover, there is no rational relationship between encouraging responsible procreation by different-sex couples and excluding same-sex couples from marriage.

Exclusionary marriage laws similarly cannot be justified by pure speculation as to the injury same-sex marriage will inflict on the institution. The Supreme Court rejected similar conjecture in *Loving v. Virginia*, 388 U.S. 1 (1967), and the experience of states permitting same-sex marriage belies such speculation. None have experienced the adverse consequences that the laws' proponents seek to avoid. Instead, the data indicate that eliminating marriage restrictions has no negative effect on rates of marriage, divorce, or births to unmarried mothers. If anything, these measures of the strength of the institution have improved. Nor have equal marriage rights weakened the ability of states to impose reasonable regulations on marriage generally.

Nevada and Hawaii marriage laws deny gay men and lesbians the fundamental right to marry and codify the second-class status—for its own sake—

3

of same-sex couples and their families. Under any standard of constitutional analysis, they cannot survive review.[3]

## ARGUMENT

### I.     CIVIL MARRIAGE ADVANCES MANY IMPORTANT STATE INTERESTS, ALL OF WHICH ARE ADVANCED BY INCLUDING SAME-SEX COUPLES IN THE INSTITUTION.

Marriage "is a great public institution, giving character to our whole civil polity." *Maynard v. Hill*, 125 U.S. 190, 213 (1888). Yet, while it has always been an anchor for an ordered society, civil marriage has never been a static institution. Societal changes have resulted in corresponding changes to marriage eligibility rules and to our collective understanding of the relative roles of persons within a marriage. Nevertheless, generations of Americans have consistently valued marriage as "a deeply personal commitment to another human being and a highly public celebration of the ideals of mutuality, companionship, intimacy, fidelity, and family." *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 954 (Mass. 2003). States, too, have long valued marriage for its many benefits to individuals, households, and the community at large, and therefore have transformed the

---

[3] For the reasons set forth in the brief of Appellants Beverly Sevcik, et al. (pp. 49-62), the *Amici* States submit that laws that discriminate on the basis of sexual orientation should be subject to heightened scrutiny.

personal commitment inherent in marriage into publicly recognized rights and obligations.

### A. State Interests In Marriage Are Furthered By Ending The Exclusion Of Same-Sex Couples.

States recognize and regulate civil marriage to serve several interests, including to facilitate governance, create economic benefit, create stable households, create legal bonds between parents and children, assign providers to care for dependents, and facilitate property ownership and inheritance. ER 267 (Cott).[4] Underlying all of these interests is the recognition that marriage provides stability for individuals, families, and the broader community. *Baker v. State*, 744 A.2d 864, 889 (Vt. 1999).

For example, the security of marital households creates a critical private safety net, ensuring that members of the family are not alone in a time of crisis, and limiting the public's liability to care for the vulnerable. *In re Marriage Cases*, 183 P.3d 384, 423-424 (Cal. 2008). Marriage also provides couples with greater freedom to make decisions about education and employment knowing that, if one spouse provides the primary economic support, the other will be protected, even in the event of divorce or death. ER 363-364 (Badgett). As a result, married couples

---

[4] References to Plaintiffs-Appellants Beverly Sevcik, et. al.'s Excerpts of Record are cited as "ER [pg.] ([declarant])."

can specialize their labor and invest in each other's education and career, which has long-term benefits for both the couple and the state. *Id*.

Marriage also advances the well-being of spouses. Research has established that married people enjoy greater physical and psychological health and greater economic prosperity than unmarried persons. ER 314-315 (Peplau). In addition, recent studies demonstrate that gay men and lesbians, in particular, benefit when marriage is made available to them.[5]

Beyond the married couple, marriage improves the quality of children's lives in many ways:

> [M]arital children reap a measure of family stability and economic security based on their parents' legally privileged status that is largely inaccessible, or not as readily accessible, to nonmarital children. Some of these benefits are social, such as the enhanced approval that still attends the status of being a marital child. Others are material, such as the greater ease of access to family-based State and Federal benefits that attend the presumption of one's parentage.

---

[5] Gay men and lesbians living in states with protective policies are significantly less likely to suffer from psychiatric disorders than their counterparts living in states without such policies. Mark L. Hatzenbuehler, et al., *State-Level Policies and Psychiatric Morbidity in Lesbian, Gay, and Bisexual Populations*, Am. J. Pub. Health, Dec. 2009. Similarly, gay men experience a statistically significant decrease in medical care visits, mental health visits, and mental health care costs following the legalization of same-sex marriage. Mark L. Hatzenbuehler et al., *Effect of Same-Sex Marriage Laws on Health Care Use and Expenditures in Sexual Minority Men: A Quasi-Natural Experiment*, Am. J. Pub. Health, Feb. 2012.

