**Case Nos. 12-17668, 12-16995, and 12-16998**

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

BEVERLY SEVCIK, et al., *Plaintiffs-Appellants*,

v.

BRIAN SANDOVAL, et al., *Defendants-Appellees*, and

COALITION FOR THE PROTECTION OF MARRIAGE, *Intervenor-Defendant-Appellee*.

---

On Appeal from the United States District Court for the District of Nevada
Case No. 2:12-CV-00578-RCJ-PAL, The Hon. Robert C. Jones, District Judge.

---

NATASHA N. JACKSON, et al., *Plaintiffs-Appellants*,

v.

NEIL S. ABERCROMBIE, Governor, State of Hawai'i, *Defendant-Appellant*,

LORETTA J. FUDDY, Director, Department of Health, State of Hawai'i, *Defendant-Appellee*, and

HAWAII FAMILY FORUM, *Intervenor-Defendant-Appellee*.

---

On Appeal from the United States District Court for the District of Hawaii
Case No. 1:11-cv-00734-ACK-KSC, The Hon. Alan C. Kay, Sr., District Judge.

---

**BRIEF OF AMICUS CURIAE COLUMBIA LAW SCHOOL SEXUALITY
AND GENDER LAW CLINIC IN SUPPORT OF THE PLAINTIFFS-
APPELLANTS**

---

Rita F. Lin
Laura W. Weissbein
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Tel: 415.268.7000

Suzanne B. Goldberg
Columbia Law School Sexuality
and Gender Law Clinic
435 West 116th Street
New York, NY 10027
Tel: 212.854.0411

*Attorneys for Amicus Curiae Columbia Law School
Sexuality and Gender Law Clinic*

## FED. R. APP. P 26.1 CORPORATE DISCLOSURE STATEMENT

Amicus Curiae the Columbia Law School Sexuality and Gender Law Clinic states that it is not a corporation that issues stock and that it has no parent corporation.

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES .................................................................iv

INTEREST OF AMICUS CURIAE ..........................................................1

SUMMARY OF ARGUMENT ................................................................2

ARGUMENT ......................................................................................3

I.    THE CONSTITUTION REQUIRES EQUAL AND FAIR ACCESS
      TO FUNDAMENTAL RIGHTS REGARDING DEEPLY
      PERSONAL CHOICES ABOUT MARRIAGE AND FAMILY LIFE.........3

      A.    Under Both Equal Protection and Due Process, the Supreme
            Court Has Repeatedly Invalidated Laws that Unequally
            Restricted Access to the Fundamental Rights to Marry and
            Build a Family Life ...............................................................3

            1.    States May Not Deny Equal Access to the Fundamental
                  Right to Marry...........................................................4

            2.    States May Not Deny Equal Access to the Right to Make
                  Deeply Personal and Fundamentally Protected Decisions
                  About Building a Family ...........................................8

      B.    Redefining the Fundamental Right to Marry in a Manner that
            Excludes Gay Couples Cannot Satisfy the Due Process and
            Equal Protection Guarantees ...............................................11

II.   DENYING EQUAL ACCESS TO FUNDAMENTAL RIGHTS,
      EVEN OUTSIDE THE CONTEXT OF ASSOCIATIONAL RIGHTS,
      ROBS THOSE RIGHTS OF THEIR IMPORTANCE AND CORE
      MEANING ....................................................................................14

      A.    The Court's Due Process Jurisprudence in a Wide Range of
            Contexts Emphasizes that Equal Access Is a Foundational
            Element of Fundamental Rights.........................................14

# TABLE OF CONTENTS
## (continued)

Page

B.  The Court's Equal Protection Jurisprudence Likewise Emphasizes that Important Rights Lose Their Meaning When Equal Access to Those Rights Is Denied ...........................................17

III.  THE COURT'S RECENT DECISION IN WINDSOR, AND THE HISTORY OF THE FOURTEENTH AMENDMENT, BOTH CONFIRM THAT THE FUNDAMENTAL NATURE OF A RIGHT IS DEEPLY INTERTWINED WITH EQUAL ACCESS TO THAT RIGHT ..........................................................................................19

CONCLUSION ....................................................................................22

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ...................24

CERTIFICATE OF SERVICE ...........................................................25

sf-3343457

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Boddie v. Connecticut,*
   401 U.S. 371 (1971) ...........................................................................5, 6

*Bolling v. Sharpe,*
   347 U.S. 497 (1954) .....................................................................3, 15, 21

*Bowers v.Hardwick,*
   478 U.S. 186 (1986) ...........................................................................12

