**Case No. 12-17668**

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

BEVERLY SEVCIK, et al.,
*Plaintiffs-Appellants*,

v.

BRIAN SANDOVAL, et al., *Defendants-Appellees*, and
COALITION FOR THE PROTECTION OF MARRIAGE,
*Intervenor-Defendant-Appellee*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEVADA, CASE NO. 2:12-CV-00578-RCJ-PAL,
HON. ROBERT C. JONES, DISTRICT JUDGE

---

**BRIEF OF *AMICI CURIAE* FAMILY LAW PROFESSORS
IN SUPPORT OF PLAINTIFFS-APPELLANTS**

---

Joan Heifetz Hollinger
John and Elizabeth Boalt
Lecturer-in-Residence
Berkeley School of Law
University of California
Berkeley, CA 94720


Courtney Joslin
Professor of Law
UC Davis School of Law
400 Mrak Hall Drive
Davis, CA 95616

KENDALL BRILL & KLIEGER LLP
*Laura W. Brill (Cal. Bar. # 195889)
Meaghan L Field (Cal. Bar. # 274130)
10100 Santa Monica Blvd, Suite 1725
Los Angeles, California  90067
Tel:    (310) 556-2700
Fax:    (310) 556-2705
Email:  lbrill@kbkfirm.com

*Counsel of Record*

# TABLE OF CONTENTS

**Page**

IDENTITY & INTEREST OF *AMICI CURIAE* ........................................................1

SUMMARY OF THE ARGUMENT ........................................................1

ARGUMENT ........................................................6

I.    Procreation Is Not A Necessary Element Of Marriage ..................................6

    A.    Marriage Serves Multiple Purposes, The Majority Of Which Are Not Related To Children ..................................7

    B.    The Constitutional Rights To Marry And To Procreate Are Distinct And Independent..................................9

II.    Nevada Law Belies Appellees' Claim That Nevada Believes That Different-Sex Couples Provide The "Optimal" Setting For Child-Rearing..................................11

    A.    Other Than Denying Same-Sex Parents Access To Marriage, Nevada Treats Same-Sex Parents And Different-Sex Parents Equally..................................12

    B.    Marriage Is Open To Virtually Any Different-Sex Couples, Irrespective Of Their Ability To Be "Optimal" Parents ..................................16

III.    Nevada's Marriage Ban Bears No Rational Relationship To Furthering "Responsible Procreation" By Different-Sex Couples..................................18

    A.    Many Children Are Directly *Harmed* By Nevada's Marriage Laws ..................................20

    B.    The Marriage Ban Is Not Rationally Or Reasonably Related To Furthering The Welfare And Well-Being Of Children Of Different-Sex Couples..................................22

    C.    Denying Rights And Protections To Children Is A Constitutionally Impermissible Means Of Influencing Their Parents' Behavior ..................................24

CONCLUSION ..................................27

i

# TABLE OF AUTHORITIES

**Page**

## STATUTES

29 U.S.C. § 2612(a)(1)(C) & (D)...................................................................8

8 U.S.C. § 1154(a)(1)(A)(i), (b), (c) ...........................................................8

Federal Rule of Appellate Procedure 29(b) ...............................................1

Federal Rule of Appellate Procedure 29(c)(5)............................................1

Federal Rule of Civil Procedure 29(a) ........................................................1

Nevada Revised Statute § 122.020(1).........................................................1

Nevada Revised Statute § 122A.100 ...........................................................1

Nevada Revised Statute § 122A.200 .........................................................14

Nevada Revised Statute § 122A.200(1)(d).............................................2, 12

Nevada Revised Statute § 122A.200(a), (d), (i) .......................................13

Nevada Revised Statute § 122A.200(d).....................................................12

Nevada Revised Statute § 123.010 ..............................................................7

Nevada Revised Statute § 125.010 .........................................................9, 10

Nevada Revised Statute § 125.480 ....................................................... 12, 13

Nevada Revised Statute § 125.480 (2).......................................................13

Nevada Revised Statute § 125B.020...........................................................26

Nevada Revised Statute § 126.031 .............................................................26

Nevada Revised Statute § 126.041 .............................................................12

Nevada Revised Statute § 126.051 .............................................................12

Nevada Revised Statute § 127.030 .............................................................13

Nevada Revised Statute § 127.220 .............................................................13

Nevada Revised Statute § 134.040-050 ........................................................7

Nevada Revised Statute § 18 ................................................................8, 14

Nevada Revised Statute § 19 ...................................................................8, 14

Nevada Revised Statute § 201.354 ..................................................19

Nevada Revised Statute § 24 ...........................................................8

Nevada Revised Statute § 286.541 ...................................................7

Nevada Revised Statute § 361.080 ...................................................7

Nevada Revised Statute § 440.280(5)(a) .........................................13

Nevada Revised Statute § 49.295 ....................................................7

Nevada Revised Statute § 616C.505 .................................................7

Nevada Revised Statute § 689B.540 .................................................7

## **STATE CASES**

*Arnold v. Arnold*
    604 P.2d 109 (Nev. 1979)...........................................................13

*Chambers by Cochran v. Sanderson*
    822 P.2d 657 (Nev. 1991)...........................................................26

*Garden State Equality v. Dow*
    2013 WL 5397372 *15 (N.J. Super. Ct. Sept. 27, 2013) ...............21

*Goodridge v. Dep't of Pub. Health*
    798 N.E.2d 941 (Mass. 2003)....................................... 16, 22, 28

*In re Forney's Estate*
    186 P. 678 (Nev. 1920)...............................................................25

*In re Marriage Cases*
    183 P.3d 384 (Cal. 2008)..........................................................9, 21

*Primm v. Lopes*
    853 P.2d 103 (Nev. 1993)...........................................................26

*St. Mary v. Damon*
    309 P.3d 1027 (Nev. 2013)........................................... 13, 14, 27

*Varnum v. Brien*
    763 N.W.2d 862 (Iowa 2009)........................................... 16, 17

*Willerton v. Bassham, by Welfare Div., State, Dep't of Human Res.*
    889 P.2d 823 (Nev. 1995)...........................................................26

## FEDERAL CASES

*Golinski v. U.S. Office of Personnel Management*
    824 F. Supp. 2d 968 (N.D. Cal. 2012)...........................................24

*Griswold v. Connecticut*
    381 U.S. 479 (1965)...........................................................................10

*Lawrence v. Texas*
    539 U.S. 558 (2003).............................................................................8

*Levy v. Louisiana*
    391 U.S. 68 (1968).............................................................................25

*Perry v. Schwarzenegger*
    704 F. Supp. 2d 921 (N.D. Cal. 2010).................................... 22, 24

*Sevcik v. Sandoval*
    911 F. Supp. 2d 996 (D. Nev. 2012) ..............................................19

*Sherrer v. Sherrer*
    334 U.S. 343 (1948)...........................................................................18

*Turner v. Safley*
    482 U.S. 78 (1987)...............................................................................9