*Goodridge*, 798 N.E.2d at 956-957.  Marriage improves children's well-being by honoring their parents' relationships and by strengthening their families through, for example, enhanced access to medical insurance, tax benefits, estate and homestead protections, and the application of predictable custody, support, and visitation rules.  *Id.* at 956.  Children whose parents are married simply have a better chance of living healthy, financially secure, and stable lives.

In sum, the states favor—and therefore encourage—marriage over transient relationships because marriage promotes stable family bonds, fosters economic interdependence and security for members of the marital household, and enhances the physical and emotional well-being of both the partners to the marriage and their children.  Michael Wald, *Same-Sex Couple Marriage: A Family Policy Perspective*, 9 Va. J. Soc. Pol'y & L. 291, 300-303 (2001); *see also Goodridge*, 798 N.E.2d at 954.  All of these interests are furthered by including same-sex couples in the institution of marriage.  Thus, this is *not* a case where the "inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not."  *Johnson v. Robinson*, 415 U.S. 361, 383 (1974).  Instead, this is a case where the exclusion of a similarly-situated group undermines the important governmental interests states promote through marriage.

Given their recognition of same-sex domestic partnerships and civil unions, the only interest Nevada's and Hawaii's laws actually advance by withholding the

7

title of "marriage" is the interest in signifying the states' lesser respect for same-sex couples.  However, no state has a legitimate interest in codifying second-class status for its own sake.  *See United States v. Windsor*, 133 S. Ct. 2675, 2694 (2013) (invalidating Section 3 of the Defense of Marriage Act because it created two classes of state-sanctioned, same-sex relationships and had the "principal purpose [of imposing] inequality").  By deliberately withholding the social benefits and cultural significance associated with state-sanctioned marriage, Nevada and Hawaii marriage laws work a special harm on same-sex couples and their families without advancing any legitimate governmental interest.  Given that the touchstone of the Fourteenth Amendment is that the government must treat all similarly-situated people alike, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)), these laws fail the most basic of constitutional inquiries.

### B.    The History And Evolving Tradition Of Civil Marriage Are Not Solely About Promoting Procreation And Do Not Justify Continued Discrimination.

The argument that the government's sole interest in recognizing and regulating marriage is the natural capacity of different-sex couples to produce children not only ignores the many state interests advanced by marriage, but also distorts history.  Appellees seek to elevate procreation to the sole, or even primary, purpose of marriage because it "singles out the one unbridgeable difference

8

between same-sex and opposite-sex couples, and transforms that difference into the essence of a legal marriage." *Goodridge*, 798 N.E.2d at 962. Their argument stands at odds with the full history of marriage in our country, and seeks to justify discrimination based on historical tradition. Encouraging procreation has never been the government's principal interest in recognizing and regulating marriage, and tradition alone cannot sustain ongoing discrimination.[6] ER 267-269 (Cott); *see also In re Marriage Cases*, 183 P.3d at 432.

In the United States, civil marriage has always been authorized and regulated by local governments in the exercise of their police powers. ER 266 (Cott). Throughout our history, therefore, marriage has been understood as an institution that is at the same time public and private, legal and intimate. On the public side, marriage has served both political and economic ends. In early America, the household formed by marriage was understood as a governable, political subgroup (organized under male heads), and therefore a form of efficient governance. ER 267-268 (Cott). As a political unit, the household included not only the married couple and their children, but also extended family. Later, households took on particular significance as economic sub-units of state

---

[6] As Professor Nancy Cott testified, marriage rules in the United States have been directed more consistently at supporting children than producing them. ER 269.

governments, functioning as support systems for all household members, not only the children born of the marriage. Thus, the states historically have encouraged couples to choose committed relationships, regardless of whether they result in children, because these private relationships assist in maintaining public order. *Goodridge*, 798 N.E.2d at 954; ER 267-268 (Cott).

At the same time, the states' authority to regulate marriage historically has been bound by the deeply personal and intimate nature of marital unions. Thus, while recognizing the states' sovereign powers over civil marriage, our courts have also consistently affirmed the understanding of marriage as a fundamental expression of liberty (*Zablocki v. Redhail*, 434 U.S. 374, 384 (1978)), privacy (*Griswold v. Connecticut*, 381 U.S. 479, 486 (1965)), intimate choice (*Lawrence v. Texas*, 539 U.S. 558, 574 (2003)), and association (*M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996)). This balance between the public and private nature of marriage has always been critical to the institution.

It is true that states traditionally defined marriage as being between one man and one woman, but that tradition does not itself justify the continued exclusion of same-sex couples.[7] The states' powers with respect to defining and regulating

---

[7] The tradition of marriage as between different-sex couples is based, at least in part, on presumptions of a division of labor along gender lines, and not only procreative abilities. ER 267-268 (Cott). Men traditionally were viewed as

10

marriage are subject to the constitutional guarantees of equal protection and due process, and it is well-established that tradition alone cannot justify perpetual discrimination. *See Romer v. Evans*, 517 U.S. 620, 633 (1996) (discriminatory classification must serve an "independent and legitimate legislative end"). And, in many ways, marriage in this country has been characterized as much by change as it has by tradition. *Goodridge*, 798 N.E.2d at 966-967 ("As a public institution and a right of fundamental importance, civil marriage is an evolving paradigm."). The direction of change consistently has been toward removing restrictions on who can marry and promoting equality of the spouses. ER 269-270 (Cott). Extending marriage to same-sex couples falls squarely in line with this tradition.