*Buchanan v. Warley,*
   245 U.S. 60 (1917).................................................................13, 15, 16

*Bush v. Gore,*
   531 U.S. 98 (2000).............................................................................17, 18

*Griffin v. Illinois,*
   351 U.S. 12 (1956)...........................................................................3, 16

*Griswold v. Connecticut,*
   381 U.S. 479 (1965) ...........................................................................12

*Harper v. Va. State Bd. of Elections,*
   383 U.S. 663 (1966) ...........................................................................18

*Hodgson v. Minnesota,*
   497 U.S. 417 (1990) .............................................................................4

*Lawrence v. Texas,*
   539 U.S. 558 (2003) ................................................................... passim

*Loving v. Virginia,*
   388 U.S. 1 (1967)...........................................................................6, 12

*M.L.B. v. S.L.J.,*
   519 U.S. 102 (1996) ...........................................................................3, 10

iv

*Meyer v. State*,
    107 Neb. 657 (1922)................................................................8, 9, 12

*Moore v. City of East Cleveland*,
    431 U.S. 494 (1977) ...................................................................8

*Pierce v.Society of Sisters*,
    268 U.S. 510 (1925) ..............................................................8, 9, 12

*Planned Parenthood of Southeastern Pa. v. Casey*,
    505 U.S. 833 (1992) ..................................................................3, 6

*Police Dep't of Chicago v. Mosley*,
    408 U.S. 92 (1972).....................................................................17

*Santosky v. Kramer*,
    455 U.S. 745 (1982) ...................................................................8

*Shapiro v. Thompson*,
    394 U.S. 618 (1969)..............................................................18, 20

*Smith v. Robbins*,
    528 U.S. 259 (2000) .................................................................16

*Turner v. Safley*,
    482 U.S. 78 (1987)...................................................................5, 12

*United States v. Windsor*,
    133 S. Ct. 2675 (2013)........................................................ passim

*Zablocki v. Redhail*,
    434 U.S. 374 (1978) .................................................................6, 7

### OTHER AUTHORITIES

Alexander M. Bickel, *The Original Understanding and the Segregation
    Decision*, 69 Harv. L. Rev. 1 (1955)...........................................21

Charles Fairman, *Does the Fourteenth Amendment Incorporate the Bill of
    Rights? The Original Understanding*, 2 Stan. L. Rev. 5 (1949)............21

v

Virginia L. Hardwick, *Punishing the Innocent: Unconstitutional Restrictions on Prison Marriage and Visitation*, 60 N.Y.U. L. Rev. 275 (1985) ........................5

Kurt T. Lash, *The Origins of the Privileges or Immunities Clause, Part II: John Bingham and the Second Draft of the Fourteenth Amendment*, 99 Geo. L.J. 329 (2011)......................................................................22

Kenji Yoshino, *The New Equal Protection*, 124 Harv. L. Rev. 747 (2011) ..............19

## INTEREST OF AMICUS CURIAE[1]

The Columbia Law School Sexuality and Gender Law Clinic (the Clinic or Amicus), founded in 2006, is the first such clinical law program at an American law school.  The Clinic has extensive expertise in the constitutional law related to marriage and family recognition.   Indeed, the Clinic previously submitted an amicus brief on related issues to this Court in *Perry v. Schwarzenegger* on behalf of the National Gay and Lesbian Task Force.   The Clinic has also submitted numerous other amicus briefs in cases seeking to end marriage laws' exclusion of same-sex couples, including in *United States v. Windsor* and *Perry v. Brown* at the U.S. Supreme Court, and before state supreme courts in California, Connecticut, and Iowa.  As developed below, the Clinic's interest here is in highlighting the interdependence of the equal protection and due process guarantees.  Together, as well as individually, these guarantees render impermissible Nevada's and Hawaii's singular burden on lesbian and gay couples who seek to exercise their fundamental right to marry.

---

[1] The parties have consented to the filing of this brief.  Counsel for the parties have not authored this brief.  The parties and counsel for the parties have not contributed money that was intended to fund the preparation or submission of this brief.  No person other than the amicus curiae or its counsel contributed money that was intended to fund preparation and submission of this brief.

1

## SUMMARY OF ARGUMENT

Decisions about who to marry and how to build one's family life lie at the intersection of the Constitution's equality and due process guarantees. It is not surprising, then, that the Supreme Court has recognized, in a broad set of equal protection *and* due process decisions, that states must provide their constituents with fair and equal access to exercise these fundamental rights.