*United States v. Windsor*
    133 S. Ct. 2675 (2013).......................................................................21

*Weber v. Aetna Cas. & Sur. Co.*
    406 U.S. 164 (1972) ..........................................................................25

*Zablocki v. Redhail*
    434 U.S. 374 (1978)...........................................................................17

## OTHER AUTHORITIES

Arlene Istar Lev, *Gay Dads: Choosing Surrogacy*, 7 LESBIAN & GAY
    PSYCHOLOGY REVIEW 72 (2006) ..................................................15

Charles H. Whitebread, *Freeing Ourselves from the Prohibition Idea in the
    Twenty-First Century*
    33 Suffolk U. L. Rev. 235 (2000).....................................................19

Courtney G. Joslin, *Modernizing Divorce Jurisdiction: Same-Sex Couples
    and Minimum Contacts*
    91 B.U. L. Rev. 1669 (2011) ...........................................................10

Encyc. of Contemp. Am. Soc. Issues 1182
    (Michael Shally-Jensen ed., 2011) ...................................................9

Gary J. Gates, Same Sex and Different Sex Couples in the American
Community Survey: 2005-2011 (Williams Institute, 2013)
http://williamsinstitute.law.ucla.edu/wp-content/uploads/ACS-
2013.pdf ..................................................................................................20

Gilman M. Ostrander, Nevada:
The Great Rotten Borough, 1859-1964, ix (1966) .......................................18

Melissa Murray, *Marriage As Punishment*,
112 Colum. L. Rev. 1, 33 n.165 (2012) ........................................................25

Michael L. Eisenberg M.D. *et al.*
*Predictors of not Pursuing Infertility Treatment*
*After an Infertility Diagnosis: Examination of a Prospective U.S.*
*Cohort*
94 Fertility & Sterility 2369, 2369 (2010) .....................................................9

Susan Donaldson James, *More Gay Men Choose Surrogacy to Have*
*Children*, ABC News
http://abcnews.go.com/Entertainment/OnCall/story?id=4439567&
page=1 (last accessed Feb. 21. 2013) ..........................................................15

## IDENTITY & INTEREST OF *AMICI CURIAE*

Pursuant to Federal Rule of Appellate Procedure 29(b), *Amici Curiae*[1]—all scholars of family law—respectfully submit this brief in support of Appellants.[2] Specifically, *Amici* wish to provide the Court with a reliable exposition of Nevada law, as expressed both through statutes and case authorities, with respect to marriage, parentage, and the well-being of children—all of which are central to the issues now before the Court.[3]

## SUMMARY OF THE ARGUMENT

Article I, Section 21 of the Nevada Constitution and Nevada Revised Statutes section 122.020(1) (collectively "marriage ban") preclude same-sex couples from entering civil marriage in Nevada and deny recognition to marriages that same-sex couples have validly entered elsewhere. At the same time, however, Nevada permits same-sex couples to enter into registered domestic partnerships. Nev. Rev. Stat. § 122A.100. Couples in registered domestic partnerships have nearly all of the tangible rights and obligations under state law that married couples

---

[1] *Amici* professors are listed in Appendix A.

[2] Pursuant to Federal Rule of Appellate Procedure 29(c)(5), no counsel for any party authored this brief in whole or in part, and no party or counsel for any party made a monetary contribution intended to fund the preparation or submission of this brief. The parties' consent letters have been filed with the Clerk's office. *See* Fed. R. App. Proc. 29(a).

[3] *Amici* agree with Appellants that heightened scrutiny should be applied in this case and that under any standard of review the Nevada marriage ban is unconstitutional.

have, including equal rights and responsibilities with respect to children born into the relationship. The statute provides, for instance, that the "rights and obligations of domestic partners with respect to a child of either of them are the same as those of spouses." Nev. Rev. Stat. § 122A.200(1)(d).

Among their purported justifications for the marriage ban, Appellees argue that it furthers a state interest with regard to child well-being and child welfare in two primary ways. First, Appellees argue that the marriage ban encourages heterosexual couples to bear and raise children in the "optimal" environment for child rearing, which is (they claim) a home with a married biological father and mother. Second, Appellees argue that the marriage ban encourages different-sex couples to marry and thus provide a stable home for their often "accidentally procreated" biological offspring.

Appellees' claims are in direct conflict with Nevada law related to marriage, parentage and child welfare. Like other states, Nevada's marriage laws serve myriad purposes, including an interest in providing a stable, nurturing, and enduring environment for ***all*** children regardless of how they were conceived. Nevada has recognized that this goal is equally achievable by same-sex and different-sex couples.

Appellees' emphasis on the significance of biological and genetic relationships between parents and children, and the need for parents of different

sexes, flatly contradicts Nevada law, which does not view biology as the sole criterion for parentage and rejects the notion that the gender of parents is legally relevant. Indeed, Nevada law supports parenting by same-sex couples. With respect to biology, Nevada law facilitates the adoption of non-biological children and supports procreation through assisted reproduction with donated genetic material or gestational surrogacy, without regard to the marital status, gender, or sexual orientation of the intended parent or parents. Moreover, Nevada views a child's social and emotional ties to parental caregivers as so important that they can at times trump biological connections.

Appellees' single-minded focus on procreation and childrearing is inconsistent with Nevada public policies supporting marriage. Nevada recognizes that individuals enter into marriage for many reasons, including a desire for mutual economic and financial support, and to have public acknowledgment and respect for their private choices to integrate their lives with someone they love. Nevada neither limits marriage to those who can or want to have children, nor screens candidates for marriage based on their suitability to be parents. The only class of individuals excluded from marriage is the class of individuals who wish to marry someone of the same sex.

Appellees' claim that denying same-sex couples access to marriage is necessary to encourage different-sex couples to marry, cuts totally against

3

Nevada's policies regarding same-sex couples and their children. In addition to barring access to certain tangible state benefits, the exclusion from marriage means that same-sex couples and their children are denied access to many hundreds of substantial benefits under federal law. Moreover, by categorically excluding all same-sex couples from enjoying the legal status of marriage, the Nevada marriage ban sends the message that the relationships of same-sex couples are unequal to those of different-sex couples.

This stigmatizing message affects not only same-sex couples but also the children they raise. Appellees' defense of Nevada's marriage ban reduces to the idea that same-sex couples and their children may be disadvantaged and stigmatized in order to induce better behavior by heterosexual couples. Yet, both Nevada authorities and the U.S. Supreme Court have long recognized that it is not constitutionally permissible to punish children in order to influence adult behavior.

In fact, Appellees' "responsible procreation" theory bears a striking similarity to the rationales once used to support now-abandoned laws that branded children as "illegitimate." In addition to this negative label, children born to unwed mothers were deprived of important legal rights in order to shame their parents into marriage. Nevada and the U.S. Supreme Court no longer permit treatment of some children as more deserving of care, support and protection than other children.