Indeed, many of the features of marriage that we take for granted today would have been unthinkable at our Nation's Founding. For centuries (and until relatively recently) men and women were treated unequally, with wives ceding their legal and economic identities to their husbands upon marriage. *See, e.g., United States v. Yazell*, 382 U.S. 341, 342-343 (1966) (applying law of coverture). Marriage between persons of different races was prohibited, nullified, and even

---

suitable for certain types of work (providing for the family) and women for others (caretaking), both of which were required for the survival of the household. *Id.* However, these views are outdated, particularly to the extent that they presume women's abilities to be limited or inferior to men's.

11

criminalized for parts of three centuries. Divorce was difficult, if not impossible, in early America. ER 269-270 (Cott). That civil marriage has endured as a core institution is a testament to both the value of the institution and its ability to evolve in concert with social mores and constitutional principles.

## II. NEVADA AND HAWAII MARRIAGE LAWS ARE NOT RATIONALLY RELATED TO INTERESTS IN PROCREATION AND CHILDREARING BY DIFFERENT-SEX COUPLES

The chief argument advanced in support of Nevada and Hawaii marriage laws is that these states, like all states, have a legitimate interest in promoting marriage between two people who may produce children, intentionally or not, thereby ensuring that they will raise the children together. Refusing to recognize marriages between same-sex couples does not advance this interest. In fact, excluding same-sex couples from marriage does not promote the well-being of *any* children. It does just the opposite by denying their families the dignity, benefits, and protections afforded by marriage. In addition, the notion of using procreative abilities to limit access to marriage is inconsistent with our legal tradition, as the desire or ability to procreate has never been a prerequisite for marriage. Finally, drawing the line at same-sex couples – as opposed to other couples who are unable or unwilling to procreate – is simply irrational.

12

### A. Excluding Same-Sex Couples From Marriage Does Not Promote The Well-Being Of Children.

*All* states share a paramount interest in the healthy upbringing of children. However, the exclusion of same-sex couples from marriage works against this interest. The second-class status that Nevada and Hawaii assign to same-sex couples has the unavoidable effect of conferring second-class status on their families as well—an outcome that harms children.[8] As the Supreme Court recently recognized:

> The differentiation [between state-sanctioned relationships] demeans the couple . . . And it humiliates tens of thousands of children now being raised by same-sex couples. The law in question makes it even more difficult for children to understand the integrity and closeness of their own family and its concord with other families in their community and their daily lives.

*Windsor*, 133 S. Ct. at 2694 (citation omitted). Indeed, parties and experts on both sides of this debate acknowledge that children benefit when their parents are able to marry. David Blankenhorn, a prominent expert employed by proponents of

---

[8] Following the Supreme Court's invalidation of Section 3 of DOMA, Nevada's and Hawaii's exclusion of same-sex couples from marriage imposes tangible harms and inequalities that extend to an extensive body of federal law. *Windsor*, 133 S. Ct. at 2694. Nevada and Hawaii marriage laws now prevent same-sex couples and their families from obtaining important federal benefits and protections otherwise available to married couples. This works significant and practical harm to those families and further undercuts the rationality of state laws that create two classes of state-sanctioned relationships.

13

restrictive marriage laws, admitted that permitting same-sex couples to marry would likely improve the well-being of gay and lesbian households and their children. Lisa Leff, *Defense Lawyers Rest Case at Gay Marriage Trial*, Associated Press, Jan. 27, 2010, http://www.boston.com/news/nation/articles /2010/01/27/witness_says_gay_marriage_would_help_children/. A statewide survey conducted by the Massachusetts Department of Public Health confirmed this conclusion, finding that the children of married same-sex couples "felt more secure and protected" and saw "their families as being validated or legitimated by society or the government." Christopher Ramos, et al., *The Effects of Marriage Equality in Massachusetts: A Survey of the Experiences and Impact of Marriage on Same-Sex Couples*, The Williams Institute, May 2009, at 9, http://williamsinstitute.law.ucla.edu/experts/lee-badgett/effects-marriage-equality-masurvey/.