Lesbian and gay couples are no exception to this rule. This is because fundamental rights are defined by the content of the protected conduct, not by *who* exercises those rights. Consequently, efforts to characterize the right at issue as inherently belonging only to heterosexuals are unavailing. They miss the central point of the extensive equal protection and due process jurisprudence in this area: that states cannot singularly burden some of their constituents' access to these well-protected, elemental aspects of human autonomy and civic participation. The Court's cases in a wide range of contexts—from voting rights to picketing and more—reinforce that unequal rules related to the exercise of fundamental rights are constitutionally intolerable.

Indeed, just months ago, when the Court held that "basic due process *and* equal protection principles" required invalidation of the Defense of Marriage Act's central provision, *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) (emphasis added), the decision built on many decades of decisions that recognized

2

the inevitable interdependence of equality and liberty protections. As the Court earlier observed, both clauses serve the same "central aim," *Griffin v. Illinois*, 351 U.S. 12, 17 (1956), and "both stem[] from our American ideal of fairness." *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

By denying lesbian and gay couples equal access to marriage, Nevada and Hawaii contravene this core understanding. At once, their selective restriction both diminishes the fundamental right to marry and violates core precepts of equal protection and due process.

## ARGUMENT

I. **THE CONSTITUTION REQUIRES EQUAL AND FAIR ACCESS TO FUNDAMENTAL RIGHTS REGARDING DEEPLY PERSONAL CHOICES ABOUT MARRIAGE AND FAMILY LIFE.**

   A. **Under Both Equal Protection and Due Process, the Supreme Court Has Repeatedly Invalidated Laws that Unequally Restricted Access to the Fundamental Rights to Marry and Build a Family Life.**

The Supreme Court has made clear that a person's freedom to choose whom to marry and how to build a family life is one of the most important elements of personal autonomy. "Choices about marriage, family life, and the upbringing of children are among associational rights . . . 'of basic importance in our society.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996); *see also Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 847-49, 851 (1992) (describing "personal

decisions relating to marriage" as among "the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy" and as "central to the liberty protected by the Fourteenth Amendment"). Although states have a legitimate interest in regulating marriage, any "regulation of [this] constitutionally protected decision[]" about "whom [to] marry[] must be predicated on legitimate state concerns other than disagreement with the choice the individual has made." *Hodgson v. Minnesota*, 497 U.S. 417, 435 (1990).

When confronted with laws that impose unequal burdens on these deeply personal, associational choices, the Supreme Court has also made its views clear: If the State offers access to a fundamental right, it must do so in a way that does not impose an unequal burden on a subset of its constituents, not only because of equal protection's strictures, but also because of the due process guarantee.

### 1. States May Not Deny Equal Access to the Fundamental Right to Marry.

The Supreme Court's numerous rulings requiring states to grant equal and fair access to the fundamental right to marry mean that states may not exclude disfavored subgroups from marriage.[2]

---

[2] This is the case whether or not the excluded group fits within a classification deemed suspect. As it happens, the classification at issue here, which excludes gay people from marrying their partners, discriminates based on both sex and sexual orientation and is therefore subject to heightened scrutiny. As this issue has been

4

In the due process case *Turner v. Safley*, 482 U.S. 78 (1987), for example, it was prisoners who were not permitted to marry. Even though prison inmates could have their associational rights—and even their rights within marriage—limited in other ways, the state could not constitutionally deny equal access to marriage itself. *Id.* at 86. It did not matter that the right to marry had not traditionally been extended to people in prison. *See* Virginia L. Hardwick, *Punishing the Innocent: Unconstitutional Restrictions on Prison Marriage and Visitation*, 60 N.Y.U. L. Rev. 275, 277-79 (1985). Instead, the Court rejected the proposition that the fundamental right to marry "does not apply to prison inmates," emphasizing that "inmate marriages, like others, are expressions of emotional support and public commitment" that "are an important and significant aspect of the marital relationship." *Turner*, 482 U.S. at 95-96.

Similarly, in *Boddie v. Connecticut*, 401 U.S. 371 (1971), a case focused on the termination of marriage, the Court struck down on due process grounds a rule that unequally restricted indigent individuals' exercise of that fundamental associational right. "[G]iven the basic position of the marriage relationship in this society's hierarchy of values and the concomitant state monopolization of the means for legally dissolving this relationship," the Court said, due process

---

ably addressed by Plaintiffs-Appellants and other supporting amici, *see, e.g.*, Brief for Plaintiffs-Appellants at 48-61, *Sevcik v. Sandoval*, No. 12-17688 (9th Cir. Oct. 18, 2013), amicus curiae does not repeat those arguments here.