Appellees' responsible procreation theory also has no basis in logic or social experience. There is no reason to think, and certainly no evidence, that including same-sex couples in the institution of marriage would cause heterosexual couples to shun marriage. For this reason, Nevada's marriage exclusion cannot be viewed as having a rational basis in encouraging heterosexual couples to marry.

In sum, the purported state interests that Appellees and their *amici* rely on to justify disparate treatment of opposite-sex and same-sex couples do not reflect the policies that Nevada law pursues regarding marriage, parentage, and the best interests of children. Indeed, Appellees have not produced one shred of evidence from Nevada family law or policy, other than the marriage exclusion itself, to substantiate their largely speculative claims. Viewed in the context of Nevada's policies towards children and families, Appellees' arguments make no sense. And, under the federal Constitution, Appellees' theories do not provide a rational basis for denying same-sex couples the right to marry and relegating them to a separate but unequal legal status denominated "registered domestic partner."

# ARGUMENT

The core of Appellees' arguments is that Nevada's marriage ban serves the legitimate state interest of protecting the welfare of children.[4] It does so in two ways, they claim. First, Appellees argue that the marriage ban encourages heterosexual couples to bear and raise children in the "optimal" environment for child rearing, which they allege is a home with a married biological father and mother. Second, Appellees argue that the marriage ban encourages different-sex couples to marry and thus provide a stable home for their often "accidentally procreated" biological offspring.

The Appellees' argument fails on multiple levels.

## I.    Procreation Is Not A Necessary Element Of Marriage

As a preliminary matter, both the optimal parenting and the responsible procreation arguments are implicitly premised on a claim that the core or primary purpose of marriage is to encourage the raising of children in families with their married, biological mothers and fathers. This underlying premise, however, is inconsistent with state and federal law.

---

[4] Protecting the welfare of children is a legitimate, indeed it is a compelling, state interest. As *Amici* demonstrate herein, however, there is no rational connection between the marriage ban and this interest.

6

### A.    Marriage Serves Multiple Purposes, The Majority Of Which Are Not Related To Children

State and federal law make clear that marriage serves multiple purposes, the vast majority of which focus on enabling the spouses to protect and foster their personal and financial relationship *to one another*.  Under state law, married couples receive many protections and benefits and assume mutual responsibilities pertaining, for instance, to health care decisions, workers' compensation and pension benefits, property ownership, spousal support, inheritance, taxation, insurance coverage, and testimonial privileges.  *See, e.g.,* Nev. Rev. Stat. § 49.295 (spousal testimonial privilege); *id.* § 123.010 *et seq.* (establishing property and support rights and obligations of spouses); *id.* § 134.040-050 (intestate succession rights of surviving spouse); *id.* § 286.541 (requiring statement from spouse for public employee application for retirement allowance); *id.* § 287.021 (insurance eligibility rights for surviving spouse of police officer or firefighter killed in line of duty); *id.* § 361.080 (tax exemption for property of surviving spouse); *id.* § 616C.505 (spousal death benefits where spouse injured or killed in the course of employment); *id.* § 689B.540 (permitting enrollment of spouse in insurance plan during "special enrollment" period following marriage).  Likewise, in the more than 1,000 references to marriage under federal law, Congress recognizes myriad purposes of marriage, most of which have nothing to do with the ability or willingness to bring children into a family.  *See, e.g.,* 29 U.S.C. § 2612(a)(1)(C) &

(D) (permitting an employee to take leave to care for a seriously ill spouse);

8 U.S.C. § 1154(a)(1)(A)(i), (b), (c) (permitting a citizen to petition for an

"immediate relative" visa for a non-citizen spouse).

Moreover, the marital benefits provisions of state and federal law that *do*

relate to children and childrearing are not dependent upon a biological parent-child

relationship. Indeed, some of these provisions explicitly encourage the formation

of parent-child relationships in the absence of a biological connection. *See, e.g.,*

Nev. Rev. Stat. § 127.003, *et seq.* (providing for adoption and foster care

placement); *and id.* § 126.041 (parent-child relationship may be established in

several ways); *see also* Act of May 28, 2013, §§ 18–19, 24, Nevada Laws Ch. 213

(A.B. 421) (revising provisions relating to assisted reproduction, including

defining parentage of a child conceived by assisted reproduction).

As explained more fully in Plaintiff-Appellants' Opening Brief, Appellees'

claim that the right to marry is inextricably intertwined with procreation is wrong.

Nevada, like all other states, has never required prospective spouses to agree to

procreate, to remain open to procreation, or even to be able to procreate. *See, e.g.,*

*Lawrence v. Texas*, 539 U.S. 558, 604 (2003) (Scalia, J., dissenting). Likewise,

infertility is not a basis for invalidating a marriage.[5] *See, e.g., In re Marriage*

---

[5] Data from 2002 show that approximately seven million women and four million men suffer from infertility. Michael L. Eisenberg M.D. *et al., Predictors of not Pursuing Infertility Treatment After an Infertility Diagnosis: Examination of a*

*Cases*, 183 P.3d 384, 431 n.48 (Cal. 2008) ("[N]o case has suggested that an inability to have children—when disclosed to a prospective partner—would constitute a basis for denying a marriage license or nullifying a marriage"); *see also* Nev. Rev. Stat. § 125.010 (listing causes for divorce; infertility not included).

### B.    The Constitutional Rights To Marry And To Procreate Are Distinct And Independent

Moreover, as a matter of constitutional law, the U.S. Supreme Court made clear in *Turner v. Safley*, 482 U.S. 78 (1987), that individuals cannot be excluded from the right to marry simply because they are unable to engage in procreation. There, the Court struck down a Missouri regulation under which approval of a prison inmate's marriage was generally given only when a pregnancy or the birth of an out-of-wedlock child was involved. *Id*. at 82, 96–97. The Court recognized that incarcerated prisoners—even those with no right to conjugal visits, and thus no opportunity to procreate—have a fundamental right to marry, because many "important attributes of marriage remain, . . . after taking into account the limitations of prison life." *Id*. at 95. The Court also explained that marriage has multiple purposes unrelated to procreation, such as "the expression of emotional support and public commitment," "exercise of religious faith," "expression of personal dedication," and "the receipt of government benefits." *Id*. at 95–96. The

---

*Prospective U.S. Cohort,* 94 Fertility & Sterility 2369, 2369 (2010). Approximately two to three million couples are infertile. Encyc. of Contemp. Am. Soc. Issues 1182 (Michael Shally-Jensen ed., 2011).

Supreme Court has also held that married couples have a constitutionally protected right to engage in non-procreative sexual intimacy. *See, e.g., Griswold v. Connecticut*, 381 U.S. 479 (1965).

Likewise, "no-fault" divorce laws—which are now enacted in every state, including Nevada, *see* Nev. Rev. Stat. § 125.010—reflect the principle that the right to marry is not dependent upon the ability to procreate, as they focus on the failure of the spousal relationship as the basis for divorce and say nothing about procreation or infertility. *See, e.g.*, *id.* (listing "insanity," non-cohabitation for at least a year, and "incompatibility" as the causes for divorce in Nevada); Courtney G. Joslin, *Modernizing Divorce Jurisdiction: Same-Sex Couples and Minimum Contacts*, 91 B.U. L. Rev. 1669, 1704 (2011) ("no-fault divorce" means that a divorce can be obtained solely on the basis of the breakdown of the marital relationship without a showing of fault or misconduct).