Rather than encourage biological parents to raise their children together, exclusionary marriage laws only impede one set of parents—same-sex couples—in their efforts to provide their children with stable family environments.[9] *See*

---

[9] According to the 2010 Census, 17% of same-sex households (over 111,000) include at least one child. The Williams Institute, *United States Census Snapshot*: *2010*, at 3, http://williamsinstitute.law.ucla.edu/wp-content/uploads/Census 2010Snapshot-US-v2.pdf. (last visited Oct. 25, 2013). Many of these families live in states that offer no legal recognition to the couples. *See, e.g.*, Sabrina Tavernise,

14

*Goodridge*, 798 N.E.2d at 963-964 ("[T]he task of child rearing for same-sex couples is made infinitely harder by their status as outliers to the marriage laws."); *see also Baker*, 744 A.2d at 882; *Andersen v. King County*, 138 P.3d 963, 1018 (Wash. 2006) (Fairhurst, J., dissenting) ("children of same-sex couples . . . actually do and will continue to suffer by denying their parents the right to marry").  By depriving the children of same-sex couples of the benefits of being raised in a secure, protected, and respected family unit with two married parents, Nevada and Hawaii laws work against the states' efforts to "strengthen the modern family in its many variations."  *Goodridge*, 798 N.E.2d at 963 (collecting examples in Massachusetts).  Thus, these laws do not promote the well-being of children; they do just the opposite.

**B.    Same-Sex Parents Are As Capable As Different-Sex Parents Of Raising Healthy, Well-Adjusted Children.**

The implication that same-sex couples are somehow less suitable parents is contrary to the experience of the *Amici* States and scientific consensus.  A similar argument was advanced, and rejected, in *Loving*, when Virginia defended its anti-miscegenation law based on its concern for the well-being of children "who become the victims of their intermarried parents."  *See* Brief for Appellee, *Loving*

---

*Parenting by Gays More Common in the South, Census Shows*, N.Y. Times, Jan. 19, 2011, at A1.

*v. Virginia*, 388 U.S. 1 (1967) (No. 395), 1967 WL 113931, at *47-48. The argument likewise should be rejected here.

The overwhelming scientific consensus based on decades of peer-reviewed research establishes that children raised by same-sex couples fare as well as children raised by different-sex couples. ER 502, 508-510 (Lamb); *see also Fla. Dep't of Children & Families v. Adoption of X.X.G.*, 45 So.3d 79, 87 (Fla. Dist. Ct. App. 2010) ("[B]ased on the robust nature of the evidence available in the field, this Court is satisfied that the issue is so far beyond dispute that it would be irrational to hold otherwise."); *Varnum v. Brien*, 763 N.W.2d 862, 899 n.26 (Iowa 2009). In fact, the research that has directly compared gay and lesbian parents with heterosexual parents has consistently shown gay and lesbian parents to be equally fit and capable. ER 508-510 (Lamb). Numerous organizations representing mental health and child welfare professionals have confirmed that same-sex parents are as effective as different-sex parents at raising psychologically healthy and well-adjusted children.[10]

---

[10] These organizations include the most well-respected psychological and child-welfare groups in the nation: the American Academy of Pediatrics, the American Academy of Child and Adolescent Psychiatry, the American Psychiatric Association, the American Psychological Association, the Psychological Association, the American Psychoanalytic Association, the National Association of Social Workers, the Child Welfare League of America, and the North American Council on Adoptable Children.

In addition, there is no basis for the assertion that children need traditional male and female role models, or that children need mothers and fathers to perform distinct roles in their lives.[11] ER 505-507 (Lamb). These views are disconnected from the "changing realities of the American family." *Troxel v. Granville*, 530 U.S. 57, 63 (2000) (plurality) (recognizing that "[t]he composition of families varies greatly from household to household"). More importantly, courts have repeatedly rejected gender-based stereotyping by the government. *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 733-735 (2003) (finding that government action based on stereotypes about women's greater suitability or inclination to assume primary childcare responsibility is unconstitutional); *United States v. Virginia*, 518 U.S. 515, 533-34 (1996) (rejecting "overbroad generalizations of the different talents, capacities, or preferences of males and females" as justifying discrimination) (citations omitted); *Stanley v. Illinois*, 405 U.S. 645, 656-657 (1972) (striking down a statute that presumed unmarried fathers to be unfit custodians).

Nor is there any basis for the suggestion that children necessarily benefit from being raised by two biological parents. ER 513-514 (Lamb). The most

---

[11] Even if this were true, Nevada and Hawaii (like many other states) allow unmarried same-sex (and different-sex) couples to raise children. Thus, barring same-sex couples from marriage does nothing to advance the purported interest in ensuring traditional gender role-modeling.

important factors predicting the well-being of a child include (1) the relationship of the parents to one another, (2) the parents' mutual commitment to their child's well-being, and (3) the social and economic resources available to the family. ER 502-503 (Lamb). These factors apply equally to children of same-sex and different-sex parents, and they apply whether one, both, or neither of these parents is a biological parent.[12] The reality is that both different-sex and same-sex couples become parents in a variety of ways, including through assistive technology, surrogacy, and adoption, and it is in the states' interest to promote the well-being of all these families.