"prohibit[s] a State from denying, solely because of inability to pay, access to its courts to individuals who seek judicial dissolution of their marriages." *Id*. at 374. That is, the due process guarantee forbids the state from enacting "laws that operate to jeopardize [this fundamental right] for particular individuals." *Id.* at 380.

Equal protection review of discriminatory marriage rules has echoed the Court's due process case law in this area by linking concerns regarding both inequality and invasions of fundamental rights. As the Court explained in *Zablocki v. Redhail*, 434 U.S. 374 (1978), a statute restricting marriage of a parent who owed back child support could not withstand equal protection review precisely because it imposed unequal barriers to the fundamental "right to marry." *Id.* at 384.

As the Court's foundational case in this area, *Loving v. Virginia*, 388 U.S. 1 (1967), makes the shared concern of the equal protection and due process guarantees even clearer with respect to unequal marriage rules. The "freedom of choice to marry may not be restricted," the Court wrote, adding that Virginia's law worked an "arbitrary and invidious discrimination" in access to a fundamental right. *Id.* at 10-12. That interracial marriage had been prohibited by statute in Virginia and other states for many years, and was believed by some to present a challenge to the very nature of marriage, could not justify this singular restriction on access to the marriage right. *See Planned Parenthood*, 505 U.S. at 847-48 ("[I]nterracial marriage was illegal in most States in the 19th century, but the Court

6

was no doubt correct in finding it to be an aspect of liberty protected against state interference. . . .").

As the Court later explained, *Loving* "could have rested solely on the ground that the [anti-miscegenation] statutes discriminated on the basis of race in violation of the Equal Protection Clause." *Zablocki*, 434 U.S. at 383. But it did not. *Loving* concluded that the race-based restriction also burdened the freedom to marry in a due process analysis infused with equal protection principles. As the Court explained, denying the fundamental right to marry "on so unsupportable a basis as . . . racial classifications . . . [that are] directly subversive of the principle of equality at the heart of the Fourteenth Amendment, is surely to deprive all the State's citizens of liberty without due process of law." *Id*. at 398 (Powell, J., concurring) (quoting *Loving*, 388 U.S. at 12.). Reiterating the baseline equality concern within due process analysis, the Court later added that "although *Loving* arose in the context of racial discrimination, prior and subsequent decisions of this Court confirm that the right to marry is of fundamental importance for *all* individuals." *Id*. at 384 (emphasis added).

2. **States May Not Deny Equal Access to the Right to Make Deeply Personal and Fundamentally Protected Decisions About Building a Family.**

As the Court has repeatedly explained, the Constitution's due process and equal protection guarantees protect the freedom to marry as one among several "aspects of what might broadly be termed 'private family life' that are constitutionally protected against state interference." *Moore v. City of East Cleveland*, 431 U.S. 494, 536 (1977) (citations omitted). These include "personal decisions relating to . . . procreation, contraception, family relationships, child rearing, and education." *Lawrence v. Texas*, 539 U.S. 558, 574 (2003) (quoting *Casey*). These kinds of decisions, like the decision to marry, are elemental to an individual's ability to "define the attributes of personhood." *Id.* For this reason, the Court has repeatedly found that "the Constitution demands . . . the autonomy of the person in making these choices." *Id.*; *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) ("[F]reedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment.").

The Court has consistently held, too, that this autonomy to decide how to structure one's family must be accessible to all. Put another way, the state may not grant this autonomy to some but not others. Two older cases, *Meyer v. Nebraska* and *Pierce v. Society of Sisters*, lay the groundwork for this proposition, making clear that the Court's due process jurisprudence is centrally concerned with

8

guaranteeing equal access to fundamental associational rights (there, the right of parents to control their children's upbringing).

In *Meyer*, the Court overturned a law that made it illegal to teach any language other than English to a student who had not yet completed eighth grade. *Meyer*, 262 U.S. 390, 396-97 (1923). Recognizing that the law's impact fell singularly on "those of foreign lineage," *id.* at 398 (citing the decision below, *Meyer v. State*, 107 Neb. 657, 662 (1922)), the Court stressed that "[t]he protection of the Constitution extends to all, to those who speak other languages as well as to those born with English on the tongue." *Id.* at 401. This fundamental associational right to "establish a home and bring up children" had to be available on an equal basis to the country's newest inhabitants as well as to its longtime residents. *Id.* at 399. Indeed, the Court's insistence on equal access to this associational right outweighed the state's proffered interest in establishing English as the primary language, *id.* at 401, an interest that was surely understood as central to American life at that time.