In sum, the lack of a procreation-based foundation for valid marriage or divorce renders implausible Appellees' contention that the core purpose of marriage is and has been to encourage and protect families with biologically procreated children.

## II. Nevada Law Belies Appellees' Claim That Nevada Believes That Different-Sex Couples Provide The "Optimal" Setting For Child-Rearing

Appellees argued before the district court that it is permissible for the Nevada marriage ban to limit marriage to different-sex couples because families headed by two married biological parents of different genders provide the "optimal" environment in which to raise children. A number of Appellees' *amici* continue not only to press the claim that heterosexual, biological parents provide the optimal environment for rearing children, but also to assert that parenting by same-sex couples is sub-optimal. However, as Plaintiffs-Appellants and some of their *amici* demonstrate, these claims about optimal parenting are directly contradicted by the available social science data. *See* Amicus Curiae Brief Of American Psychological Association, et al.; *and* Amicus Curiae Brief Of The American Sociological Association On Behalf Of Appellants.

Appellees' contentions are also flatly contrary to Nevada law. There is nothing in Nevada law that reflects or implements Appellees' argument that the allegedly "optimal" environment for raising children is confined to families headed by different-sex married couples.

### A. Other Than Denying Same-Sex Parents Access To Marriage, Nevada Treats Same-Sex Parents And Different-Sex Parents Equally

Nevada law and policy do not consider being raised by different-sex parents superior to being raised by parents of the same sex. With the sole exception of the exclusion from marriage, Nevada law fully supports and facilitates the choice of same-sex couples to have children. The State regards gender and sexual orientation as impermissible bases for making decisions about children. *See* Nev. Rev. Stat. § 125.480. Moreover, Nevada law makes clear that there are many ways to establish a legal parent-child relationship, and that a biological relationship is not a prerequisite. *See, e.g.*, Nev. Rev. Stat. § 122A.200(1)(d) (rights and obligations of domestic partners with respect to a child of either of them are the same as those of spouses); *id.* § 126.041 (stating that both the mother-child and father-child relationships may be established, *inter alia*, by consent to assisted reproduction or by gestational agreement); *id.* § 126.051 (setting forth various presumptions regarding paternity, including presumptions applicable to unmarried fathers).

Current and former domestic partners in Nevada are expressly afforded the same rights and charged with the same responsibilities with respect to their children as are current and formerly married couples. *See* Nev. Rev. Stat. § 122A.200(d) ("The rights and obligations of domestic partners with respect to a

child of either of them are the same as those of spouses."). Registered domestic partners are also permitted to put both partners' names on a child's birth certificate. *See* Nev. Rev. Stat. § 122A.200(a), (d), (i); *id.* § 440.280(5)(a). As the Nevada Supreme Court recently declared, Nevada law and public policy indicate that "children of same-sex domestic partners bear no lesser rights to the enjoyment and support of two parents than children born to married heterosexual parents." *St. Mary v. Damon*, 309 P.3d 1027, 1033 (Nev. 2013).

In addition, Nevada laws and guidelines regarding child custody, visitation, adoption, and foster care do not give a preference to heterosexuals, *see* Nev. Rev. Stat. § 125.480 (custody decisions); *id.* § 127.030 (adoption); *id.* § 127.220 *et seq.* (foster care placement); or to one gender over the other. In these areas, the State is often involved in choosing between parents or choosing new parents for a child, and in doing so, the child's best interest is the paramount concern. Nev. Rev. Stat. § 125.480(1)(1) (best interest of child is sole consideration of the court in custody determination). Nevada law explicitly prohibits courts from giving any preference in such determinations "to either parent for the sole reason that the parent is the mother or the father of the child." Nev. Rev. Stat. § 125.480 (2). Moreover, Nevada courts have long warned against using gender-role stereotypes as a basis for custody determinations between two parents. *See, e.g., Arnold v. Arnold*, 604 P.2d 109, 110 (Nev. 1979) ("The touchstone of all custody determinations is the

13

best interests of the child; the foundation of these determinations is the particular facts and circumstances of each case.  A preference for one parent over the other, solely on the basis of the parent's sex, has no place in this scheme.").

Appellees' assertion that Nevada has a preference for children being raised by their heterosexual biological parents is likewise contradicted by Nevada law. As the Nevada Supreme Court recently declared, "a determination of parentage rests upon a wide array of considerations rather than genetics alone." *St. Mary*, 309 P.3d at 1032.  For example, Nevada laws facilitate the use of alternative reproductive technologies and surrogacy.  Under Nevada law, individuals can be legal parents even in the absence of a genetic relationship, and people who are genetically related to children are not necessarily their legal parents. *See, e.g.*, Act of May 28, 2013, § 18, Nevada Laws Ch. 213 (A.B. 421) (providing that a donor of gametes or embryos is not a legal parent); *id.* § 19 (providing that a person who intends to be a legal parent of a child born through assisted reproduction is a legal parent even in the absence of a genetic relationship).  These laws do not turn on the marital status, gender, sexual orientation, or genetic connection of the intended parent or parents; indeed, registered domestic partners are expressly included in the statutory scheme. *See id.*; *see also* Nev. Rev. Stat. § 122A.200.  Accordingly,

Nevada law recognizes that a child born through assisted reproduction may have two legal mothers, even in the absence of an adoption.[6]

Contrary to Appellees' claim that the State of Nevada has a particular interest in furthering the well-being of children being raised by their married, biological parents, Nevada law and public policy are clear that "the preservation and strengthening of family life is part of a public policy of this State," and, further, that this policy applies equally to all families, including those headed by same-sex parents. *St. Mary*, 309 P.3d at 1033 (quoting Nev. Rev. Stat. § 128.005(1)) (holding that a woman may be a legal parent of a child born to her same-sex partner).

In sum, Appellees' "optimal" child-rearing argument is not supportable, as it is inconsistent with Nevada law. Its sole function in the context of Appellees' efforts to justify the marriage ban, is to cast unwarranted aspersions on the childrearing capacities of same-sex couples. *See Goodridge v. Dep't of Pub.*

---

[6] Same-sex couples becoming parents through assisted reproductive technology are not limited to lesbians. Male couples are increasingly using surrogacy to father children. *See* Arlene Istar Lev, *Gay Dads: Choosing Surrogacy*, 7 LESBIAN & GAY PSYCHOLOGY REVIEW, 72, 72 (2006) ("gay men are also taking charge of their own biological potential and becoming fathers in unprecedented numbers through surrogacy arrangements"); Susan Donaldson James, *More Gay Men Choose Surrogacy to Have Children*, ABC News, available at http://abcnews.go.com/Entertainment/OnCall/story?id=4439567&page=1 (last accessed Feb. 21. 2013) (recognizing growing trend of male couples having children through surrogates and noting that "'[j]ust because your son is gay, doesn't mean you can't be a grandparent'").