### C. Promoting Responsible Procreation Does Not Justify Restricting Marriage To Different-Sex Couples.

Singling out responsible procreation as the states' primary governmental interest advanced by marriage is fundamentally flawed. The argument requires the recognition of a restriction on marriage premised on the ability to procreate, and this notion is antithetical to our legal tradition. Never before has the ability or desire to procreate been a prerequisite for entry into marriage. ER 268 (Cott); *see*

---

[12] Of course, many children raised by same-sex parents are raised by one biological parent and his or her partner. Refusing to allow these couples to marry will not make it more likely that the biological parent will instead marry his or her donor or surrogate, for example.

*also In re Marriage Cases*, 183 P.3d at 431); *Turner v. Safley*, 482 U.S. 78, 95-96 (1987).

For example, while states have long allowed parties to void marriages where one spouse is physically incapable of intercourse, *e.g., Martin v. Otis*, 124 N.E. 294, 296 (Mass. 1919); *Ryder v. Ryder*, 28 A. 1029, 1030 (Vt. 1894), the inability to produce children has not itself been a grounds for annulment. *See e.g.*, *Lapides v. Lapides*, 171 N.E. 911, 913 (N.Y. 1930). Similarly, some states expressly presume infertility after a certain age for purposes of allocating property, but do not presume that these individuals are not qualified to marry. *See e.g.*, N.Y. Est. Powers & Trusts Law § 9-1.3(e) (women over age 55); Il. St. Ch. 765 § 305/4(c)(3) (any person age 65 or older). Individuals who are not free to procreate (prisoners, for example) still have the right to marry. *Turner*, 482 U.S. at 94-99. Even parents who are "irresponsible" about their obligations to their children have the right to marry. *Zablocki*, 434 U.S. at 389-391.

States have an interest in ensuring that couples make responsible choices about having children, as we all want children to be raised by loving, capable parents. However, that is not what opponents of same-sex marriage mean by "responsible procreation," and the challenged laws are not rationally related to the interest as they describe it. Opponents use the term "responsible procreation" to describe a narrow interest in sanctioning marriage to protect the biological children

19

of different-sex couples.  Considering this interest, Nevada's and Hawaii's recognition of different-sex marriages that do not or cannot produce biological children not only creates an "imperfect fit between means and ends," *Heller v. Doe*, 509 U.S. 312, 321 (1993), but pursues the supposed objective of promoting responsible procreation in a manner that "[makes] no sense in light of how [those states] treat other groups similarly situated in relevant respects."  *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 n.4 (2001), *citing Cleburne*, 473 U.S. at 447-450; *see also Romer*, 517 U.S. at 633 (invalidating discriminatory law because it is "at once too narrow and too broad").

Many different-sex couples either cannot procreate or choose not to, yet these marriage laws are concerned with none of them.  If it is the case that states only recognize marriage to further their interest in protecting the children born out of sexual intimacy, then it makes no sense to recognize marriages where one or both spouses are incapable or unwilling to bear children.  Instead, the reality is that states recognize marriage to advance many important governmental interests.  At the same time, states—and the courts—have also consistently recognized the autonomy to make personal choices about entry into marriage and procreation as a fundamental individual right, not to be restricted without compelling reason. *Lawrence,* 539 U.S. at 574; *M.L.B.,* 519 U.S. at 116; *Zablocki*, 434 U.S. at 384;

20

*Griswold,* 381 U.S. at 486.  Thus, states have never before restricted marriage rights based on procreative capabilities.

To save an incongruous rationale, some have argued that extending marriage to different-sex couples who lack the ability or desire to procreate nonetheless encourages responsible procreation by promoting the "optimal" or "ideal" family structure.  However, it defies reason to conclude that allowing same-sex couples to marry will diminish the example that married different-sex couples set for their unmarried counterparts.  Both different- and same-sex couples model the formation of committed, exclusive relationships, and both establish stable families based on mutual love and support.  At best, the "modeling" theory is so attenuated that the distinction it supposedly supports is rendered arbitrary and irrational.  *Cleburne*, 473 U.S. at 446.  At worst, the theory is a poorly disguised attempt to codify discriminatory views as to what constitutes an ideal family.  In light of Nevada's and Hawaii's extension of parental rights to gay men and lesbians, and their recognition of same-sex domestic partnerships and civil unions, it is difficult not to conclude that the only purpose for withholding the title of "marriage" is to send the discriminatory message that some families are simply inferior—a purpose the Constitution does not permit.  *U.S. Dep't of Agriculture v. Moreno*, 413 U.S. 528, 534-535 (1973) (bare desire to harm unpopular group is not a legitimate governmental interest).