In *Pierce*, the Court likewise overturned, on due process grounds, a law that required all children to attend public schools because the law "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control." 268 U.S. 510, 534-35 (1925). In this case, the targets were religious minorities—specifically, Roman Catholics—who

9

maintained that the law "conflict[ed] with the right of parents to choose schools where their children will receive appropriate mental and religious training." *Id.* at 532. The states' refusal to allow those parents equal access to the right to decide how their children would be educated offended the "fundamental theory of liberty." *Id.* at 535.

Likewise, in *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996), the Court struck down a state-imposed fee to appeal a termination of parental rights because that fee unequally burdened the associational right of indigent people to be parents. *Id.* at 127.[3]  In so holding, the Court expressly recognized that "[d]ue process and equal protection principles converge" when state action restricts individual choices related to family formation. The invalidated fee requirement "fenc[ed] out would-be appellants based solely on their inability to pay core costs," defying the requirement of "essential fairness of the state-ordered proceedings" given the "intens[e] . . . individual interest at stake[.]" *Id.* at 120 (internal citations omitted). If there is a fundamental liberty interest involved—such as the fundamental parent-child relationship—the state must provide "equal justice" to all. *Id.* at 124.

---

[3] "We hold that, just as a State may not block an indigent petty offender's access to an appeal afforded others, so Mississippi may not deny M.L.B., because of her poverty, appellate review of the sufficiency of the evidence on which the trial court found her unfit to remain a parent." *Id.* at 107 (citations omitted).

sf-3343457

Same-sex couples and their deeply personal decisions about how to build a family life together are no exception to this rule. *Lawrence v. Texas*, 539 U.S. 558 (2003), holds that "the substantive guarantee of liberty" may not be infringed for same-sex couples any more than it can be infringed for heterosexual couples. In choosing to rely on due process to strike down a law that restricted the associational freedom of gay people with respect to personal choices about sexual intimacy, the Court affirmed that the due process guarantee, like the Equal Protection Clause, protects individuals' ability to exercise their fundamental rights on an equal basis with others. As the Court explained, "[p]ersons in a homosexual relationship may seek autonomy . . . just as heterosexual persons do" for "the most intimate and personal choices a person may make in a lifetime." *Id.* at 574-75.

**B.      Redefining the Fundamental Right to Marry in a Manner that Excludes Gay Couples Cannot Satisfy the Due Process and Equal Protection Guarantees.**

The district court's suggestion that the issue here is not the fundamental right to marry, but rather the "right to marry a person of the same sex," (ER 31), misses the central point of the decisions just discussed: that fundamental rights are defined by what conduct they protect, not by *who* can exercise them. If the district court's characterization were adopted, the Constitution's insistence on equal and fair access to fundamental rights would be eviscerated—states could restrict some

11

groups' exercise of fundamental rights and then revise those rights to render them available only to those not similarly burdened.

Refashioning the right at issue in any of the cases just discussed makes clear how unworkable a proposition this is. *Meyer*, for example, was not based on a fundamental right of Germans to raise their children in their own tradition, but rather on a general liberty interest of all parents in choosing how their children will be raised. *Pierce* did not describe a fundamental right to parent in a Catholic fashion, but rather a general liberty interest of all parents to choose how their children are educated. Likewise, *Turner* was not a case about "prisoner marriage" any more than *Loving* was about a fundamental right to "interracial marriage." Instead, these cases were about the fundamental right to marry. *Cf. Griswold v. Connecticut*, 381 U.S. 479, 486 (1965) ("Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, . . . a harmony in living, . . . a bilateral loyalty.").

Indeed, the Court's opinion in *Lawrence* directly corrected a similar rights-framing error in reversing *Bowers v. Hardwick*, 478 U.S. 186 (1986). In *Bowers*, the Court characterized the plaintiff's claim as seeking protection for "a fundamental right to engage in homosexual sodomy." *Id.* at 191. The *Lawrence* court flatly rejected that description as a mischaracterization of the right at issue. It

12

held that defendants Lawrence and Garner sought protection of their fundamental right to "the autonomy of the person" to make "the most intimate and personal choices . . . [that] are central to personal dignity and autonomy . . . [and] to the liberty protected by the Fourteenth Amendment . . . ." *Lawrence*, 539 U.S. at 574. That liberty right could not properly be understood as defined by the sex or sexual orientation of the parties who sought to exercise it.