*Health*, 798 N.E.2d 941, 964 (Mass. 2003) ("Excluding same-sex couples from civil marriage will not make children of opposite-sex marriages more secure, but it does prevent children of same-sex couples from enjoying the immeasurable advantages that flow from the assurance of a stable family structure in which children will be reared, educated, and socialized." (internal quotation marks omitted)); *Varnum v. Brien*, 763 N.W.2d 862, 901 (Iowa 2009) ("[T]he statute reveals it is less about using marriage to achieve an optimal environment for children and more about merely precluding gay and lesbian people from civil marriage.").

### B.    Marriage Is Open To Virtually Any Different-Sex Couples, Irrespective Of Their Ability To Be "Optimal" Parents

Appellees argue that same-sex couples should be excluded from marriage because the marriage laws seek to channel children into the optimal parenting setting. This claim is inconsistent with Nevada law and policy and is unsupported by social science evidence. As demonstrated above, Nevada law considers same-sex couples to be equal to opposite-sex couples as parents.

Moreover, the exclusion of same-sex couples from marriage cannot be justified on the basis of parental characteristics. In Nevada, as in all other states, the suitability of potential marriage partners to be parents is not a factor in access to marriage. Marriage is open to virtually everyone in Nevada, except gay and lesbian people, regardless of their potential qualifications as a parent. For that

reason, the marriage exclusion cannot be viewed as serving a legitimate state interest in optimal child-rearing by heterosexual couples raising their own biological children.

Similarly, the U.S. Supreme Court has recognized that whether members of a couple would be good parents, or whether they could even provide support for children, are not constitutionally permissible bases upon which to deny them the right to marry. The Court's decision in *Zablocki v. Redhail*, 434 U.S. 374 (1978), is instructive on this point. In *Zablocki*, Wisconsin sought to deny the right to marry to parents the state considered to be irresponsible because they had failed to pay child support, but the Court held that conditioning marriage on a person's parenting conduct was an unconstitutional infringement of the right to marry. *Id.* at 386, 388–89. In this vein, courts have rejected the "optimal" child-rearing theory in part because marriage is not and cannot be restricted to individuals who would be "good" parents. *See, e.g.*, *Varnum v. Brien*, 763 N.W.2d 862, 900 (Iowa 2009) (noting that Iowa did "not exclude from marriage other groups of parents— such as child abusers, sexual predators, parents neglecting to provide child support, and violent felons—that are undeniably less than optimal parents").

The optimal parenting argument is particularly misplaced in this case. Not only does Nevada permit and encourage marriage without regard to procreative capacity, but historically, Nevada has allowed couples to marry and divorce faster

17

and with fewer bureaucratic hurdles than any other state in the country. *See* Gilman M. Ostrander, Nevada: The Great Rotten Borough, 1859-1964, ix (1966) (describing "the quick-divorce and quick-marriage businesses, which by the early years of the Great Depression had developed themselves into an economic mainstay of the state"); *id.* at 206 ("[By 1940,] Nevada offered instant marriage, around the clock, at a cost of only two dollars for a marriage license and a small donation to the justice of the peace or minister."). Even the U.S. Supreme Court has recognized Nevada as a "divorce mill." *Sherrer v. Sherrer*, 334 U.S. 343, 367 n.14 (1948). Thus, while same-sex couples, such as Appellants Beverly Sevcik and Mary Baranovich, may be in loving, committed relationships with one another for more than forty years and yet be unable to marry, *see* Plaintiff-Appellants Opening Br. at 1-3, heterosexual couples can marry in Nevada after knowing each other less than forty minutes. Such a policy clearly has nothing to do with encouraging optimal parenting.

## III.   Nevada's Marriage Ban Bears No Rational Relationship To Furthering "Responsible Procreation" By Different-Sex Couples

In addition to their optimal parenting argument, Appellees also claim that the marriage ban furthers an interest in promoting "responsible procreation."

To understand this argument, it is necessary to break it down into a number of steps. First, Appellees claim that Nevada has an interest in ensuring that sexual activity between heterosexual couples occurs within marriage because (i) such

18

activity may lead to pregnancy (accidental or otherwise), and (ii) it is important to prevent societal problems arising from "accidental" or unplanned pregnancies that occur out of wedlock.  (*See* Coalition Mot. For Summary Judgment at 18–19). According to Appellees, by reserving to different-sex couples the legal status of marriage—and prohibiting couples of the same sex from getting married— Nevada's marriage ban purportedly encourages different-sex couples to marry, thereby decreasing the likelihood that that they will have children outside of marriage and advancing society's interest in channeling procreation into marriage. (*See* Glover Mot. For Summary Judgment at 22 ("Marriage is an inducement to opposite-sex couples to engage in responsible procreation, which due to biology is unneeded for same-sex couples . . . ."")).[7]

As discussed below, even assuming arguendo that the State has an interest in encouraging "responsible procreation" by different-sex couples, there is no rational connection between the marriage ban and this interest.[8]  Moreover, denying critical

---

[7] The district court also referenced this theory.  *See Sevcik v. Sandoval*, 911 F. Supp. 2d 996, 1015 (D. Nev. 2012) ("Human beings are created through the conjugation of one man and one woman…").

[8] This asserted interest in encouraging heterosexuals to have sexual activity within marriage is particularly misplaced in Nevada.  Indeed, Nevada may be the only state that explicitly facilitates non-procreative nonmarital sex by allowing legalized prostitution in several counties.  *Cf.* Nev. Rev. Stat. § 201.354; *see also* Charles H. Whitebread, *Freeing Ourselves from the Prohibition Idea in the Twenty-First Century*, 33 Suffolk U. L. Rev. 235, 243 (2000).

benefits to and stigmatizing the children of same-sex couples is a constitutionally impermissible means of furthering that end.

## A.    Many Children Are Directly *Harmed* By Nevada's Marriage Laws

The marriage ban directly harms a group of children—the children of same-sex couples—by denying their families access to critical tangible federal marital benefits as well as to some state benefits that are conducive to providing stable and secure environments for the raising of children.[9]  In addition, Nevada's marriage ban marks the families of these children as being less worthy of respect and support than families headed by different-sex couples.  In this way, the marriage ban does significant tangible and intangible harm to the interests of children born to, adopted by, and raised in families headed by couples of the same sex.