21

### III.    SPECULATION ABOUT THE EROSION OF THE INSTITUTION OF MARRIAGE IS DEMONSTRABLY FALSE

Speculation that removing state restrictions on marriage between same-sex couples will erode the institution, as measured by the markers cited below—marriage, divorce, and nonmarital birth rates—does not justify discriminatory marriage laws.  Nor does allowing same-sex couples to marry preclude states from otherwise regulating marriage.  The experience of the *Amici* States who recognize same-sex marriage belies dire predictions about the future of marriage, and establishes that states can and do continue to impose reasonable restrictions on who may marry.

### A.    The Institution Of Marriage Remains Strong In States That Allow Same-Sex Couples To Marry.

The *Amici* States' experience with equal marriage rights should carry substantially more weight than surmise and conjecture in the constitutional analysis of the challenged laws.  *See, e.g.*, *Plyler*, 457 U.S. at 228-229 (rejecting hypothetical justifications for law excluding undocumented children as unsupported); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981) ("[P]arties challenging legislation under the Equal Protection Clause may introduce evidence supporting their claim that it is irrational[.]") (citation omitted).  And, the actual data show that the conjecture about the negative impact of same-sex marriage is unfounded.

22

1.    *Overall Marriage Rates*:  Marriage rates in states that permit same-sex couples to marry have generally improved.  Despite a pre-existing national downward trend in marriage rates, the most recent national data available (from 2011) indicate an increase—or, at minimum, a deceleration in the downward trend—in all seven states with marriage equality at the time (Connecticut, the District of Columbia, Iowa, Massachusetts, New Hampshire, New York, and Vermont).[13]

Typically, states have seen a significant increase in marriage rates during the first, and sometimes, second year after legalizing same-sex marriage.  For example, the marriage rate in Massachusetts jumped from 5.6 to 6.5 marriages per thousand residents (a 16.1% increase) in 2004, the first year same-sex couples could marry, and remained at 6.2 in 2005.  In Vermont, the marriage rate increased from 7.9 to 8.7 in the first year, and then rose again to 9.3.  In the District of Columbia, the marriage rate jumped from 4.7 to 7.6 (a 61.7% increase) in 2010, the first year marriage licenses were issued to same-sex couples.[14]

---

[13] Centers for Disease Control and Prevention, National Vital Statistics System, *Marriage Rates by State: 1990, 1995, and 1999-2011*, http://www.cdc.gov/nchs/data/dvs/marriage_rates_90_95_99-11.pdf (last visited Oct. 25, 2013) [hereinafter, CDC Marriage Rates].

[14] CDC Marriage Rates, *supra* note 13; Centers for Disease Control and Prevention, National Vital Statistics System, *National Marriage and Divorce Rate*

In Massachusetts, where marriage equality has been the law for nearly a decade, the marriage rate stabilized following the legalization of same-sex marriage, but remained higher than the national trend would otherwise predict. From 2005 to 2007, the average annual marriage rate (6.0) was higher than the average rate for the three years preceding same-sex marriage (5.9). Massachusetts' marriage rates for 2009 and 2010 were the same as the rate for 2003, the year before same-sex couples could marry. And, in six of the seven states that permitted same-sex couples to marry as of 2011, the marriage rate remained at or above the level it was the year preceding same-sex marriage. Meanwhile, the national average marriage rate declined steadily from 7.8 in 2005 to 6.8 in 2011. Thus, contrary to predictions, there appears to be a general *improvement* in marriage rates, or at least a deceleration of the national downward trend, in states allowing same-sex couples to marry.[15]

2. *Different-Sex Marriage Rates*: Although there are limited data available on different-sex marriage rates in particular, the data that are available do

---

*Trends 2000-2011*, http://www.cdc.gov/nchs/nvss/marriage_divorce_tables.htm (last visited Oct. 25, 2013) [hereinafter, CDC National Trends]; Chris Kirk & Hanna Rosin, *Does Gay Marriage Destroy Marriage? A Look at the Data*, Slate.com, May 23, 2012, http://www.slate.com/articles/double_x/doublex/2012/05/does_gay_marriage_affect_marriage_or_divorce_rates_.html [hereinafter, Kirk & Rosin] (last visited Oct. 25, 2013).

[15] Kirk & Rosin, *supra* note14; CDC Marriage Rates, *supra* note13.

not support the theory that same-sex marriage has a negative effect on different-sex marriage rates.[16]  To the contrary, it appears that rates of different-sex marriage in states licensing same-sex marriages are equivalent to rates in states that do not recognize same-sex marriage.[17]  In fact, in some states, the number of different-sex marriages increased in the years following the state's recognition of same-sex marriages.  In Connecticut, for example, the number of different-sex marriages increased by 2.2% from 2009 to 2012.[18]  In Iowa, the number of different-sex marriages also increased slightly in 2010 and 2011.[19]  In Massachusetts, the number of different-sex marriages in the first three years after the state began licensing same-sex marriage (2005-2007) was higher than it was in the year before (2003).[20]

---

[16] Alexis Dinno & Chelsea Whitney, *Same Sex Marriage and the Perceived Assault on Opposite Sex Marriage*, PloS ONE, Vol. 8, No. 6 (June 2013), http://www.plosone.org/article/info%3Adoi%2F10.1371%2Fjournal.pone.0065730 (last visited Oct. 25, 2013).