In the same vein, the district court's speculation that equal access to marriage could cause heterosexual couples to "cease to value the civil institution," (ER 32), rests on the similarly impermissible reasoning that a fundamental right can be denied to some based on the preferences of others. Indeed, the court's reasoning is uncomfortably similar to the rationale advanced to defend racially restrictive covenants nearly a century ago. "It is said that such acquisitions [of property] by colored persons depreciate property owned in the neighborhood by white persons." *Buchanan v. Warley*, 245 U.S. 60, 82 (1917).

Rejecting this argument, the Supreme Court first made a practical point that could be similarly applicable here: "But property [marriage] may be acquired by undesirable white [heterosexual] neighbors or put to disagreeable though lawful uses with like results." *Cf. id*. Moreover, as further explained below, conditioning one group's access to a fundamental right based on the preference of another is

13

wholly contrary to longstanding doctrine recognizing the central importance of these rights.

## II. DENYING EQUAL ACCESS TO FUNDAMENTAL RIGHTS, EVEN OUTSIDE THE CONTEXT OF ASSOCIATIONAL RIGHTS, ROBS THOSE RIGHTS OF THEIR IMPORTANCE AND CORE MEANING.

Far from enhancing the value of the institution of marriage, the discriminatory exclusion of same-sex couples from equal access to the right to marry and to build a family life is inherently at odds with the foundational significance of those rights. In a variety of contexts, from voting to picketing to property ownership, the Supreme Court has emphasized that the guarantees of due process and equal protection work in tandem in the area of fundamental rights. Fundamental rights are universally shared because they are bound up with basic respect for human dignity and personal autonomy. Conversely, a right extended only to a select group, by nature, cannot be a central requirement of human liberty. As such, discriminatory denials of equal access to fundamental rights erode and undermine the value of those rights.

### A. The Court's Due Process Jurisprudence in a Wide Range of Contexts Emphasizes that Equal Access Is a Foundational Element of Fundamental Rights.

The Court has consistently held that due process rights can lose their meaning when not provided equally. For that reason, it has struck down unequal

14

restrictions on access to fundamental rights in areas as diverse as education, property ownership, suffrage, travel, and access to courts.

In the education context, for example, the Court emphasized the intertwined nature of equal protection and due process when it invalidated school segregation in the District of Columbia under the Fifth Amendment's Due Process Clause. *See Bolling*, 347 U.S. at 497. The Court observed that "discrimination may be so unjustifiable as to be violative of due process," *id.* at 499, recognizing too that "the concepts of equal protection and due process . . . both stem[] from our American ideal of fairness." *Id.* In other words, while "'equal protection of the laws' is a more explicit safeguard of prohibited unfairness than 'due process of law,'" both bring an inquiry motivated by an underlying constitutional commitment to governments' fair treatment of their constituents and both, therefore, are implicated by discriminatory laws. *Id.*

Similarly, in *Buchanan*, 245 U.S. at 60, the Supreme Court held that a racially discriminatory property law violated the Due Process Clause because discrimination undermines the fair and equal access that is the foundation of all fundamental rights. There, a Kentucky municipal ordinance prohibited property owners from selling their property to a person of a different race. *Id.* at 70. This "compulsory separation of the races on account of color" invaded the Due Process Clause's protection against "state interference with property rights," the Court

15

concluded. *Id.* at 81-82. Thus, this ordinance that annulled "the civil right of a white man to dispose of his property if he saw fit to do so to a person of color and of a colored person to make such disposition to a white person" failed constitutional review. *Id.*

Moreover, the Court has expressly recognized that, far from enhancing the value of a fundamental right, the discriminatory refusal to provide equal access to that right robs it of meaning. In invalidating a state law that required criminal defendants to pay for a transcript before they could appeal, the Court held that this type of discriminatory rule "would make the constitutional promise of a fair trial a worthless thing." *Griffin v. Illinois*, 351 U.S. 12, 17 (1956). "[I]nvidious discriminations between persons and different groups of persons" in criminal procedure offend not only equal protection but also due process, the Court wrote, because the fundamental right to a fair trial is meaningless unless it is equally available to all. *Id.* Indeed, the Court refused to distinguish between equal protection and due process in its ruling, concluding that "both equal protection and due process emphasize the central aim of our entire judicial system." *Id.*; *see also Smith v. Robbins*, 528 U.S. 259, 276 (2000) (in discussing *Griffin*, stressing that "the two Clauses largely converge" to require equal access to fundamental rights).