While same-sex couples in registered domestic partnerships are entitled to most of the state-conferred rights and responsibilities of marriage, they are denied access to the vast majority of federal marital rights and responsibilities.  As the Supreme Court explained in *United States v. Windsor*, whether a couple is "married" for federal purposes is relevant to determining the application of well "over 1,000 federal statutes and numerous federal regulations" pertaining to a wide range of areas, such as "Social Security, housing, taxes, criminal sanctions,

---

[9] "As of 2011, about one in five same-sex couples are raising children under age 18."  Gary J. Gates, Same Sex and Different Sex Couples in the American Community Survey: 2005-2011 (Williams Institute, 2013), available at http://williamsinstitute.law.ucla.edu/wp-content/uploads/ACS-2013.pdf.

copyright, and veterans' benefits." *United States v. Windsor*, 133 S. Ct. 2675, 2694 (2013). While many federal agencies have not yet issued guidance, "the clear trend [in the wake of the *Windsor* opinion striking down Section 3 of DOMA] has been for [federal] agencies to limit the extension of benefits to only those same-sex couples in legally recognized marriages." *Garden State Equality v. Dow*, 2013 WL 5397372 *15 (N.J. Super. Ct. Sept. 27, 2013). *See also* Plaintiff-Appellants Opening Br. at 17-22, & n. 13; Amicus Curiae Brief Of Gay & Lesbian Advocates & Defenders. The vast majority of federal marital benefits will not be extended to people in Nevada registered domestic partnerships.

In addition to the hundreds of tangible federal rights and protections that will be unavailable to same-sex couples, including those couples validly married elsewhere but relegated to registered domestic partnerships in Nevada, the marriage exclusion imposes stigma on same-sex couples and their children. The marriage ban signals that the State believes that same-sex relationships are less worthy of respect and support than different-sex relationships. As the California Supreme Court recognized, statutorily excluding all same-sex couples from an institution with a "long and celebrated history" amounts to an official statement "that the family relationship of same-sex couples is not of comparable stature or equal dignity" to married couples. *In re Marriage Cases*, 183 P.3d 384, 445 (Cal. 2008). This stigma leads children to understand that the State considers their gay

and lesbian parents to be somehow unworthy of participating in the institution of marriage and devalues their families compared to families that are headed by married heterosexuals. *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 963 (Mass. 2003).

It is only marriage that provides a "status of equality with all other married persons." *Windsor*, 133 S. Ct. at 2689. As historian Nancy Cott said in her testimony in the *Perry v. Schwarzenegger* trial, "domestic partnerships do not have the same historical and social meaning as marriage …. [T]here is nothing like marriage except marriage." *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 970 (N.D. Cal. 2010) (quoting Cott trial testimony at Tr. 208: 9-17).

### B. The Marriage Ban Is Not Rationally Or Reasonably Related To Furthering The Welfare And Well-Being Of Children Of Different-Sex Couples.

While it is absolutely clear that the children of same-sex couples are directly harmed in tangible and intangible ways by the marriage ban, there is no reasonable or rational basis for believing that the marriage ban will further the welfare or well-being of the children of different-sex couples.

Appellees suggest that if same-sex couples were permitted to marry, their marriages would prompt more different-sex couples to have out-of-wedlock children. In other words, for Appellees' argument to make any sense, there must be something about permitting same-sex couples to marry that would make

marriage less appealing to opposite-sex couples, particularly in the wake of an unplanned pregnancy. Appellees did not (because they cannot) offer any logical explanation as to how prohibiting marriage by couples of the same sex would have *any* influence on the marital decisions of unwed biological parents.

Insofar as marriage laws encourage different-sex couples to marry in order to channel unplanned pregnancies into a marital household, there is no basis in logic or social experience to suppose that such couples will lose respect for the institution if same-sex couples are permitted to marry in Nevada or to remain married if they move to Nevada from a state where they were legally married. This supposition, which is central to Appellees' argument, makes sense only if same-sex relationships are so abhorrent as to contaminate the institution of marriage to the point that different-sex couples will shun it. Appellees ask this Court to believe that stigmatizing the children of same-sex couples and denying their parents access to substantial state and federal benefits will make marriage more attractive to different-sex couples.

Because there is simply no logical connection between the means and the purported end, numerous courts have rejected this claim even under rational basis review. *See e.g. Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 963 (Mass. 2003) ("The department has offered no evidence that forbidding marriage to people of the same sex will increase the number of couples choosing to enter into

opposite-sex marriages in order to have and raise children."); *Golinski v. U.S.*

*Office of Personnel Management*, 824 F. Supp. 2d 968, 993 (N.D. Cal. 2012)

("Permitting same-sex couples to marry will not affect the number of opposite-sex

couples who marry, divorce, cohabit, have children outside of marriage or

otherwise affect the stability of opposite-sex marriages.") (quoting *Perry v.*

*Schwarzenegger*, 704 F. Supp. 2d 921, 972 (N.D. Cal. 2010)).

In short, even if promoting "responsible procreation" by different-sex

couples was a legitimate state interest, the notion that preventing couples of the

same sex to marry furthers that purported interest strains credulity—there is simply

no plausible connection between the two.

### C.    Denying Rights And Protections To Children Is A Constitutionally Impermissible Means Of Influencing Their Parents' Behavior

Moreover, even if there were some reasonably conceivable connection

between the marriage ban and a reduction in the number of out-of-wedlock births

to heterosexual couples, the United States Supreme Court and Nevada laws have

already made clear that punishing innocent children is an impermissible means of

trying to influence the behavior of adults.

Nevada's marriage ban functions in a way that is remarkably similar to the

manner by which children born out-of-wedlock were denied legal and economic

protections and stigmatized under now-repudiated laws in Nevada and most other

states regarding "illegitimate" children.  Historically, state parentage laws addled the children of unwed parents with the demeaning status of "illegitimacy" and denied their children important rights in an effort to shame their parents into marrying one another.  *See* Melissa Murray, *Marriage As Punishment*, 112 Colum. L. Rev. 1, 33 n.165 (2012) (marriage was offered as a way to lead unwed mothers away "from vice towards the path of virtue").  Rights that were denied to "illegitimate" children included the right to a relationship with and support from their fathers, intestate succession, and compensation for wrongful death or injury to their fathers.  *See, e.g.*, *In re Forney's Estate*, 186 P. 678, 679 (Nev. 1920) (denying illegitimate child's right to inherit property from father, stating that "[t]he right to inherit depends upon the child's status" as legitimate or illegitimate).

Since the late 1960s, however, the Supreme Court has repudiated Nevada's and other states' laws that discriminate against children based on outmoded concepts of "illegitimacy."  In *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164 (1972), for example, the United States Supreme Court made clear that

> [I]mposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing.  Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual—as well as unjust—way of deterring the parent.

*Id.* at 175.  *See also Levy v. Louisiana*, 391 U.S. 68 (1968).