[17] Dinno & Whitney, *supra* note 16, at 5.

[18] Data provided by the Connecticut State Vital Records Office (July 2013).

[19] Iowa Department of Public Health, Bureau of Vital Statistics, *2010 and 2011 Vital Statistics of Iowa*, available at: http://www.idph.state.ia.us/apl/health_statistics.asp#vital (last visited Oct. 25, 2013).

[20] Certificate of Marriage data provided by the Massachusetts Registry of Vital Records and Statistics (July 2013).

3. *Divorce Rates*: The *Amici* States' experience directly contradicts the suggestion that allowing same-sex couples to marry leads to increased rates of divorce. In four of the seven states that allowed same-sex couples to marry as of 2011, divorce rates for the years following legalization stayed at or below the divorce rate for the year preceding it, even as the national divorce rate increased.[21] In Massachusetts, the divorce rate decreased from 2.5 per thousand residents in 2003 to as low as 2.0 in 2008, four years after legalization. Connecticut's divorce rate dropped from 3.4 in 2008 to 2.9 in 2010, a change of 14.7%. Similarly, Iowa, New Hampshire, and Vermont all saw significant drops in their divorce rates during the first year in which same-sex couples could marry. Iowa, for example, saw its lowest number of divorces since 1970.[22]

Moreover, as of 2011, six of the seven jurisdictions that permitted same-sex couples to marry (Connecticut, the District of Columbia, Iowa, Massachusetts, New York, and Vermont) had a divorce rate that was at or below the national average. In fact, four of the ten states with the lowest divorce rates in the country

---

[21] Kirk & Rosin, *supra* note 14.

[22] Centers for Disease Control and Prevention, National Vital Statistics System, *Divorce Rates by State: 1990, 1995, and 1999-2011*, http://www.cdc.gov/nchs/data/dvs/divorce_rates_90_95_99-11.pdf (last visited Oct. 25, 2013) [hereinafter, CDC Divorce Rates]; Rod Boshart Lee, *Marriages Up, Divorces Down in Iowa*, Sioux City Journal, July 23, 2010.

were states that allowed same-sex couples to marry. Iowa and Massachusetts had the lowest and third-lowest rates, respectively.[23]

　　　4.　　*Nonmarital Births*: The suggestion that allowing same-sex couples to marry will lead to an increase in nonmarital births is likewise unsupported. Massachusetts's nonmarital birth rate has been well below the national average for years, and that continued after same-sex couples began to marry. In fact, as of 2011, the most recent year for which data are available, five of the seven states that allowed same-same couples to marry (Connecticut, Iowa, Massachusetts, New Hampshire, and Vermont) had nonmarital birth rates below the national average.[24]

　　　The total number of births to unmarried women nationally increased from 1940 through 2008. Notably, it has declined since. The drop from 2010 to 2011 was the third consecutive decline, totaling 11% since 2008. During that same time period (2008-2011), seven states (including California) extended marriage to same-sex couples. There is simply no correlation between same-sex marriage and increases in nonmarital births. In fact, in Iowa, the percentage of women having children outside of marriage actually decreased from 35.2% in 2009, the first year

---

[23] CDC Divorce Rates, *supra* note 22; CDC National Trends, *supra* note 14; Kirk & Rosin, *supra* note 14.

[24] *See* Brady E. Hamilton, Joyce A. Martin, & Stephanie J. Ventura, *National Vital Statistics Reports, Birth: Preliminary Data for 2011*, Vol. 61, No. 5, Table I-1, Oct. 3, 2012 http://www.cdc.gov/nchs/data/nvsr/nvsr61_05_tables.pdf.

same-sex couples could marry, to 34.2% the following year.  The rate decreased

again in 2011 to 33.8%.[25]

### B. Allowing Same-Sex Couples To Marry Does Not Threaten The States' Ability To Regulate Marriage.

It is likewise not true that "once the link between marriage and procreation is

taken away," it becomes virtually impossible for states to limit entry to marriage in

any meaningful way.  *Jackson v. Abercrombie*, 884 F. Supp. 2d 1065, 1118 n.37

(D. Haw. 2012).  Rather, as *Loving* instructs, states simply may not circumscribe

access to marriage, and thus restrict a fundamental right, based on a personal trait

that itself has no bearing on one's qualifications for marriage.  States can continue

to exercise their sovereign power to regulate marriage subject to constitutional

guarantees and protections.