16

### B. The Court's Equal Protection Jurisprudence Likewise Emphasizes that Important Rights Lose Their Meaning When Equal Access to Those Rights Is Denied.

Turning to still other areas of the law, the Court's equal protection jurisprudence reinforces that states may not diminish fundamental rights by interfering with some constituents' exercise of those rights. The Court made this strikingly clear in the First Amendment context when it rejected, on equal protection grounds, an ordinance that permitted only a select group of picketers to voice their views near schools in Chicago. *See Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). Where the government offers space for speech that is "closely intertwined with First Amendment interests," *id.* at 95, the Court wrote, "government must afford all points of view an *equal opportunity* to be heard." *Id.* at 96 (emphasis added). Rejecting the city's expressed concerns about school disruption, the Court concluded that equal access must "[n]ecessarily" be granted for equal protection and First Amendment guarantees to retain their meaning. *Id.*

The Court reached a similar conclusion about voting rights in *Bush v. Gore*, 531 U.S. 98 (2000) (per curiam), concluding that the right to vote is undermined when not extended evenhandedly. When the Court invalidated Florida's statewide vote recount on equal protection grounds, it observed that "[t]he right to vote is protected in more than the initial allocation of the franchise" and that equal access to the exercise of that right is also essential for that fundamental right to be fully

17

protected.  *Id.* at 104.  While the decision rested on equal protection grounds, the Due Process Clause's protection of voting rights was central to its reasoning. As the Court explained, "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."  *Id.* at 105 (citation omitted).

In a range of other contexts, the Court has similarly stressed that equal access and the sanctity of fundamental rights go hand in hand—that is, if a right is fundamental, access to it must be equal.  To take two examples, consider the Court's invalidations of both the poll tax and a limitation on welfare benefits for new residents in a state.  Regarding the poll tax, the Court held that although poverty is not a suspect classification, a poll tax that rendered access unequal for low-income individuals would be an impermissible burden on a fundamental right. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966).  "[T]he right to vote," the Court wrote, "is too precious, too fundamental to be so burdened or conditioned."  *Id.* at 670.  Similarly, in *Shapiro v. Thompson*, 394 U.S. 618, 641 (1969), the Court recognized, again, that poverty was not a suspect classification but invalidated the length-of-residence restriction nonetheless.  The restriction imposed an unequal infringement "on the fundamental right of interstate movement," the Court wrote.  *Id.* at 638.

18

The infusion of equality concerns into Supreme Court evaluations of due process liberty claims and vice versa is not unique to the cases discussed here. As Professor Kenji Yoshino has observed, "Too much emphasis has been placed on the formal distinction between the equality claims made under the equal protection guarantees and the liberty claims made under the due process or other guarantees. In practice, the Court does not abide by this distinction." Kenji Yoshino, *The New Equal Protection*, 124 Harv. L. Rev. 747, 749-50 (2011). Instead, the Court has found that each clause furthers concerns shared by its counterpart in safeguarding equal access to important rights.

## III. THE COURT'S RECENT DECISION IN *WINDSOR*, AND THE HISTORY OF THE FOURTEENTH AMENDMENT, BOTH CONFIRM THAT THE FUNDAMENTAL NATURE OF A RIGHT IS DEEPLY INTERTWINED WITH EQUAL ACCESS TO THAT RIGHT.

The Court's invalidation of Section 3 of the federal Defense of Marriage Act (DOMA) in *United States v. Windsor*, 133 S. Ct. at 2675, and the history of the Equal Protection Clause, taken together, also make abundantly clear that equality and due process rights are inextricably linked.

In *Windsor*, the Court held that DOMA violated "basic due process and equal protection principles applicable to the Federal Government." *Id.* at 2693. More specifically, the Court held that DOMA deprived married gay people of their

"liberty of the person," a due process concept, while at the same time finding that DOMA's "disability on the class" of same-sex married couples served the impermissible "purpose . . . to impose inequality." *Id.* at 2694-96. In addition, although the litigants argued the case primarily on equal protection grounds, *see, e.g.*, Brief of Respondent on the Merits, *United States v. Windsor*, No. 12-307, at i (U.S. Feb. 26, 2013), the Court invoked the due process-based injury to dignity that it had found in *Lawrence*. *See Windsor*, 133 S. Ct. at 2692, 2694.

The Court also took pains to highlight in *Windsor* the well-settled understanding that equality and due process protections are linked structurally as well as conceptually, given that the Fifth Amendment's due process guarantee is the very source of "the prohibition against denying to any person the equal protection of the laws." *Id.* at 2695 (citing *Bolling*, 347 U.S. at 499-500; *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217-18 (1995)). *See also Shapiro*, 394 U.S. at 641-42 ("While the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is 'so unjustifiable as to be violative of due process.'") (citations omitted).