25

Consistent with the directive of the Supreme Court, Nevada no longer denies protections to nonmarital children. In 1979, the Nevada legislature adopted the Uniform Parentage Act ("UPA") "to address serious shortcomings in the unequal legal treatment of illegitimate children." *Willerton v. Bassham, by Welfare Div., State, Dep't of Human Res.*, 889 P.2d 823, 828-29 (Nev. 1995). The Nevada UPA explicitly states that "[t]he parent and child relationship extends equally to every child and to *every* parent, *regardless of the marital status of the parents*." Nev. Rev. Stat. § 126.031 (emphases added). Nevada now imposes child support obligations on all parents regardless of their gender or marital status, *see* Nev. Rev. Stat. § 125B.020 ("The parents of a child . . . have a duty to provide the child necessary maintenance, health care, education and support."); *Chambers by Cochran v. Sanderson*, 822 P.2d 657 (Nev. 1991) (affirming imposition of child support obligation on father of child born out of wedlock), and it no longer denies custody or visitation rights to fathers of children born out of wedlock, *see, e.g.*, *Primm v. Lopes*, 853 P.2d 103 (Nev. 1993) (affirming award of custody to father of child born out of wedlock).

These changes in Nevada family law directly affect the rights and obligations of heterosexual men who father or may father children. While, taken together, they may have removed some incentives for unmarried heterosexual couples to marry, Nevada nevertheless recognized that these changes were crucial

26

to ensuring that *all* children are provided with the legal rights and protections they need to thrive, irrespective of their parents' marital status. These changes clarify that the State public policy supports "the preservation and strengthening of [all] family life." *St. Mary v. Damon*, 309 P.3d 1027, 1033 (Nev. 2013). Nevada law simply does not support the proposition that it is permissible to deny critical benefits and security to some children in order to make the families of other children more stable or secure.

Thus, Appellees' argument that Nevada's marriage ban can be justified as an effort to discourage out-of-wedlock births by making marriage exclusively available to heterosexuals (and thereby supposedly more appealing to male-female couples who experience an unplanned pregnancy) is fundamentally at odds with Nevada's strong policy of equal treatment for all children. In exchange for a wholly speculative benefit for the children of heterosexual couples, other children —those raised by same-sex couples—pay the price. This is a legally unacceptable result for the same reasons that led to the changes in the prior treatment of "illegitimacy."

## CONCLUSION

As the Massachusetts high court so eloquently concluded almost one decade ago:

> The [State] has offered purported justifications for the civil marriage restriction that are starkly at odds with the comprehensive network of

27

vigorous, gender-neutral laws promoting stable families and the best interests of children.  It has failed to identify any relevant characteristic that would justify shutting the door to civil marriage to a person who wishes to marry someone of the same sex.

*Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 968 (Mass. 2003).  *Amici* ask

that this Court reverse the district court's decision in the above-captioned action.


Dated:  October 25, 2013              Respectfully submitted,

                                      KENDALL BRILL & KLIEGER LLP


                                      By:  /s/ Laura W. Brill
                                           Laura W. Brill
                                           Attorneys for Amici Curiae
                                           Family Law Professors

# APPENDIX A[1]

**SUSAN APPLETON**
VICE DEAN AND LEMMA BARKELOO &
PHOEBE COUZINS PROFESSOR OF LAW
WASHINGTON UNIVERSITY
SCHOOL OF LAW

**KATHARINE K. BAKER**
PROFESSOR OF LAW
CHICAGO-KENT COLLEGE OF LAW

**CARLOS BALL**
DISTINGUISHED PROFESSOR OF LAW
AND JUDGE FREDERICK
LACEY SCHOLAR
RUTGERS SCHOOL OF LAW – NEWARK

**BRIAN BIX**
FREDERICK W. THOMAS PROFESSOR
OF LAW AND PHILOSOPHY
UNIVERSITY OF MINNESOTA
LAW SCHOOL

**CHRISTOPHER BLAKESLEY**
THE COBEAGA LAW FIRM
PROFESSOR OF LAW
UNIVERSITY OF NEVADA, WILLIAM S.
BOYD SCHOOL OF LAW

**GRACE GANZ BLUMBERG**
DISTINGUISHED PROFESSOR OF LAW
EMERITA
UNIVERSITY OF CALIFORNIA, LOS
ANGELES SCHOOL OF LAW

**CYNTHIA BOWMAN**
DOROTHEA S. CLARKE
PROFESSOR OF LAW
CORNELL LAW SCHOOL

**KATHRYN WEBB BRADLEY**
PROFESSOR OF THE PRACTICE OF LAW;
DIRECTOR OF LEGAL ETHICS
DUKE LAW SCHOOL

**PATRICIA CAIN**
PROFESSOR OF LAW
SANTA CLARA SCHOOL OF LAW

**NAOMI R. CAHN**
HAROLD H. GREENE PROFESSOR OF
LAW
GEORGE WASHINGTON UNIVERSITY
LAW SCHOOL

**JUNE CARBONE**
ROBINA CHAIR IN LAW, SCIENCE AND
TECHNOLOGY
UNIVERSITY OF MINNESOTA
LAW SCHOOL

**ANNE C. DAILEY**
EVANGELINE STARR PROFESSOR OF
LAW
UNIVERSITY OF CONNECTICUT
SCHOOL OF LAW

**NANCY DOWD**
DAVID H. LEVIN CHAIR IN
FAMILY LAW
DIRECTOR, CENTER ON
CHILDREN & FAMILIES
UNIVERSITY OF FLORIDA FREDERIC G.
LEVIN COLLEGE OF LAW

**JENNIFER A. DROBAC**
PROFESSOR OF LAW
INDIANA UNIVERSITY SCHOOL OF LAW
–INDIANAPOLIS

---

[1] University affiliation of the professors is given for identification purposes only, and implies no endorsement by the universities.

**MAXINE EICHNER**
REEF C. IVEY II PROFESSOR OF LAW
UNIVERSITY OF NORTH CAROLINA
SCHOOL OF LAW

**JOANNA L. GROSSMAN**
SIDNEY AND WALTER SIBEN
DISTINGUISHED PROFESSOR OF
FAMILY LAW
HOFSTRA LAW SCHOOL

**IRA MARK ELLMAN**
CHARLES J. MERRIAM DISTINGUISHED
PROFESSOR OF LAW, AFFILIATE
PROFESSOR OF PSYCHOLOGY,AND
FELLOW, CENTER FOR THE STUDY OF
LAW, SCIENCE, & TECHNOLOGY
ARIZONA STATE UNIVERSITY SANDRA
DAY O'CONNOR COLLEGE OF LAW

**LESLIE HARRIS**
DOROTHY KLIKS FONES PROFESSOR OF
LAW
UNIVERSITY OF OREGON SCHOOL OF
LAW

**MARTHA ERTMAN**
CAROLE & HANAN SIBEL RESEARCH
PROFESSOR OF LAW
UNIVERSITY OF MARYLAND FRANCIS
KING CAREY SCHOOL OF LAW

**JOAN HEIFETZ HOLLINGER**
JOHN AND ELIZABETH BOALT
LECTURER IN RESIDENCE
UNIVERSITY OF CALIFORNIA,
BERKELEY SCHOOL OF LAW