In *Loving*, the Supreme Court characterized Virginia's anti-miscegenation

laws as "rest[ing] solely upon distinctions drawn according to race," and

proscribing "generally accepted conduct if engaged in by members of different

races."  388 U.S. at 11.  Nevada and Hawaii marriage laws similarly restrict the

right to marry by drawing distinctions according to gender and by using that

---

[25] Hamilton, et al., *supra* note 24, at 3; Brady E. Hamilton, Joyce A. Martin, & Stephanie J. Ventura, *National Vital Statistics Reports, Birth:  Preliminary Data for 2009*, Vol. 59, No. 3, Table I-2, Dec. 21, 2010, http://www.cdc.gov/nchs/data/nvsr/nvsr59/nvsr59_03.pdf.

personal characteristic to define an appropriate category of marital partners. Focusing on this reliance on inherent, personal traits to regulate marriage illuminates the limiting principle that the district courts found lacking: states may not limit an individual's ability to enter into marriage or choice in spouse based on an inherent, personal characteristic that does not bear upon his or her capacity to consent to the marriage contract. Indeed, this focus on inherent characteristics is consistent with our legal tradition of considering suspect disparate treatment based on personal characteristics that typically bear no relationship to an individual's ability to perform or contribute to society.[26] *See, e.g., Frontiero v. Richardson*, 411 U.S. 677, 686-687 (1973).

Applying this principle, and removing gender from spousal restrictions, does not result in all groupings of adults having an equal claim to marriage. In furtherance of the interest in maintaining the mutuality of obligations between spouses, states may continue to lawfully limit the number of spouses one may have at any given time. Unlike race or gender, marital status is not an inherent trait, but rather is a legal status indicating the existence (or not) of a marital contract, the

---

[26] Although *Amici* States contend that sexual orientation discrimination should be subject to heightened scrutiny, it is not necessary to accept that Nevada and Hawaii laws involve suspect classifications for purposes of this analysis. The point here is not that these laws draw suspect lines, but that they draw upon a personal characteristic, unrelated to one's qualification for marriage (*i.e.*, ability to consent or current marital status), to define an individual's marriage choices.

presence of which renders a person temporarily ineligible to enter into additional marriage contracts. States similarly may continue to lawfully prohibit marriage between certain relatives in order to guard against a variety of public health outcomes. Consanguinity itself is not a personal trait, but rather defines the nature of the relationship between particular individuals and thus exists only when an individual is considered in relation to others. Finally, in order to protect children against abuse and coercion, states may regulate entry into marriage by establishing an age of consent.[27] Likewise, age is not an intrinsic trait, as it changes continually and the restriction is therefore temporary. Thus, even after gender is removed from consideration, other state regulations continue to advance important governmental interests and remain valid.

Nevada's and Hawaii's reliance on gender to regulate marriage is not saved by the argument that exclusionary marriage laws do not actually discriminate based on gender or sexual orientation because, in theory, gay men and lesbians have the same right to marry as heterosexual men and women. Opponents of same-sex marriage are not the first to argue that symmetry in a law's restrictions precludes a finding of invidious discrimination. In *Loving*, Virginia argued that because its anti-miscegenation laws punished people of different races equally, those laws,

---

[27] For similar reasons, states may regulate entry into marriage based on mental capacity because that bears upon an individual's ability to consent.

30

despite their reliance on racial classifications, did not constitute discrimination based on race.  388 U.S. at 8.  In reality, anti-miscegenation laws in Virginia and elsewhere were designed to, and did, deprive a targeted minority of the full measure of human dignity and citizenship by denying them the freedom to marry the partner of their choice.  Nevada and Hawaii marriage laws, if upheld, would achieve the same result.

The argument that Nevada and Hawaii laws do not discriminate fails to acknowledge the practical and symbolic significance of marriage, including the paramount importance of choice in one's spouse.  Quite simply, these laws prevent gay men and lesbians from fully realizing what the Supreme Court described as "one of the vital personal rights essential to the orderly pursuit of happiness by free men." *Loving*, 388 U.S. at 12.  This result is in clear conflict with our Constitution.

## CONCLUSION

For the foregoing reasons, the Court should reverse the judgments of the district courts below.

Respectfully submitted,

*/s/ Genevieve C. Nadeau*

MARTHA COAKLEY
  Attorney General
GENEVIEVE C. NADEAU*
JONATHAN B. MILLER
  Assistant Attorneys General
COMMONWEALTH OF MASSACHUSETTS
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
(617) 727-2200
genevieve.nadeau@state.ma.us

Dated: October 25, 2013        *Counsel of Record*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32</u>

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

    1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 29(d) because this brief contains 6,918 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

    2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Times New Roman in 14-point type.

      /s/ Genevieve C. Nadeau
*Counsel for Amici Curiae*

Dated:  October 25, 2013

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing *Brief of Massachusetts, California, Connecticut, Delaware, District of Columbia, Illinois, Iowa, Maine, Maryland, New Hampshire, New Mexico, New York, Oregon, Vermont, and Washington As Amici Curiae in Support of Appellants* with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 25, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

   /s/ Genevieve C. Nadeau
*Counsel for Amici Curiae*

Dated:  October 25, 2013