In addition to reflecting many decades of jurisprudence recognizing the guarantees' interdependence, *Windsor* also reflected the understanding of the Reconstruction Amendment's framers, as shown in the limited legislative history on this point, that protections for equality and due process were to be understood as

20

intertwined. Indeed, one of the few members of Congress to address the Equal Protection Clause's text during the debates over the Fourteenth Amendment, Illinois Representative John F. Farnsworth, *see* Alexander M. Bickel, *The Original Understanding and the Segregation Decision*, 69 Harv. L. Rev. 1, 47 (1955), called the Equal Protection Clause "surplusage" in light of the due process guarantee. Charles Fairman, *Does the Fourteenth Amendment Incorporate the Bill of Rights? The Original Understanding*, 2 Stan. L. Rev. 5, 50-51 (1949) (quoting Cong. Globe, 39th Cong., 1st Sess. 2539 (1865-66). He asked: How can "every subject of the Government . . . have and enjoy equal rights of 'life, liberty, and the pursuit of happiness' without 'equal protection of the laws?'" Then, answering his own question, he added: "This is so self-evident and just that no man whose soul is not too cramped and dwarfed to hold the smallest gem of justice can fail to see and appreciate it." *Id.*[4]

Representative John Bingham of Ohio, who introduced the equal protection language that was ultimately adopted, took a similar view of the interdependence of equality and due process guarantees. He believed "that some freedoms were so

---

[4] This idea of the Equal Protection Clause as "surplusage" is reinforced by *Bolling v. Sharpe* and numerous other cases that address unequal access to rights through the Fifth Amendment's Due Process Clause, including *United States v. Windsor*. Still, that question need not be reached here because the jurisprudence just discussed makes plain that equality and due process are, at the least, mutually reinforcing constitutional protections.

21

foundational that they belonged to all persons regardless of their status in society." Kurt T. Lash, *The Origins of the Privileges or Immunities Clause, Part II:  John Bingham and the Second Draft of the Fourteenth Amendment*, 99 Geo. L.J. 329, 346-47 (2011).  In Congress, he argued that while "[m]ere *political* or *conventional* rights are subject to the control of the majority," "natural or inherent rights . . . belong to all men irrespective of all conventional regulations." *Id*. at 347 nn. 79 & 80 (citing Cong. Globe 34th Cong., 3d Sess. app. at 139-40 (1857); Cong. Globe 35th Cong. 2d Sess. 983 (1859).)    He added:   "[T]his great principle of EQUALITY . . . must be to protect each human being within its jurisdiction in the free and full enjoyment of his natural rights."  *Id*. at 347 n. 79 (citing Cong. Globe 34th Cong., 3d Sess. app. at 139-40 (1857).)

## CONCLUSION

Equal protection and due process, both individually and together, do not permit states to deny lesbian and gay couples fair and equal access to the fundamental rights to marry and build a family life.  Far from advancing the institutions of marriage and family, the state law that grants the right to marry to some but not others demeans the right's fundamental character and robs that right of its core meaning.  For the foregoing reasons, amicus curiae respectfully submits

that the Court should reverse the district court opinions granting summary judgment in favor of the plaintiff-appellants.[5]

Dated: October 25, 2013                    Respectfully submitted,

                                           /s/ Suzanne B. Goldberg

Suzanne B. Goldberg                        Rita F. Lin
SEXUALITY AND GENDER LAW                   Laura W. Weissbein
CLINIC COLUMBIA LAW SCHOOL                 MORRISON & FOERSTER LLP
435 West 116th Street                      425 Market Street
New York, NY 10027                         San Francisco, California  94105-2482
Tel: 212.854.0411                          Tel:  415.268.7000

*Attorneys for Amicus Curiae, Columbia Law School*
*Sexuality and Gender Law Clinic*

---

[5] Amicus curiae acknowledges Columbia Law School students Rosie Wang and Sara Nies for their significant work on this brief.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,236 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman fourteen-point font with double-spacing in the text and fourteen-point font with single-spacing in the footnotes.

/s/ Suzanne B. Goldberg

24

## CERTIFICATE OF SERVICE

On October 25, 2013, I caused to be filed electronically, with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit, using the appellate CM/ECF system, the foregoing Brief for Amici Curiae.  I further certify that all parties in this case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Suzanne B. Goldberg

25