**ANN LAQUER ESTIN**
ALIBER FAMILY CHAIR
UNIVERSITY OF IOWA
COLLEGE OF LAW

**LISA IKEMOTO**
PROFESSOR OF LAW
UNIVERSITY OF CALIFORNIA, DAVIS
SCHOOL OF LAW

**ZANITA E. FENTON**
PROFESSOR OF LAW
UNIVERSITY OF MIAMI
SCHOOL OF LAW

**COURTNEY G. JOSLIN**
PROFESSOR OF LAW
UNIVERSITY OF CALIFORNIA, DAVIS
LAW SCHOOL

**MARTHA ALBERTSON FINEMAN**
ROBERT W. WOODRUFF PROFESSOR
DIRECTOR OF THE FEMINISM AND
LEGAL THEORY PROJECT
AND THE VULNERABILITY AND THE
HUMAN CONDITION INITIATIVE
EMORY LAW SCHOOL

**HERMA HILL KAY**
BARBARA NACHTRIEB ARMSTRONG
PROFESSOR OF LAW
UNIVERSITY OF CALIFORNIA,
BERKELEY SCHOOL OF LAW

**DEBORAH L. FORMAN**
PROFESSOR OF LAW
WHITTIER LAW SCHOOL

**LAURA T. KESSLER**
PROFESSOR OF LAW
UNIVERSITY OF UTAH,
S.J. QUINNEY COLLEGE OF LAW

2a

**SUZANNE KIM**
ASSOCIATE DEAN FOR FACULTY AND
RESEARCH, PROFESSOR OF LAW AND
JUDGE DENNY CHIN SCHOLAR
RUTGERS SCHOOL OF LAW – NEWARK

**KAY KINDRED**
SARA AND RALPH DENTON
PROFESSOR OF LAW
UNIVERSITY OF NEVADA,
WILLIAM S. BOYD SCHOOL OF LAW

**CHARLES P. KINDREGAN**
PROFESSOR OF LAW
SUFFOLK UNIVERSITY LAW SCHOOL

**KRISTINE S. KNAPLUND**
PROFESSOR OF LAW
PEPPERDINE UNIVERSITY
SCHOOL OF LAW

**HOLNING LAU**
PROFESSOR OF LAW
UNIVERSITY OF NORTH CAROLINA
SCHOOL OF LAW

**ELIZABETH L. MACDOWELL**
CO-DIRECTOR, FAMILY JUSTICECLINIC,
ASSOCIATE PROFESSOR OF LAW
UNIVERSITY OF NEVADA,
WILLIAM S. BOYD SCHOOL OF LAW

**MAYA MANIAN**
ASSOCIATE PROFESSOR
UNIVERSITY OF SAN FRANCISCO
SCHOOL OF LAW

**FATMA MAROUF**
ASSOCIATE PROFESSOR OF LAW
CO-DIRECTOR OF THE
IMMIGRATION CLINIC
UNIVERSITY OF NEVADA, WILLIAM S.
BOYD SCHOOL OF LAW

**NANCY G. MAXWELL**
PROFESSOR OF LAW
WASHBURN UNIVERSITY SCHOOL OF
LAW

**LINDA MCCLAIN**
PROFESSOR OF LAW
BOSTON UNIVERSITY SCHOOL OF LAW

**DOUGLAS NEJAIME**
PROFESSOR OF LAW
UNIVERSITY OF CALIFORNIA, IRVINE
SCHOOL OF LAW

**DOROTHY E. ROBERTS**
GEORGE A. WEISS UNIVERSITY
PROFESSOR OF LAW AND SOCIOLOGY
RAYMOND PACE AND SADIE TANNER
MOSSELL ALEXANDER PROFESSOR
OF CIVIL RIGHTS PROFESSOR OF
AFRICANA STUDIES DIRECTOR,
PROGRAM ON RACE, SCIENCE,
AND SOCIETY
UNIVERSITY OF PENNSYLVANIA
LAW SCHOOL

**KERMIT ROOSEVELT**
PROFESSOR OF LAW
UNIVERSITY OF PENNSYLVANIA
LAW SCHOOL

**LAURA A. ROSENBURY**
PROFESSOR OF LAW; JOHN S.
LEHMANN RESEARCH PROFESSOR
WASHINGTON UNIVERSITY
SCHOOL OF LAW

**REBECCA SCHARF**
ASSOCIATE PROFESSOR OF LAW
UNIVERSITY OF NEVADA,
WILLIAM S. BOYD SCHOOL OF LAW

**JULIE SHAPIRO**
PROFESSOR OF LAW; FACULTY
FELLOW, FRED T. KOREMATSU
CENTER FOR LAW AND EQUALITY
SEATTLE UNIVERSITY SCHOOL OF LAW

**KATHARINE SILBAUGH**
LAW ALUMNI SCHOLAR,
PROFESSOR OF LAW
BOSTON UNIVERSITY SCHOOL OF LAW

**JANA SINGER**
PROFESSOR OF LAW
UNIVERSITY OF MARYLAND
SCHOOL OF LAW

**EDWARD STEIN**
VICE DEAN AND PROFESSOR OF LAW
YESHIVA UNIVERSITY BENJAMIN N.
CARDOZO SCHOOL OF LAW

**MARK STRASSER**
TRUSTEES PROFESSOR OF LAW
CAPITAL UNIVERSITY LAW SCHOOL

**MICHAEL S. WALD**
JACKSON ELI REYNOLDS PROFESSOR
OF LAW, EMERITUS
STANFORD LAW SCHOOL

**LOIS WEITHORN**
PROFESSOR OF LAW
UNIVERSITY OF CALIFORNIA,
HASTINGS COLLEGE OF THE LAW

**DEBORAH WIDISS**
ASSOCIATE PROFESSOR OF LAW
INDIANA UNIVERSITY MAURER
SCHOOL OF LAW

**BARBARA BENNETT WOODHOUSE**
L.Q.C. LAMAR PROFESSOR OF LAW AND
DIRECTOR, EMORY CHILD RIGHTS
PROJECT
EMORY UNIVERSITY

## <u>CERTIFICATE OF COMPLIANCE REGARDING FRAP 32(a)(7)</u>

Pursuant to Federal Rules of Appellate Procedure 29(d) and 32(a)(7)(B)–(C) and Ninth Circuit Rule 32-1, I, the undersigned counsel of record for Amici Curiae, certify that this Brief complies with the applicable Type-Volume Limitation, Typeface Requirements, and Type-Style Requirements, as the brief contains 6,282 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and it is proportionally spaced using a Microsoft Word Times New Roman typeface of 14 points or more.

Dated:  October 25, 2013        Respectfully submitted,

KENDALL BRILL & KLIEGER LLP


By:  /s/ Laura W. Brill
     Laura W. Brill
     Attorneys for Amici Curiae
     Family Law Professors

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 25, 2013.

I certify that all participants in the case are registered CM/ECF users and that services will be accomplished by the appellate CM/ECF system.

Dated:  October 25, 2013          Respectfully submitted,

KENDALL BRILL & KLIEGER LLP


By:  /s/ Laura W. Brill
Laura W. Brill
Attorneys for Amici Curiae
Family Law Professors