9th Circuit Docket No. 12-17668

Case No. 2:12-cv-00578-RCJ-PAL (Las Vegas)

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

| | |
|---|---|
| BEVERLY SEVCIK; et al. | ) |
| Plaintiff-Appellants, | ) |
| | ) |
| v. | ) |
| | ) |
| BRIAN SANDOVAL, in his official capacity as Governor of the State of Nevada; et al., | ) ) |
| | ) |
| Defendants-Appellees. | ) |
| | ) |
| And | ) |
| COALITION FOR THE PROTECTION OF MARRIAGE, | ) ) |
| | ) |
| Intervenor/Defendant-Appellee. | ) / |

On Appeal from the United States District Court

for the District of Nevada

## APPELLEE GOVERNOR SANDOVAL'S ANSWERING BRIEF

CATHERINE CORTEZ MASTO
Nevada Attorney General
C. WAYNE HOWLE
Solicitor General
Nevada State Bar No. 3443
Office of the Attorney General
100 North Carson Street
Carson City, NV 89701-4717
(775) 684-1227
whowle@ag.nv.gov
*Counsel for Governor Brian Sandoval*

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES................................................................III

I.      JURISDICTIONAL STATEMENT ............................................1

II.     ISSUES ON APPEAL ...............................................................1

III.    STATEMENT OF THE CASE; PROCEEDINGS BELOW ...........................2

IV.     STATEMENT OF FACTS .........................................................6

MARRIAGE IN NEVADA LAW ...............................................................7

1.      MARRIAGE IN NEVADA'S STATUTORY LAW .......................................7

   A.   *MARRIAGE DEFINED*.................................................7

      (i)   What marriage is.............................................8

      (ii)  What marriage is not.........................................10

   B.   *MARRIAGE'S DEFINING EFFECT* .......................................*11*

      (i)   Property rights..............................................11

      (ii)  Licensure of marriage .......................................12

      (iii) Recordation of marriage .....................................12

      (iv)  Solemnization of marriage....................................13

2.      MARRIAGE IN NEVADA CASE LAW .........................................13

3.      MARRIAGE IN NEVADA'S CONSTITUTION...................................17

4.      PARTNERSHIP LAW ......................................................18

V.      SUMMARY OF ARGUMENT.................................................21

VI.   ARGUMENT ........................................................................................22

1.   STANDARD OF APPELLATE REVIEW .......................................22

2.   INTRODUCTION............................................................................22

3.   THE DISTRICT COURT'S DECISION WAS CORRECT AS A MATTER

OF LAW...................................................................................................24

    *A.*   *Baker v. Nelson Required Dismissal* ...........................................*24*

    *B.*   *Nevada's Law Is Valid under Equal Protection Provisions of the*

*Constitution*.........................................................................................*28*

      i.    The Law Does Not Classify on the Basis of a Suspect or Quasi-suspect

Class .................................................................................................28

      ii.   Nevada's Law Is Not Motivated by Animus............................34

      iii.  Nevada Has a Legitimate State Interest in Using the Traditional

Definition of Marriage.....................................................................38

    *C.*   *Nevada's Law is Valid under the Constitution's Due Process Provisions*...*42*

    *D.*   *Marriage Lies Uniquely Within the State's Prerogative to Define* ..............*47*

    *E.*   *Response to Amicus Briefs* ..........................................................*48*

CONCLUSION............................................................................................51

STATEMENT OF RELATED CASES .......................................................53

CERTIFICATE OF SERVICE....................................................................54

CERTIFICATE OF COMPLIANCE ..........................................................55

# TABLE OF AUTHORITIES

**PAGE**

C<small>ASES</small>

*Alden v. Maine,* 527 U.S. ___, 727 ........................................................41

*Andersen v. King Cnty.,* 158 Wash.2d 1, 138 P.3d 963, 976–77 (2006)...................43

*Baker v. Nelson,* 409 U.S. 810 (1972)...................................3, 4, 20, 23, 24, 25, 26, 27

*Bishop v. U.S.,* ___ F. Supp. 2d ___, 2014 WL 116013 (N.D. Okla. 2014) .............30

*Blakeslee v. Blakeslee,* 41 Nev. 235, 168 P. 950 (1917) ................................. 15, 16

*Bowers v. Hardwick*, 478 U.S. 186 (1986) ...............................................32

*Brown v. Buhman,* 947 F. Supp. 2d 1170 (D. Utah 2013).........................................46

*Charmicor, Inc. v. Deaner*, 572 F.2d 694, 695 (9th Cir. 1978)...............................27

*City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432 (1985) .................29

*City of New Orleans v. Dukes,* 427 U.S. 297, 303 (1976) ........................................29

*Clayton v. Republic Airlines, Inc.,* 716 F.2d 729, 730 (9th Cir. 1983).....................22

*Coalition for the Protection of Marriage v. Sevcik*, Case No. 12-689 (U.S.)..............5

*Cold Mountain v. Garber*, 375 F.3d 884, 891 (9th Cir. 2004)...................................50

*David v. New York Tel. Co.,* 470 F.2d 191 (2nd Cir. 1972) ....................................27

*Ex Parte Crosby,* 38 Nev. 389, 149 Pac. 989, 990 (1915)........................................22

*FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 315 (1993) ................................. 38, 42

*Fisher v. University of Texas at Austin*, 133 S.Ct. 2411, 2419 (2013)......................31

*Foti v. City of Menlo Park,* 146 F.3d 629, 638 (9th Cir. 1998)..................................50

*Galloway v. Truesdell*, 83 Nev. 13, 23, 422 P.2d 237 (1967)................................7, 13

*Gilstrap v. Standard Oil Co.*, 108 F.2d 736 (9th Cir. 1940)...................................27

*Hay v. Hay,* 100 Nev. 196, 199, 678 P.2d 672 (1984)..................................................7

*Heller v. Doe*, 509 U.S. at 319–20, 113 S.Ct. 2637....................................................38

*Hicks v. Miranda,* 422 U.S. 332, 344 (1975)..............................................................26

*High Tech Gays*, 895 F.2d 563 (9th Cir. 1990) ..........................................................32

*Hollingsworth v. Perry,* 570 U.S. ___, 133 S.Ct. 2652 (2013) ...................... 5, 26, 27

*In Re Burrus,* 136 U.S. 586, 593–94 (1890) ..............................................................15

*Jackson v. Abercrombie, see* 884 F. Supp. 2d 1065 (D. Haw. 2012)..........................5

*Kardules v. City of Columbus,* 95 F.3d 1335, 1355 (6th Cir. 1996) ..........................37

*Kitchen v. Herbert,* ___ F. Supp. 2d ___, 2013 WL 6697874, *28 (D. Utah 2013) ............................................................................................................. 30, 46

*Kruso v. International Telephone & Telegraph Corp.*, 872 F.2d 1416, 1421 (9th Cir. 1989) ..............................................................................................................22

*Lawrence v. Texas*, 539 U.S. 558 (2003).................................. 32, 33, 34, 39, 40, 45

*Lofton v. Sec'y of the Dep't of Children & Family Services,* 358 F.3d 804 (11th Cir. 2004)......................................................................................................33

*Loving v. Virginia,* 388 U.S. 1 (1967) ...................................................... 29, 31, 32

*Mandel v. Bradley,* 432 U.S. 173, 176 (1977).........................................................26

*Mass. v. U.S.,* 682 F.3d 1, 7 (1st Cir. 2012).................................................39

*Maynard v. Hill,* 125 U. S. 190) ..............................................................15

*Merritt v. Merritt,* 40 Nev. 385, 160 P. 22 (Nev. 1916) ...........................16

*MHC Financing Ltd. Partnership v. City of San Rafael*, 714 F.3d 1118, 1126 (9th

Cir. 2013) ..............................................................................................22

*Murphy v. Ramsey*, 114 U.S. 15 (1885)........................................... 10, 15

*Pennoyer v. Neff,* 95 U.S. 714, 734–35 (1878)........................................25

*Perry v. Nelson*, 671 F.3d at 1097 ..........................................................26

*Pollard v. Hagan*, 3 How. 212, 11 L. Ed. 565.........................................22

*Reynolds v. United States,* 98 U.S. 145 (1878)........................................10

*Romer v. Evans*, 517 U.S. 620 (1996) ......................................................4

*Romero-Ochoa v. Holder,* 712 F.3d 1328, 1331 (9th Cir. 2013)..............42

*RUI One Corp. v. City of Berkeley,* 371 F.3d 1137, ___ (9th Cir. 2004)..................39

*Sevcik v. Sandoval,* 911 F. Supp. 2d 996 (D. Nev. 2013) ... 3, 4, 24, 28, 32, 34, 39, 43

*Shively v. Bowlby*, 152 U. S. 1, 14 Sup. Ct. 548.....................................22

*Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942)......................25

*Smith v. City of Las Vegas,* 439 F.2d 706 (9th Cir. 1971)........................27

*Sosna v. Iowa,* 419 U.S. 393, 404 (1975) ...............................................25

*State v. Holm*, 137 P.3d 726 (Utah 2006), cert. denied, 2007 WL 559895 (U.S.

2007)......................................................................................................10

v

*State v. Moore,* 46 Nev. 65, 77, 207 P. 75 (1922) ........................................... 14, 15

*Tiedemann v. Tiedemann*, 36 Nev. 501, 137 Pac. 826.............................................17

*United States v. Windsor,* 570 U.S. ___, 133 S.Ct. 2675 (2013) ... 2, 6, 26, 27, 35, 36, 37, 38, 41, 43, 44, 47, 48, 51

*United States v. Yazell*, 382 U.S. 341, 353 (1966).....................................................15

*Washington v. Davis*, 426 U.S. 229, 240 (1976) ................................................. 30, 43

*Washington v. Glucksberg,* 521 U.S. 702 (1997) .....................................................46

*Wuest v. Wuest,* 17 Nev. 217, 30 P. 886 (Nev. 1880).............................................14

*Zablocki v Redhail*, 434 U.S. 374, 388 (1978) ........................................................42

## S<small>TATUTES</small>

28 U.S.C. § 1292(a)(1).............................................................................................1

28 U.S.C. § 1331.......................................................................................................1

28 U.S.C. § 1343 ...................................................................................................1, 27

Nev. Rev. Stat. § 122.020 ........................................... 2, 7, 8, 10, 17, 18, 23, 34, 36

Nev. Rev. Stat. 1.030 .............................................................................................13

Nev. Rev. Stat. 111.779 .........................................................................................12

Nev. Rev. Stat. 122.010 ......................................................................................7, 8, 9

Nev. Rev. Stat. 122.020 .........................................................................................52

Nev. Rev. Stat. 122.040 ......................................................................................7, 12

Nev. Rev. Stat. 122.045 .........................................................................................12

Nev. Rev. Stat. 122.050 .......................................................................12

Nev. Rev. Stat. 122.060 .......................................................................12

Nev. Rev. Stat. 122.062 ...................................................................7, 13

Nev. Rev. Stat. 122.210 .......................................................................12

Nev. Rev. Stat. 122.220 .......................................................................12

Nev. Rev. Stat. 122.230 .......................................................................12

Nev. Rev. Stat. 122.240 .......................................................................12

Nev. Rev. Stat. 122.260 .......................................................................13

Nev. Rev. Stat. 122A.510 ....................................................................10

Nev. Rev. Stat. 123.220 .......................................................................11

Nev. Rev. Stat. 123.225(1)....................................................................11

Nev. Rev. Stat. 123.250 .......................................................................12

Nev. Rev. Stat. 125.320 .......................................................................10

Nev. Rev. Stat. 129.010 .........................................................................9

Nev. Rev. Stat. 139.040 .......................................................................11

Nev. Rev. Stat. 201.160–170 ................................................................10

Nev. Rev. Stat. 201.180 .......................................................................10

Nev. Rev. Stat. 246.100–246.190 .........................................................12

Nev. Rev. Stat. 247.120 .......................................................................12

Nev. Rev. Stat. 440.595 .......................................................................12

Nev. Rev. Stat. 451.010 ........................................................11

Nev. Rev. Stat. 451.023–451.025 ...........................................11

Nev. Rev. Stat. Chapt. 293.....................................................17

Statutes of Nevada 1861 § 2, Ch. 33 .....................................23

Statutes of Nevada 1867 p. 88................................................23

Statutes of Nevada 2013, p. 3962 ..........................................18

OTHER AUTHORITIES

1864 Pres. Proc. No. 22, 13 Stat. 749 (October 21, 1864)........................22

Aderson Bellegarde François, *To Go Into Battle with Space and Time: Emancipated Slave Marriage, Interracial Marriage, and Same-Sex Marriage,* 13 J. Gender Race & Just. 105 (2009) ........................................................31

Allan W. Vestal, *To Soften Their Obdurate Hearts: The Southern Baptist Convention and Marriage Equality,* 21 Tul. J. L. & Sexuality 49 (2012) .................................51

CA PENAL Pt. 1, T. 9, O.R.S. T. 16, Ch. 167 ........................................10

Christine Jax, *Same-Sex Marriage—Why Not?,* 4 Widener J. Pub. L. 461 (1995) ....40

Daniel O. Conkle, *Evolving Values, Animus, and Same-Sex Marriage*, 89 Ind. L.J. 27 (2014)........................................................27

*Debates & Proceedings of the Nevada State Constitutional Convention of 1864,* at 59 (Andrew J. Marsh off. rep., 1866) .............................................34

Derek C. Araujo, *A Queer Alliance: Gay Marriage and the New Federalism,* 4 Rutgers J. L. & Pub. Pol'y 200 (2006) .................................................................51

Edward J. Sullivan, "*Substantive Due Process Resurrected Through the Takings Clause: Nollan, Dolan, and Ehrlich*., 25 Environmental Law 155 (1995).............47

Eric Berger, *Lawrence's Stealth Constitutionalism and Same-Sex Marriage Litigation,* 21 Wm. & Mary Bill Rts. J. 765, 778 (2013) .............................. 34, 45

*Fixing Lawrence,* 118 Harv. L. Rev. 2858, 2860 (2005)........................................33

Hassan El Menyawi*, Same-Sex Marriage in Islamic Law*, 2 Wake Forest J.L. & Pol'y 375 (2012) .....................................................................................................51

J. Kelly Strader, *Lawrence's Criminal Law,* 16 Berkeley J. Crim. L. 41, 55 (2011)...................................................................................................................33

Jack B. Harrison, *The Strange Intersection Between Law, Religion, and Government in the Regulation of Marriage,* 6 Charleston L. Rev. 547 (2012).........................51

Jeremiah Egger, *Glucksberg, Lawrence, and the Decline of Loving's Marriage Precedent*, 98 Va. L. Rev. 1825 (2012)................................................................32

Jesse H. Choper, John C. Yoo , *Can the Government Prohibit Gay Marriage,* 50 South Texas Law Review 15, 32 ( 2008) .......................................................40

Julie A. Nice, *The Descent of Responsible Procreation: A Genealogy of an Ideology*, 45 Loy. L.A. L. Rev. 781, 788 (2012) ................................................................41

Justin Reinheimer, *What Lawrence Should Have Said: Reconstructing an Equality Approach*, 96 Cal. L. Rev. 505 (2008) ................................................................33

Lee Goldman, *The Constitutional Right to Privacy,* 84 Denv. U. L. Rev. 601, 614 (2006) ........................................................................................................................46

Mae Kuykendall, *Equality Federalism: A Solution to the Marriage Wars,* 15 U. Pa. J. Const. L. 377, 391 (2013) ..........................................................................48

Matthew J. Clark, *Rational Relationship to What? How Lawrence v. Texas Destroyed Our Understanding of what Constitutes a Legitimate State Interest*, 6 Liberty U. L. Rev. 415, (2012) ..........................................................................40

*Merrifield v. Lockyer,* 547 F.3d 978 (9th Cir. 2008) ...............................................39

N.Y. Penal Law Ch. 40, Pt. THREE, T. M. ..............................................................10

Paul Benjamin Linton, Esq., *Same-Sex Marriage and the New Mexico Equal Rights Amendment,* 20 Geo. Mason U. Civ. Rts. L.J. 209 (2010) ....................................30

Robert A. Destro, *"You Have the Right to Remain Silent": Does the U.S. Constitution Require Public Affirmation of Same-Sex Marriage?,* 27 BYU J. Pub. L. 397 (2013) ......................................................................................................31

Robin L. West, *The Incoherence of Marital Benefits,* 161 U. Pa. L. Rev. Online 179, (2013) ..........................................................................................................40

Rose Cuison Villazor, *The Undocumented Closet*, 92 N.C. L. Rev. 1(2013) ...........46

Senate Joint Resolution 13 ......................................................................................18

Susan Frelich Appleton, *Illegitimacy and Sex, Old and New,* 20 Am. U. J. Gender

   Soc. Pol'y & L. 347, 369 n. 128 ..........................................................33

Susannah W. Pollvogt, *Windsor, Animus, and the Future of Marriage Equality*,

   113 Colum. L. Rev. Sidebar 204 (2013) ............................................36

<u>RULES</u>

Fed. R. Civ. P. 12..............................................................................22

<u>CONSTITUTIONAL PROVISIONS</u>

NEV. CONST. art. 1, § 21.................................................................2, 17

NEV. CONST. art. 1, sec. 21............................................................ 35, 52

NEV. CONST. art. 1, sec. 4..................................................................34

NEV. CONST. art. 19............................................................................17

NEV. CONST. art. 4, § 30....................................................................17

NEV. CONST. art. 4, § 31....................................................................17

Defendant/Appellee Nevada Governor Brian Sandoval, by and through counsel, Catherine Cortez Masto, Attorney General of the State of Nevada, and Solicitor General C. Wayne Howle, respectfully submits his Answering Brief pursuant to Fed. R. App. P. 28, in response to the Opening Brief filed by Appellants Beverly Sevcik and fifteen other individuals[1] (hereafter referred to as Sevcik) who brought the underlying district court action.

## I.    JURISDICTIONAL STATEMENT.

Jurisdiction for this appeal exists pursuant to 28 U.S.C. § 1292(a)(1).

The State disputes Sevcik's assertion that the United States District Court for the District of Nevada (the "district court") had original subject matter jurisdiction. The district court dismissed the complaint against the State for want of a substantial federal question, and the State agrees with that action.  However, if there were a substantial federal question, the State agrees that jurisdiction would exist under 28 U.S.C. §§ 1331 and 1343.

## II.    ISSUES ON APPEAL.

1.    Whether the Federal Constitution's equal protection guarantees require the State of Nevada to recognize a right to marry for same-sex couples in Nevada;

---

[1] The individual Plaintiffs/Appellants are eight same-sex couples:  Beverly Sevcik and Mary Baranovich; Antioco Carrillo and Theodore Small; Karen Goody and Karen Vibe; Fletcher Whitwell and Greg Flamer; Mikyla Miller and Katrina Miller; Adele Terranova and Tara Newberry; Caren Cafferata-Jenkins and Farrell Cafferata-Jenkins; Megan Lanz and Sara Geiger. *See* Complaint.

1

and require the State of Nevada to recognize valid same-sex marriages from other jurisdictions.

2.    Whether the Federal Constitution's due process guarantees require the State of Nevada to recognize a right to marry for same-sex couples in Nevada; and require the State of Nevada to recognize valid same-sex marriages from other jurisdictions.[2]

### III.    STATEMENT OF THE CASE; PROCEEDINGS BELOW.

The case made here is that the State of Nevada's marriage law is constitutional because it serves the legitimate purpose of preserving traditional marriage.    The district court so determined, and its decision should be affirmed.

In the action below, Sevcik sought to invalidate, by declaratory judgment, two separate and specific provisions of State law:    (1) Nevada Revised Statutes § 122.020, and (2) article 1, sec. 21 of the Nevada Constitution because they preclude same-sex couples from marrying.    *See* Complaint at 29.[3]    Sevcik named the Governor of Nevada and three county clerks as defendants, all in their official capacities.    The

---

[2] Sevcik did not argue that Due Process establishes a right to same-sex marriage, but now presents the argument in light of the decision in *Windsor*.    The State concurs that the argument can and should be considered on appeal and the issue decided, as being in the public's and the State's best interest.

[3] Sevcik also made a nonspecific challenge to all sources of state law restricting same-sex couples from marriage, or from having a valid same-sex marriage from another jurisdiction recognized.

Governor's appearance is in defense of those State laws and the policies animating them.[4]  Sevcik's argument was that Nevada's law is unconstitutional because it does not permit marriage by same-sex couples.

Sevcik relied solely upon an equal protection argument in district court. Sevcik alleged that, by classifying people and couples according to their gender, Nevada's laws deny equal treatment in violation of the Equal Protection Clause of the Fifth and Fourteenth Amendments.  Specifically Sevcik claimed that such law "serves no purpose other than to impose a stigmatizing government label of inferiority upon lesbians and gay men and their relationships and denies Plaintiffs equal treatment based on their sexual orientation and sex."

By its order filed on November 26, 2012, *see* 911 F. Supp. 2d 996 (D. Nev. 2013), the district court decided two dispositive State motions.  In the first, the State moved to dismiss on the basis that the court lacked jurisdiction because the decision in *Baker v. Nelson*, 409 U.S. 810 (1972) still is controlling and relevant precedent, establishing that claims of right to same-sex marriage present no substantial federal question.

---

[4] Further references to the Governor, in his appearance here in defense of State law, are to the "State."

3

In its second motion, the State moved for summary judgment. Building on its motion to dismiss, the State explained why no genuine issues of material fact exist: questions before the court were exclusively legal ones, not subject to fact finding.

The court decided the State's motions by first granting the motion to dismiss: "the present equal protection claim is precluded by *Baker* insofar as the claim does not rely on the *Romer* [i.e., withdrawal of existing rights] line of cases."[5] 911 F. Supp. 2d at 1003. But the court also "conduct[ed] a full equal protection analysis so that the Court of Appeals need not remand for further proceedings should it rule that *Baker* does not control or does not control as broadly as the Court finds." *Id.* Following a thorough-going analysis, the court granted the State's summary judgment motion:

> Because the maintenance of the traditional institution of civil marriage as between one man and one woman is a legitimate state interest, because the exclusion of same-sex couples from the institution of civil marriage is rationally related to furthering that interest, and because the challenged laws neither withdraw any existing rights nor effect a broad change in the legal status or protections of homosexuals based upon pure animus, the State is entitled to summary judgment.

911 F. Supp. 2d at 1021.

---

[5] *Romer v. Evans*, 517 U.S. 620 (1996) (holding that a law that stripped legal protections from gays and lesbians failed rational basis scrutiny).

The district court's order was filed on November 26, 2012 and Sevcik appealed shortly after, on December 3, 2012. Two days later, the defendant-intervenor in the case, Coalition for the Protection of Marriage (Coalition), filed a petition at the U.S. Supreme Court for certiorari before judgment. *Coalition for the Protection of Marriage v. Sevcik*, Case No. 12-689 (U.S.).

Just six days later, on December 11, 2012, Sevcik moved this Court to consider and hear argument in this case together with a like matter arising in Hawaii, *Jackson v. Abercrombie, see* 884 F. Supp. 2d 1065 (D. Haw. 2012). Sevcik expressly (1) limited the argument on appeal to one based on Equal Protection, and (2) disclaimed any argument based upon due process. *See* Plaintiffs-Appellants' Reply in Support of Motion to Have Cases Heard Together, Ct. Doc. No. 10 at 3 ("Plaintiffs-Appellants have not raised a sweeping claim that all same-sex couples have a fundamental right to marry under the Fourteenth Amendment's Due Process Clause . . . .").

The motion to have the cases heard together was granted, along with a short stay in briefing, on January 7, 2013. Ct. Doc. 11. An additional enlargement was ordered on March 26, 2013, on Appellee Hawaii Family Forum's unopposed motion. Ct. Doc. 13.

On June 26, 2013, the U.S. Supreme Court decided both *Hollingsworth v. Perry,* 570 U.S. ___, 133 S.Ct. 2652 (2013); and *United States v. Windsor,* 570 U.S.

___, 133 S.Ct. 2675 (2013).  The next day, it denied certiorari on the Coalition's petition in Case No. 12-689.  Briefing in this appeal was thereafter set on March 26, 2013 by this Court's order.

Even though Sevcik's case was self-limited to the equal protection argument, the three defendants making appearances have elected (1) not to object to the Plaintiffs' raising their substantive due process claim on appeal, (2) to brief that issue in their respective Response Briefs, and (3) to urge this Court to address and resolve the Plaintiffs' substantive due process claim on the merits.  The Defendants believe that such a course is best for all parties to this civil action because it will assure that the important issue raised here—the constitutionality of Nevada's definition of marriage—be fully and fairly argued before this Court, and decided in an expeditious manner.

## IV.    STATEMENT OF FACTS.

Sevcik's statement of facts recounts matters about each couples' and each individuals' personal lives.  With these, the State makes no issue.  The State has no knowledge about the personal lives of the parties, nor need the Court have such knowledge to decide this appeal.  The only relevant facts are legislative facts discernible from legal authorities.

///

///

## MARRIAGE IN NEVADA LAW

Marriage is an object of great public concern for the State. *See Galloway v. Truesdell*, 83 Nev. 13, 23, 422 P.2d 237 (1967), *Hay v. Hay,* 100 Nev. 196, 199, 678 P.2d 672 (1984) ("We recognize that the state has a strong public policy interest in encouraging legal marriage").

The entirety of domestic relations, including marriage, is governed by fourteen chapters in Title 11 of the Nevada Revised Statutes. Marriage itself is governed by Nev. Rev. Stat. Chapt. 122. "[A] male and a female person, at least 18 years of age, not nearer of kin than second cousins or cousins of the half blood, and not having a husband or wife living, may be joined in marriage." Nev. Rev. Stat. 122.020(1). To be valid, marriage must be solemnized. Nev. Rev. Stat. 122.010(1). Provisions are established for authenticating marriage. Nev. Rev. Stat. 122.040. Marriage requires a license issued by the county clerk. Nev. Rev. Stat. 122.040. Persons who administer marriages must be certified. Nev. Rev. Stat. 122.062 *et seq*. Through these enactments, the State's legislature has carefully made innumerable policy choices that are entitled to respect and deference.

### 1.    MARRIAGE IN NEVADA'S STATUTORY LAW.

### A.    MARRIAGE DEFINED.

Nevada defines marriage in statute both by declaring what it is, and what it is not. State law also establishes an extensive system for regulating the institution of

marriage.  By challenging the definition of marriage, Sevcik challenges and seeks to alter the entire State system.

     (i) <u>What marriage is</u>.

  Nevada defines marriage by statute.  It is first of all a contract:

> Marriage, so far as its validity in law is concerned, is a civil contract, to which the consent of the parties capable in law of contracting is essential. Consent alone will not constitute marriage; it must be followed by solemnization as authorized and provided by this chapter.

Nev. Rev. Stat. 122.010(1).  Only specified persons are capable of marrying:

>  1. Except as otherwise provided in this section, a male and a female person, at least 18 years of age, not nearer of kin than second cousins or cousins of the half blood, and not having a husband or wife living, may be joined in marriage.
>  2. A male and a female person who are the husband and wife of each other may be rejoined in marriage if the record of their marriage has been lost or destroyed or is otherwise unobtainable.
>  3. A person at least 16 years of age but less than 18 years of age may marry only if the person has the consent of:
>  (a) Either parent; or
>  (b) Such person's legal guardian.

Nev. Rev. Stat. 122.020.

///

///

///

///

8

There are thus a handful of criteria: gender, age, kinship, marital status.[6] The statutory provisions setting these forth date from pre-statehood. They have remained constant. So, for over a century, marriage in Nevada has been between an adult,[7] unmarried, consenting man and woman, who are no more closely related than second cousins.

///

///

----

[6] Competency is also required. *See* Nev. Rev. Stat. 122.010 (establishing requirement for "consent of the parties capable in law of contracting"); *cf.* Nev. Rev. Stat. 129.010 ([a]ll persons of the age of 18 years who are under no legal disability, and all persons who have been declared emancipated . . . are capable of entering into any contract . . . .").

[7] In certain limited cases, children may marry:

> 1. A person less than 16 years of age may marry only if the person has the consent of:
> (a) Either parent; or
> (b) Such person's legal guardian,
> and such person also obtains authorization from a district court as provided in subsection 2.
> 2. In extraordinary circumstances, a district court may authorize the marriage of a person less than 16 years of age if the court finds that:
> (a) The marriage will serve the best interests of such person; and
> (b) Such person has the consent required by paragraph (a) or (b) of subsection 1.
> Pregnancy alone does not establish that the best interests of such person will be served by marriage, nor may pregnancy be required by a court as a condition necessary for its authorization for the marriage of such person.

(ii)     <u>What marriage is not</u>.

The contours of marriage as an institution are as definitely set by laws stating what marriage is not as by those stating what it is.

Marriage is not between more than two people.  In Nevada, bigamy is a category D felony.  Nev. Rev. Stat. 201.160–170.[8]

Marriage is not between close relatives.  Incest is a category A felony.  Nev. Rev. Stat. 201.180.[9]  *See also* 122.020 (marriage between first cousins prohibited).

Marriage is not for children.  Nev. Rev. Stat. 125.320 (annulment for lack of consent).

Finally, marriage is not equivalent to domestic partnership.  Nev. Rev. Stat. 122A.510.  The domestic partnership law in Nevada was enacted in 2009 in order to provide persons living together who could not marry certain rights and benefits.  *See* discussion below at 18–20.

---

[8] Prohibition of bigamy has been long upheld as constitutional.  *See e.g. Reynolds v. United States,* 98 U.S. 145 (1878), *Murphy v. Ramsey*, 114 U.S. 15 (1885).  *See also State v. Holm*, 137 P.3d 726 (Utah 2006), cert. denied, 2007 WL 559895 (U.S. 2007).

[9] Notably the criminalization of bigamy and incest are located in Chapter 201 of the Nevada Revised Statutes, which sets forth a multitude of "Crimes against Public Decency and Good Morals."  Nearly every state's statutes contain similar provisions, evincing a legitimate and ubiquitous state purpose. *See e.g.* CA PENAL Pt. 1, T. 9, O.R.S. T. 16, Ch. 167; N.Y. Penal Law Ch. 40, Pt. THREE, T. M.

The institution of traditional marriage pervades Nevada law and society. Its presence exists in almost countless statutes, but the following are particularly important because they have a defining effect on Nevada's society.

## B.    MARRIAGE'S DEFINING EFFECT.

Nevada's statutes evince a strong encouragement of marriage in its traditional form. These laws are not based on policy whimsy; they are grounded in policy as deeply rooted as any that exists in Nevada law. They define Nevada society.

### (i)    Property rights.

Nevada is a community property state. Nev. Rev. Stat. 123.220. Chapter 123 of the Nevada Revised Statutes defines the property rights of "husband and wife," nine times using that specific phrase.

Nevada statutes also:

> (1) allow husband and wife to sue or be sued together;
> (2) grant a surviving spouse first rights as administrator of the intestate estate of a deceased spouse, Nev. Rev. Stat. 139.040;
> (3) provide surviving spouses rights to authorize burial of the other, Nev. Rev. Stat. 451.023–451.025, and autopsy of the other. Nev. Rev. Stat. 451.010
> (4) establish the relative rights to property of a husband and wife. "The respective interests of the husband and wife in community property during continuance of the marriage relation are present, existing and equal interests . . . ." Nev. Rev. Stat. 123.225(1).

11

Succession of community property upon the death of a spouse is defined by law.  Nev. Rev. Stat. 111.779, 123.250.

(ii)    Licensure of marriage.

The solemnity of marriage comes in large part from the State sanction it receives by virtue of licensing, for which there is an extensive system.  Generally licensing is done by the seventeen county clerks.  Nev. Rev. Stat. 122.040.  The form of the license is specified by the legislature, Nev. Rev. Stat. 122.050, as are the fees.  Nev. Rev. Stat. 122.045, 122.060.  The requirements for licensure are enforced with criminal penalties.  *See e.g., inter alia,* Nev. Rev. Stat. 122.210 (unauthorized issuance of license, penalty), Nev. Rev. Stat. 122.220 (solemnization without exhibition of license, penalty).

(iii)    Recordation of marriage.

The significance of the marriage institution in Nevada is also demonstrated by the State's system of redundant recordation.  In the counties, clerks are required to record marriages.  Nev. Rev. Stat. 246.100–246.190; county recorders, too, record them when they are presented.  Nev. Rev. Stat. 247.120.  Marriages are also recorded at the State level.  *See* Nev. Rev. Stat. 440.595.  The requirements for recordation are enforced with criminal penalties for violation of the requirements. *See e.g.* Nev. Rev. Stat. 122.230 and 122.240.

///

12

(iv)   <u>Solemnization of marriage</u>.

State law identifies who may perform marriage ceremonies.  Nev. Rev. Stat. NRS 122.062–122.073.   It also penalizes unauthorized persons who perform marriage ceremonies.   Nev. Rev. Stat. 122.260.   "The State has a paramount interest in the marriage ceremony and its ramifications."  *Galloway,* 83 Nev. at 23.

## 2.   MARRIAGE IN NEVADA'S CASE LAW.

The positive law speaks for itself, as demonstrated above; there is no need or call for a witness other than the law to explain the State's purpose.  These various statutory provisions proclaim the high importance of the institution of traditional marriage to the State of Nevada.   In addition, Nevada's highest Court has expounded upon that meaning and has left a clear trail of precedent describing it.

Remarkably, and tellingly, Sevcik makes not a single citation to Nevada decisional authority.   Nor do supporting amici.   They may seem unimportant, or perhaps harmful, to Sevcik's ultimate objective, but the words of Nevada's highest court are in fact a rich and significant source of information about marriage in Nevada.

Marriage as an institution in Nevada is older than the State itself.   It is based upon  the common law of England, which remains the State's basic law.  Nev. Rev. Stat. 1.030 ("[t]he common law of England, so far as it is not repugnant to or in conflict with the Constitution and laws of the United States, or the Constitution and

13

laws of this State, shall be the rule of decision in all the courts of this State"). The common law of marriage was very early recognized in Nevada to be the law of the Nation and the State. *See Wuest v. Wuest,* 17 Nev. 217, 30 P. 886 (Nev. 1880) ("[t]he law of marriage and divorce, as administered by the ecclesiastical courts, is a part of the common law of this country, except as it has been altered by statutes").

The protection of this institution—marriage as derived from the common law—is the basis for all of the State's laws on the subject. "The state, or sovereign, is deeply concerned in maintaining the integrity and permanence of the marriage relation, on which depends so much the happiness of the people and the progress of civilization." *State v. Moore,* 46 Nev. 65, 77, 207 P. 75 (1922).

The State's highest court has explained the institution and its historical origins:

> Prior to 1858, and from a very remote period in England, the ecclesiastical tribunals had exclusive jurisdiction over divorce . . . .
> The common law which we received in this country from England was the common law as it existed when this jurisdiction still belonged to the ecclesiastical courts . . . .
> By an act of Parliament passed in 1857, and by its provisions made effective in 1858, known as the Matrimonial Causes Act, the jurisdiction of the ecclesiastical courts over divorce was transferred to a court established by the same act and called "The Court for Divorce and Matrimonial Causes" . . . .

14

*Id.,* 46 Nev. 65, 76–77, 207 P. 75 (1922).

In its exposition of marriage, the Nevada Court found firm support in the decisions of the United States Supreme Court.

> In the Supreme Court of the United States, the court, speaking through Mr. Justice Field, said: ". . . It [marriage] is an institution, in the maintenance of which in its purity, the public is deeply interested, for it is the foundation of the family and of society, without which there would be neither civilization nor progress."

*Id.,* 46 Nev. at 78 (quoting *Maynard v. Hill,* 125 U. S. 190).[10]  Based on such authorities, the Court in *Moore* discerned a "universal judicial view of the importance of the marriage relation to the state." *Id.*

The historical roots from which modern traditional marriage evolved were also described in 1917 in *Blakeslee v. Blakeslee*:

---

[10] Additional like authority appears in *In Re Burrus,* 136 U.S. 586, 593–94 (1890) (the "whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States, and not to the laws of the United States"); *Murphy v. Ramsey*, 114 U.S. 15, 45 (1885) (for certainly no legislation can be supposed more wholesome and necessary . . . than that which seeks to establish it on the basis of the idea of the family, as consisting in and springing from the union for life of one man and one woman in the holy estate of matrimony; the sure foundation of all that is stable and noble in our civilization; the best guarantee of that reverent morality which is the source of all beneficent progress in social and political improvement"); *Maynard v. Hill,* 125 U.S. 190, 211 (1888) ("marriage . . . is something more than a mere contract. . . . It is an institution, in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family and of society, without which there would be neither civilization nor progress") (quoted in *State v. Moore*, 46 Nev. 65, 78, 207 P. 75 (1922)); *United States v. Yazell*, 382 U.S. 341, 353 (1966) (describing family law as a "peculiarly state province").

> Christianity struck a standard for monogamous marriages; the relationship thus established, whether recognized as sacramental or as contractual, has been the subject of thought by theologians, academicians, philosophers, and jurists.
>
> Viewed either from the standpoint of the ecclesiastical domain, where it is primarily recognized as sacramental in nature, or from that of the civil or common law, where it takes the form of contract only, this relationship is regarded as the nucleus of modern civilization, being that around which groups the family, the basis of human existence. Thus courts and lawgivers have dealt with the question with a view to uniformity of rule and harmony of consideration.

*Blakeslee v. Blakeslee,* 41 Nev. 235, 168 P. 950 (1917).  In other words, the marriage institution is fundamentally important to society, and to the State. Without a doubt there is no other institution that has been called  the "nucleus of modern civilization."  The State therefore has a deep, abiding interest in defining what marriage is:  "The power of our Legislature to enact this statute, and others of similar nature, wherein that body, representing the people of the state, seeks to regulate marriage and divorce, will, we apprehend, not be questioned.  *Merritt v. Merritt,* 40 Nev. 385, 160 P. 22 (Nev. 1916).  And this means that the State is within its rights to identify factors serving as qualifying criteria:

> Generally speaking, the marital status of the citizen, the age of consent, the manner in which marriage may be solemnized, the obligations it imposes affecting personal or property rights, the time, condition of residence and causes required for obtaining divorce, are all within the control of the state and subject to her laws as enacted by the Legislature.

16

*Tiedemann v. Tiedemann*, 36 Nev. 501, 137 Pac. 826 (concurring opinion of C.J. Talbot).

In sum, the State's highest court has confirmed what the statutes reflect. Its holdings and pronouncements are not an historical curiosity; they are part of the living law of the State. They deserve consideration and respect.

### 3.      MARRIAGE IN NEVADA'S CONSTITUTION.

The People of the State of Nevada, through their elected representatives, enacted Nev. Rev. Stat. 122.020 defining marriage to be between a man and a woman. More than one hundred years subsequently, the People of the State of Nevada amended their constitution through a ballot initiative[11] to reiterate and reinforce this definition.[12]

By this process, since 2002, Nevada's highest law—its Constitution—has stated: "Only a marriage between a male and female person shall be recognized and given effect in this state." NEV. CONST. art. 1, § 21. This provision, enacted by citizen petition, did not change any law, and it did not take away any right.

---

[11] Nevada's initiative process is governed by NEV. CONST. art. 19 and Nev. Rev. Stat. Chapt. 293.

[12] Additional references to marriage in Nevada's constitution occur at art. 4, sec. 30, referring to "husband and wife" in defining homestead exemption; and art. 4, sec. 31, pertaining to separate property of married individuals.

Instead it put into the constitution what had already been enacted into law in Nev. Rev. Stat. 122.020.

Nevada legislators last year also took a first step to repeal the amendment that defined marriage as being between a man and woman with passage of Senate Joint Resolution 13. If approved by the legislature again in 2015, and ratified by the voters at the 2016 General Election, the measure would amend the constitution, effective November 22, 2016, to read:

> 1. The State of Nevada and its political subdivisions shall recognize marriages and issue marriage licenses to couples, regardless of gender.
> 2. Religious organizations and clergy have the right to refuse to solemnize a marriage and no person has the right to make any claim against a religious organization or clergy for such a refusal.
> 3. All legally valid marriages shall be treated equally under the law.

Statutes of Nevada 2013, p. 3962.

### 4.    PARTNERSHIP LAW

In 2009, legislative hearings[13] were conducted on Senate Bill 283, at each of which the dialogue was respectful and decorous. The legislative history of the

---

[13] Hearings were conducted on March 27 and April 8, 2009, before the Senate Committee on Commerce and Labor; and May 8 and 12, 2009, before the Assembly Judiciary Committee. Minutes of the hearings are available online at http://www.leg.state.nv.us/Session/75th2009/Reports/HistListBills.cfm?DoctypeID=2.

measure reflects that it was intended to extend certain legal benefits to couples who could not marry.

> This bill is about fairness. All couples should have legal protections for their relationships. These couples buy homes, have families and in other ways seek to create stable, productive lives. Legal protections for their relationships will provide basic security that other long-term committed couples have. A domestic partnership is a social contract between two persons who have chosen to share one another's lives in an intimate and committed relationship. This bill specifically clarifies that a domestic partnership is not a marriage as defined in section 21 of Article 1 of the Nevada Constitution.

Statement of Senator David R. Parks, Minutes of the Senate Committee on Commerce and Labor, Seventy-fifth Session, at 12 (March 27, 2009). Senator Parks at a subsequent hearing said, "On Friday, February 27, we saw a roomful of individuals who wanted Nevada State law to recognize them and their feelings for each other. This bill establishes domestic partnerships for all individuals who are not married or cannot qualify." Statement of Senator David R. Parks, Minutes of the Senate Committee on Commerce and Labor, Seventy-fifth Session, at 39 (April 8, 2009).

The former and first Dean of Nevada's law school spoke at length on the measure:

> [The Domestic Partnership Act] will help committed couples to manage their lives and affairs in an orderly way. It will make it easier to implement major life decisions affecting each other and eliminate some of the

19

cumbersome aspects of the contracting process that were spoken to a moment ago by the family law expert.

Second, I think this bill, if enacted, will make Nevada a fairer and more just state. Not every committed couple can marry. This provides an alternative for those who cannot avail themselves of marriage. I think in that respect it increases the fairness and the justness of our state in its treatment of its citizens.

Third, I see this bill as bringing positive economic effects to the state. Many highly productive people will be attracted to, or retained in, Nevada by this sort of legal recognition of domestic partnerships. Some of those people will be couples who will avail themselves of the benefits of the domestic partner legislation. Others will be people who are attracted here because this sort of legislation and treatment of Nevada's citizens sends a good signal that this is a fair state and one in which people should come to work and be productive.

Finally, I see this legislation as reaffirming the state's policy of encouraging committed relationships between responsible adults. We want, as a matter of public policy, to encourage long-term, stable, committed relationships between adults as opposed to quickie marriages, promiscuity, and other hedonistic behavior.

Providing legal recognition of such relationships through a domestic partnership, or a marriage in the cases where marriage is available, I think furthers that public policy interest.

Statement of Richard Morgan, Minutes of the Assembly Committee on Judiciary, Seventy-Fifth Session, at 12 (May 8, 2009).

///

///

## V.    SUMMARY OF ARGUMENT

The district court did not err when it granted Nevada's motion to dismiss this action challenging Nevada's legal definition of marriage. The U.S. Supreme Court had already ruled on Sevcik's legal arguments, in *Baker v. Nelson,* putting the legal action outside the court's jurisdiction. The Court's summary dismissal of the petition for certiorari in *Baker* was a ruling on the merits. Nothing since *Baker v. Nelson* has altered its precedential status.

Further, the district court did not err when it granted summary judgment to the State because the issues were all legal ones, and there was and is no genuine issue of material fact for decision. Nevada law that defines marriage to be between a man and a woman is legitimate, whether measured under equal protection or due process standards. The interest of the State in defining marriage in this manner is motivated by the state's desire to protect and perpetuate traditional marriage. In establishing this criterion and others—e.g., age, consanguinity, unmarried status, etc.—the State exercises its prerogative as a State, and that exercise is entitled to respect. The State's definition of marriage is not motivated by animus against any group, but it is instead in adherence to a traditional standard, which is a legitimate state purpose.

Therefore the district court was correct when it dismissed Sevcik's suit, and was correct when it granted summary judgment to the State.

///

## VI.    ARGUMENT

### 1.    STANDARD OF APPELLATE REVIEW.

The district court's ruling on the constitutionality of Nevada's law is reviewed de novo. *MHC Financing Ltd. Partnership v. City of San Rafael*, 714 F.3d 1118, 1126 (9th Cir. 2013). So also is a grant of summary judgment, *Delta Savings Bank v. U.S.*, 265 F.3d 1017, 1021 (9th Cir. 2001) ([t]he court must determine . . . whether there are any genuine issues fo fact and whether the district court correctly applied the relevant substantive law"); and as well dismissal of an action under Fed. R. Civ. P. 12. *Kruso v. International Telephone & Telegraph Corp.*, 872 F.2d 1416, 1421 (9th Cir. 1989).

The question of federal subject matter jurisdiction is also reviewable de novo. *Clayton v. Republic Airlines, Inc.,* 716 F.2d 729, 730 (9th Cir. 1983).

### 2.    INTRODUCTION.

Nevada became the 36th State in 1864 when, on October 31, 1864, President Lincoln proclaimed Nevada's admission to the Union. 1864 Pres. Proc. No. 22, 13 Stat. 749 (October 21, 1864). The State was admitted on an equal footing with all other States. *Ex Parte Crosby,* 38 Nev. 389, 149 Pac. 989, 990 (1915), citing, *inter alia, Pollard v. Hagan*, 3 How. 212, 11 L. Ed. 565, *Shively v. Bowlby*, 152 U. S. 1, 14 Sup. Ct. 548.

This legal case occurs in an environment of passionate nationwide debate about the abstract question whether same-sex partners have, or should have, a constitutional right to marry. But this case is about one State's—Nevada's—laws. It presents a concrete, not an abstract, set of issues.

Two specific enactments of Nevada's positive law are challenged. One of these is statutory. Even before statehood, the 1861 territorial laws of Nevada defined marriage as existing between "a male and a female." Section 2, Chapt. 33, Statutes of Nevada 1861. The same limitation on marriage was codified in 1867 in the Statutes of Nevada and it is substantially the same today. 1867 Nev. Stat. 88; Nev. Rev. Stat. 122.020(1).

The Petitioners also challenge a separate, constitutional provision of more recent vintage. In 2002, Nevada's constitution was amended by citizen petition by adding Article 1, section 21, to state "Only a marriage between a male and female person shall be recognized and given effect in this state." NEV. CONST. art. 1, § 21.

The purpose of this appearance is to defend on appeal the district court's decision, *see* 911 F. Supp. 2d 996, upholding both the statute and the constitutional amendment. In order to do so, the State here demonstrates that the court's decision was correct on the law. Judge Jones' decision, though 41 pages in length, is simply outlined: (1) *Baker v. Nelson* is controlling precedent and required dismissal of Sevcik's equal protection action; and (2) even if *Baker* is not controlling, Nevada's

laws are valid as against an equal protection challenge because distinctions drawn based upon sexual orientation are subject to rational basis review, under which Nevada's purpose of preserving the traditional institution of marriage is both a conceivable and legitimate basis for the distinction drawn.[14]

The court's decision was correct on both points. Furthermore, even though renounced by Sevcik in district court, any possible argument based on marriage as a substantive due process right was addressed by the district court in footnote nine of the order. 911 F. Supp. 2d at 1017, n.9. Same-sex civil marriage, concluded the court, is not a fundamental right. This conclusion was also correct for the reasons set forth below.

## 3. THE DISTRICT COURT'S DECISION WAS CORRECT AS A MATTER OF LAW.

### A. *Baker v. Nelson* Required Dismissal.

Sevcik's theory from the outset was that laws preventing same-sex couples from marrying are invalid because they violate the equal protection guarantees of the U.S. Constitution. But this argument was decided adversely to Sevcik's position in *Baker v. Nelson*, 191 N.W.2d 185, 185 (Minn. 1971). And a petition for certiorari was thereafter summarily dismissed. 409 U.S. 810 (1972) (mem.).

---

[14] Even though renounced below by Sevcik, any possible due process argument based on same-sex marriage as a substantive due process right was addressed by the district court. 911 F. Supp. 2d at 1017, n.9. Same-sex civil marriage, concluded the court, is not a fundamental right. *Id.*

24

Based upon this precedent, there is no federal question presented in this case. The central subject matter involved—the definition of marriage—is peculiarly and traditionally the right of states to define. States have always had "the absolute right to prescribe the conditions upon which the marriage relation between [their] own citizens shall be credited . . . ." *Pennoyer v. Neff,* 95 U.S. 714, 734–35 (1878), *reaffirmed in Sosna v. Iowa,* 419 U.S. 393, 404 (1975).

The right of states to define marriage was so well-established that the U.S. Supreme Court labeled a same-sex challenge to marriage laws unsubstantial. In *Baker v. Nelson,* 191 N.W.2d 185 (Minn. 1971), two men challenged Minnesota's law limiting marriage to opposite sex couples. The state court quoted *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942):

> Marriage and procreation are fundamental to the very existence and survival of the race. This historic institution manifestly is more deeply founded than the asserted contemporary concept of marriage and societal interests for which petitioners contend. The due process clause of the Fourteenth Amendment is not a charter for restructuring it by judicial legislation.

*Baker v. Nelson*, 191 N.W.2d at 186 (internal quotations omitted). Following this, the court expressly held: "The equal protection clause of the Fourteenth Amendment, like the due process clause, is not offended by the state's classification of persons authorized to marry. There is no irrational or invidious discrimination." *Id.*, 191 N.W.2d at 187. On appeal to the U.S. Supreme Court,

the *Baker* decision was affirmed by the Court's summary dismissal of the appeal for want of a substantial question. *Baker v. Nelson*, 409 U.S. 810 (1972) (mem.).

This disposition by the U.S. Supreme Court was a decision on the merits. *Hicks v. Miranda,* 422 U.S. 332, 344 (1975). *Perry v. Nelson*, 671 F.3d at 1097 (N.R. Smith, Circuit Judge, concurring in part and dissenting in part.)*, quoting Mandel v. Bradley,* 432 U.S. 173, 176 (1977) (per curiam).[15]  Sevcik's best argument that *Baker* does not control is a novel one based on the content of oral arguments in *Windsor*.  *See* Opening brief at 96 (recounting observation made by a single justice).  Then correctly noting that *Baker* is not even mentioned in the *Windsor* decision,[16] Sevcik counter-intuitively concludes that "[a]ny lingering shadow *Baker* may have cast, however, was extinguished." *Id.*  This reasoning simply does not match the district court's well-reasoned analysis.  To the contrary, *United States v. Windsor confirms* the States' right to define marriage in the

///

---

[15] At least one federal court has held that *Baker* is no longer controlling. *See Kitchen v. Herbert*, ___ F. Supp. 2d ___, 2013 WL 6697874, \*7–8 (D. Utah). However, that court's view is contrary to the district court's holding in the present matter, and it lies in the Tenth Circuit. *See also* ___ S.Ct. ___, 2014 WL 30367 (2014) (U.S. Supreme Court order granting application for stay of permanent injunction pending final disposition of appeal by the Tenth Circuit).

[16] *Baker* is also not referenced in the decision in *Hollingsworth v. Perry,* 133 S.Ct. 2652 (2013).

manner in which it has traditionally been done and *Baker* remains undisturbed by the Court.[17]

Because, based on *Baker v. Nelson*, there was no substantial federal question presented by the complaint in this action below, the district court lacked jurisdiction, *see, e.g., Charmicor, Inc. v. Deaner*, 572 F.2d 694, 695 (9th Cir. 1978) (affirming dismissal where complaint failed to state a claim and there was no substantial federal question), and consequently and properly dismissed it.  Lack of a substantial federal question was and is a proper ground for dismissal.  *Id.  See also David v. New York Tel. Co.,* 470 F.2d 191 (2nd Cir. 1972) ("[s]ince jurisdiction under § 1343(3) depends on the statement of a substantial federal question, we affirm the dismissal of the complaint here on that [failure to state a claim] ground") (citations omitted), *Smith v. City of Las Vegas,* 439 F.2d 706 (9th Cir. 1971), *Gilstrap v. Standard Oil Co*., 108 F.2d 736 (9th Cir. 1940).

///

///

///

---

[17]  *Accord,* Daniel O. Conkle, *Evolving Values, Animus, and Same-Sex Marriage*, 89 Ind. L.J. 27 (2014) ("The Court evaded the Fourteenth Amendment issue in *Hollingsworth*, and it explicitly confined its decision in *Windsor* to the federal Defense of Marriage Act (DOMA). *Baker v. Nelson* may still be controlling").

**B.** **Nevada's Law Is Valid under Equal Protection Provisions of the Constitution.**

In spite of concluding properly that the action should be dismissed, the district court proceeded to analyze the action as though *Baker v. Nelson* did not govern. The court's analysis here, too, was correct in every important respect and should be affirmed on appeal.

Sevcik originally challenged Nevada's laws by arguing that the laws violate the equal protection guarantees of the U.S. Constitution. The district court treated the argument in faithful adherence to the accepted legal model:

> In analyzing an equal protection challenge, a court first identifies the categorical distinction the state has drawn and determines what level of constitutional scrutiny applies to such distinctions. . . . The court then scrutinizes the challenged law, accordingly.

911 F. Supp. 2d 1004. The Court concluded that the laws—statute and amendment—classify according to sexual orientation. *Id.* at 1005 ("the distinction is definitely sexual-orientation based"). It then determined that classification on such basis is afforded rational basis review. Under that standard, the court correctly concluded the State's laws are constitutional.

**i.** **The Law Does Not Classify on the Basis of a Suspect or Quasi-suspect Class.**

Characterizing the classifications drawn by Nevada's laws is necessary in order to ascertain the appropriate level of scrutiny applied to them. Heightened

28

scrutiny is used to measure laws distinguishing on the basis of characterizing traits such as race, sex, illegitimacy, religion, alienage, and national origin. *City of New Orleans v. Dukes,* 427 U.S. 297, 303 (1976). Other classifications are judged under rational basis review. *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432 (1985) (challenged legislation is presumed valid and will be sustained if classification drawn is rationally related to a legitimate state interest).

To escape rational basis review and invoke heightened scrutiny, Sevcik first argues that Nevada's laws discriminate against an already-established suspect class, sex or gender. As a back-up, Sevcik argues that same-sex couples qualify as a new or additional suspect class, using the criteria of a three-part test typically employed to determine whether a classification calls for heightened scrutiny. Daniel O. Conkle, *Evolving Values, Animus, and Same-Sex Marriage*, 89 Ind. L.J. 27 (2014). Neither argument is legally accurate.

Judge Jones below examined and rejected Sevcik's argument that Nevada's laws discriminate on the basis of the already-suspect class of gender.

> Although the State appears to have drawn no distinction at all at first glance, and although the distinction drawn by the State could be characterized as gender-based under the *Loving* reciprocal-disability principle, the Court finds that for the purposes of an equal protection challenge, the distinction is definitely sexual-orientation based. *The issue turns upon the alleged discriminatory intent behind the challenged laws . . . .*

29

911 F. Supp. 2d at 1005.   The court supported this latter proposition—which is indubitably a correct statement of the law—with citation to *Washington v. Davis*, 426 U.S. 229, 240 (1976) (stating "the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose").  *Id.*[18]

Contrary to Sevcik's assertion, Nevada's law does not classify on the basis of sex.   In 2010, one writer recounted, "twelve state reviewing courts, three federal courts, and the District of Columbia Court of Appeals have all held that statutes reserving marriage to opposite-sex couples 'do [ ] not subject men to different treatment from women; each is equally prohibited from the same conduct.'"  Paul Benjamin Linton, Esq., *Same-Sex Marriage and the New Mexico Equal Rights Amendment,* 20 Geo. Mason U. Civ. Rts. L.J. 209 (2010) (citation omitted).  The case count has changed since 2010 but the clear majority view is still that marriage laws like Nevada's do not discriminate on the basis of sex (*compare Kitchen v. Herbert,* ___ F. Supp. 2d ___, 2013 WL 6697874, *28 (D. Utah 2013) stating that "the law discriminates on the basis of sexual identity without a rational reason to do so"; and *Bishop v. U.S.*, ___ F. Supp. 2d ___, 2014 WL 116013 (N.D. Okla. 2014) (holding that Oklahoma's law does not discriminate on the basis of gender).

Obviously, Nevada's law does not classify on the basis of race.  But much of Sevcik's and amici's argument is based on the analogy they suggest between this

---

[18] While the State agrees with the statement of the test, it does not agree or concede that its laws discriminate on the basis of sexual orientation.

case and the decision in *Loving v. Virginia,* 388 U.S. 1 (1967). *See also* Robert A. Destro, *"You Have the Right to Remain Silent": Does the U.S. Constitution Require Public Affirmation of Same-Sex Marriage?,* 27 BYU J. Pub. L. 397 (2013).

> [T]he analogy to race is the single, most powerful rhetorical argument in favoring legal recognition of same-sex relationships; for it explicitly appropriates the moral force of the civil-rights movement, as exemplified by the leadership of Dr. Martin Luther King, Jr., the courage of Rosa Parks, and the quiet courage and perseverance of millions of African Americans (and their supporters) in the face of generations of slavery, legally enforced racial segregation, political exclusion, and ongoing debates over the most efficient ways to eliminate that legacy.

*Id.* at 419–20.

Race, however, is *sui generis*. Race was the first suspect classification. Race is still a suspect classification. *See Fisher v. University of Texas at Austin*, 133 S.Ct. 2411, 2419 (2013) (holding that Fifth Circuit Court of Appeals did not apply correct standard of strict scrutiny to university applicant's complaint regarding denial of admission to state university on account of race).

More than one author has quarreled with the attempted analogy made between race and sexual preference. *See e.g.* Aderson Bellegarde François, *To Go Into Battle with Space and Time: Emancipated Slave Marriage, Interracial Marriage, and Same-Sex Marriage,* 13 J. Gender Race & Just. 105 (2009). "I am no longer certain that the analogy between opposition to interracial marriage and opposition to same-sex marriage is as irrefutably sound as civil rights advocates and legal scholars have

31

sought to demonstrate," writes Francois. *Id.* at 107. The mistaken analogy he imputes to its proponents failure to understand the historical conditions that underlie the treatment of race in the law. Sevcik makes the same mistake, and *Loving* does not control this case.[19]

The district court correctly rejected the analogy as inapt. 911 F. Supp. 2d at 1005. And the court also correctly held that Nevada's laws do not implicate rights of any new quasi-suspect class. Applying the three "traditional factors" identified in *High Tech Gays*, 895 F.2d 563 (9th Cir. 1990), the court concluded—the same as this Court in *High Tech Gays*—that same-sex couples are not a suspect class entitled to heightened protection or scrutiny of classifications. In particular, "the Supreme Court has not ruled that homosexuals lack political power ," concluded the court, so there is no argument to disregard *High Tech Gays,* 911 F. Supp. 2d at 1008; and in fact this "group has great political power." *Id.*

Sevcik's argument to the contrary is not persuasive. It relies on the Court's overturning of *Bowers v. Hardwick*, 478 U.S. 186 (1986), in *Lawrence v. Texas*, 539 U.S. 558 (2003). The principal fault in this argument is that it stretches *Lawrence* too far. *Lawrence* and *Bowers* concerned the State's authority to enact

---

[19] *Accord,* Jeremiah Egger, *Glucksberg, Lawrence, and the Decline of Loving's Marriage Precedent*, 98 Va. L. Rev. 1825 (2012).

criminal provisions, not civil marriage provisions as in this case.[20]  In fact, "in case after case, state courts and lower federal courts have distinguished or otherwise failed [even] to follow *Lawrence* in a variety of *criminal* law contexts."  J. Kelly Strader, *Lawrence's Criminal Law,* 16 Berkeley J. Crim. L. 41, 55 (2011) (emphasis added).  *See also* Note, *Fixing Lawrence,* 118 Harv. L. Rev. 2858, 2860 (2005) ("A significant share of . . . scholarship thus manifests the desire not to read *Lawrence* too closely, lest the actual opinion end up not saying what has been imputed to it").

*Lawrence's* reasoning found a "protected right of homosexual adults to engage in intimate, consensual conduct," 539 U.S. at 576, triggering *due process* protection against *criminal prosecution*.  There is no lack of commentators who have observed the dissimilarities from a case such as this one;[21] the district court's discernment of them was both well-founded and correct as a matter of law.

///

---

[20] *Cf. Lofton v. Sec'y of the Dep't of Children & Family Services,* 358 F.3d 804 (11th Cir. 2004) (distinguishing *Lawrence* by noting that Florida's challenged adoption statute was civil rather than criminal).  *See also* Susan Frelich Appleton, *Illegitimacy and Sex, Old and New,* 20 Am. U. J. Gender Soc. Pol'y & L. 347, 369 n. 128 (noting that the *Lawrence* "majority's disclaimers signal significant limitations on the holding . . . suggesting that civil laws, as distinguished from criminal penalties, might well remain within constitutional bounds").

[21] *See generally,* Eric Berger, *Lawrence's Stealth Constitutionalism and Same-Sex Marriage Litigation,* 21 Wm. & Mary Bill Rts. J. 765 (2013); Justin Reinheimer, *What Lawrence Should Have Said: Reconstructing an Equality Approach*, 96 Cal. L. Rev. 505 (2008).

33

## ii.     Nevada's Law Is Not Motivated by Animus.

Animus, akin to intent, is also key in determining whether any particular group is suspect. *Romer v. Evans,* 517 U.S. 620 (1996). *See also* district court decision, 911 F. Supp. 2d at 1020.    In this regard, no one has produced any historic showing that the nineteenth century Nevada Legislature even had in mind same-sex partners when it enacted what is now Nev. Rev. Stat. 122.020.  Polygamists were the only group identified in the historical record.  In reference to the Nevada Constitution's freedom of religion clause, NEV. CONST. art. 1, sec. 4, Mr. DeLong stated that "[i]t shuts up the bars . . . against polygamy." *Debates & Proceedings of the Nevada State Constitutional Convention of 1864,* at 59 (Andrew J. Marsh off. rep., 1866). Otherwise, the legislature was simply defining marriage in the manner it had traditionally been defined.

As one commentator notes:

> attempts to convince courts to label a group "suspect" "have an increasingly antiquated air in federal constitutional litigation."  Indeed, the Supreme Court has not accorded heightened scrutiny to a new classification since 1977, when it did so on the basis of non-marital parentage.

Eric Berger, *Lawrence's Stealth Constitutionalism and Same-Sex Marriage Litigation,* 21 Wm. & Mary Bill Rts. J. 765, 797 (2013).  This is no case in which to

establish any new classification as there is no animus or improper intent behind the State's laws, either Nev. Rev. Stat. 122.020 or NEV. CONST. art. 1, sec. 21.

The question of animus arose in the *Windsor* decision, with Supreme Court Justices voicing strongly differing opinions about whether Congress acted with animus when it enacted DOMA (federal Defense of Marriage Act, which states in pertinent part that "the word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife." 1 U. S. C. § 7.

Justice Kennedy identified the test: "In determining whether a law is motived by an improper animus or purpose, [d]iscriminations of an unusual character especially require careful consideration." 133 S.Ct. 2675, 2693 (internal quotation marks omitted). He then reasoned that DOMA manifested evidence of animus:

> DOMA's unusual deviation from the usual tradition of recognizing and accepting state definitions of marriage here operates to deprive same-sex couples of the benefits and responsibilities that come with the federal recognition of their marriages. This is strong evidence of a law having the purpose and effect of disapproval of that class.

///

///

///

///

///

35

*Id.*[22]

Unlike the intent apparently discerned by the Court in *Windsor,* there is no such discernible intent plausible in Nevada's laws, no matter how measured.[23] Self-evidently, Nevada's statute makes no "discriminations of an unusual character" by defining marriage to be between a man and a woman. Instead, this was a globally universal classification until 2004 when Massachusetts became the first state to allow same-sex marriage.[24] Animus is utterly impossible to find in relation to Nevada's statutory definition of marriage. Nev. Rev. Stat. 122.020. There was no "deviation

---

[22] Justice Scalia made issue with the majority conclusion that animus underlay DOMA: "That is not animus—just stabilizing prudence. Congress has hardly demonstrated itself unwilling to make such further, revising judgments upon due deliberation." 133 S.Ct. at 2708 (Scalia, J., dissenting).

> [T]he majority says that the supporters of this Act acted with malice—with the purpose . . . to disparage and to injure, . . . to demean, . . . to impose inequality, . . . to impose . . . a stigma, . . . to deny people equal dignity, . . . to brand gay people as unworthy, . . . and to humiliat[e ] their children . . . .

*Id.* (internal citations and quotation marks omitted). Justice Scalia found no evidence upon which to base such a conclusion: "I am sure these accusations are quite untrue." *Id.* In his view, the majority decision was a "high-handed invalidation of a presumptively valid statute." *Id.* at 2708–09.

[23] The legal concept of animus is explored extensively in Susannah W. Pollvogt, *Windsor, Animus, and the Future of Marriage Equality*, 113 Colum. L. Rev. Sidebar 204 (2013).

[24] Linda C. McClain , *From Romer v. Evans to United States v. Windsor: Law as a Vehicle for Moral Disapproval in Amendment 2 and the Defense of Marriage Act,* 20 Duke J. Gender L. & Pol'y 351, 416 (2013).

from [ ] usual tradition" by the first Nevadans when they defined marriage to be between a man and a woman. "Disapproval of that class," 133 S.Ct. at 2693, was not on any legislator's mind in 1867 when the law was enacted. The record will defy any contrary position. Animus against any class would need be entirely synthesized.

With respect to the constitutional amendment enacted in 2002 by petition, it is not possible to honestly say what was in the voters' minds when they passed the law. A court should "be reluctant to probe the minds of the voters in an attempt to quantify the effects of these various factors" leading to passage of a measure. *Kardules v. City of Columbus,* 95 F.3d 1335, 1355 (6th Cir. 1996). It is clearly possible that *some* individual voters were motivated by *some* animus against same-sex couples; but that conceded, there is no basis to say that was the pivotal, or dominant, or determinative factor for any number—much less a majority—of voters. It is just as likely that any individual voter simply preferred the traditional definition of marriage and agreed with the amendment in the ballot box as a result. That is a far stretch from *animus.*

Finally it bears noting that *Windsor* does not inform the equal protection analysis.

> [I]f [*Windsor*] is meant to be an equal-protection opinion, it is a confusing one. The opinion does not resolve and indeed does not even mention what had been the central question in this litigation: whether, under the Equal Protection Clause, laws restricting marriage to a man and a woman are reviewed for more than mere rationality.

37

133 S.Ct. at 2706 (Scalia, J., dissenting).  The majority itself recognized *Windsor's* limited application: "This opinion and its holding are confined to those lawful [same-sex] marriages [recognized in New York]."  133 S.Ct. at 2696.  Nothing more is meant by the decision than that due process under the Fifth Amendment prevents Congress from enacting DOMA ("that intervention," 133 S.Ct. at 2691), since DOMA transgresses State primacy with respect to domestic relations law.  "DOMA, because of its reach and extent, departs from this history and tradition of reliance on state law to define marriage."  133 S.Ct. 2692.

### iii.    Nevada Has a Legitimate State Interest in Using the Traditional Definition of Marriage

Given that no suspect or quasi-suspect class is involved, and that there is no animus directed at any group, the question for Equal Protection purposes then becomes "whether 'there is any reasonably conceivable state of facts that could provide a rational basis for the classification.' *Heller*, 509 U.S. at 319–20, 113 S.Ct. 2637."  911 F. Supp. 2d at 1014.  Answering this question also entails identifying a legitimate state interest.

On a challenge to a state classification, the question is a purely legal one.  "A State . . . has no obligation to produce evidence to sustain the rationality of a statutory classification."  *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 315 (1993).  "[A] legislative choice is not subject to courtroom fact-finding and may be based on

rational speculation unsupported by evidence or empirical data." *Id.  See also Mass. v. U.S.,* 682 F.3d 1, 7 (1st Cir. 2012)  ("the issues presented are themselves legal in character, even though informed by background information as to legislative purpose and 'legislative facts' bearing upon the rationality or adequacy of distinctions drawn by statutes").[25]

This circuit has held that, when considering a law such as this under the rational basis standard, "we must determine whether there is any reasonably conceivable state of facts that could provide a rational basis for the classification . . . because this case involves social and economic policy, and neither targets a suspect class nor impinges upon a fundamental right."  *RUI One Corp. v. City of Berkeley,* 371 F.3d 1137, 1154 (9th Cir. 2004) (internal citations and quotation marks omitted). *Accord, Merrifield v. Lockyer,* 547 F.3d 978 (9th Cir. 2008).

The State's legitimate interest furthered by the enacted laws defining marriage is that of preserving traditional marriage, i.e., marriage as it has existed and has been defined for all of recorded human history.  The court agreed: "the maintenance of the traditional institution of civil marriage as between one man and one woman is a legitimate state interest."  911 F. Supp. 2d at 1021.  *See also Lawrence,* 539 U.S. at

---

[25]  Numerous articles explore the proper role of fact finding in constitutional law cases.  *See e.g.,* Angelo N. Ancheta, *Science and Constitutional Fact Finding in Equal Protection Analysis*, 69 Ohio St. L.J. 1115 (2008).

585 (O'Connor, J., concurring in the judgment) (expressly noting the "legitimate state interest . . . [in] preserving the traditional institution of marriage").

The district court parsed even further. Under the umbrella of preserving marriage, it teased out the purpose of "moral disapproval" and "preventing abuse of an institution the law protects." 911 F. Supp. 2d at 1015. Citing to Justice O'Connor's concurrence in *Lawrence*, it identified legitimate state interests to also include "perpetuation of the human race," *id.*, and avoiding enumerated societal ills caused by flight of individuals from an altered institution of marriage with which they disagree. *Id.* at 1015–16.

The State's co-defendant, the Coalition, proffers separate elements constituting the State's interest. Academics[26] and courts have also attempted to pierce the veil of traditional marriage to discern its component parts. "The states' interest in regulating marriage stems from important values concerning procreation, family stability, safeguarding societal mores, and preserving personal morals." Christine Jax, *Same-Sex Marriage—Why Not?,* 4 Widener J. Pub. L. 461(1995).

_____

[26] *See e.g.* Jesse H. Choper, John C. Yoo , *Can the Government Prohibit Gay Marriage,* 50 South Texas Law Review 15, 32 ( 2008) (states' interest is "to preserve the widely shared values surrounding the traditional institution of marriage"); Matthew J. Clark*, Rational Relationship to What? How Lawrence v. Texas Destroyed Our Understanding of what Constitutes a Legitimate State Interest*, 6 Liberty U. L. Rev. 415 (2012); Robin L. West, *The Incoherence of Marital Benefits,* 161 U. Pa. L. Rev. Online 179, (2013).

Finding a purported element, critics then attack them like straw men one by one. *See e.g.,* Julie A. Nice, *The Descent of Responsible Procreation: A Genealogy of an Ideology*, 45 Loy. L.A. L. Rev. 781, 788 (2012) (setting up and purporting to knock down (1) the historical argument, (2) the doctrinal argument, (3) the moral argument, (4) the structural argument, (5) the positive-right argument, and (6) the typical last resort slippery-slope argument).

But the district court did not need to define the State interest as precisely as it did, or as either supporters or opponents of Nevada's law do. The State does not pretend to know the unknowable or attempt to prove the unprovable. It does not choose to hypothesize the elements that define the marriage formulation. Every single constituent ingredient proffered by the other defendants, and by the district court in its decision, are conceivable rationales; one might even agree they are *probably* (more likely than not) the underlying reasons for the social and legal institution of marriage. But they are also all conjecture.

The State interest is in perpetuating the institution as it is and has been without reverse engineering it to comprehend and justify its minutest parts. This is what States do and have done since the birth of the Nation.[27] And "[T]he Federal Government, through our history, has deferred to state-law policy decisions with respect to domestic relations." *Windsor,* 133 S.Ct. at 2681.

---

[27] *Cf. Alden v. Maine,* 527 U.S. 709, 727 (1999) (referring to "history and experience, and the established order of things." *Id.*).

To say, as Sevcik does, that there is no legitimate state interest now is to say there has *never* been a legitimate interest.  The assertion is astounding in its sweep.  And it is a clear invitation to the Court to, in effect, legislate.  The invitation should be rejected.

> [E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.

*FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096 (1993), *cited in Romero-Ochoa v. Holder,* 712 F.3d 1328, 1331 (9th Cir. 2013).

### C.    Nevada's Law is Valid under the Constitution's Due Process Provisions.

As with equal protection, due process requires that certain legislation be measured by strict scrutiny.  Specifically, when legislation burdens the exercise of a right deemed fundamental, the government must show that the intrusion withstands strict scrutiny.  *Zablocki v Redhail*, 434 U.S. 374, 388 (1978).  Sevcik's principal argument now is that Nevada's legal definition of marriage must be measured by strict scrutiny because the law affects a fundamental right.

The district court anticipated Sevcik's due process argument and rejected it with sound reasoning:

> As to a putative due process challenge . . . the prohibition against same-sex civil marriage has been nearly ubiquitous since antiquity, *see, e.g., Andersen v. King Cnty.,* 158 Wash.2d 1, 138 P.3d 963, 976–77 (2006) (en banc) (collecting cases). Until very recently, it has been utterly unknown to the history and traditions of this Nation, and it is still unknown in the vast majority of American jurisdictions, as well as in the vast majority of international jurisdictions. Unlike private, consensual, homosexual activity, therefore, same-sex civil marriage is not a fundamental right.

911 F. Supp. 2d 1017, n. 9. This conclusion—that Sevcik's case involves no fundamental right—is plainly correct. It is in direct accordance with the decision in *Washington v. Glucksberg*, 521 U.S. 702 (1997), which held that an asserted right to assistance in committing suicide was not a fundamental right protected by the Due Process Clause.

Even though it was not argued by Sevcik below, due process has become the cornerstone of the appeal. The reason why is no doubt the Supreme Court's decision in *Windsor* and the door that it is perceived to have opened. But the decision does not support such a sanguine view. "This opinion and its holding are confined to [ones in which state laws make them] lawful marriages." 133 S.Ct. at 2696. Chief Justice Roberts correctly observed in dissent that "the logic of its [Court majority] opinion does not decide [ ] the distinct question whether the States [ ] in the exercise of their historic and essential authority to define the marital relation may continue to utilize the traditional definition of marriage." 133 S.Ct. at 2696 (internal quotation marks and citation omitted). *Windsor* "can be distinguished in many ways. And

43

deserves to be.  State and lower federal courts should take the Court at its word and distinguish away."  133 S.Ct. at 2709 (Scalia, J., dissenting).

The Court first signaled in *Windsor* that it was engaging in Due Process analysis when it stated that DOMA "requires this Court now to address whether the resulting injury and indignity is a deprivation of an essential part of the liberty protected by the Fifth Amendment." *Windsor* at ___.  And while the Court speaks to both Due Process and Equal Protection, *Windsor* at 2693 ("DOMA [the federal Defense of Marriage Act] . . . *violates basic due process and equal protection principles* applicable to the Federal Government"), its full force occurs in discussion of the Due Process Rights of same-sex couples:

> Though Congress has great authority to design laws to fit its own conception of sound national policy, it cannot deny the liberty protected by the Due Process Clause of the Fifth Amendment.
>
> What has been explained to this point should more than suffice to establish that the principal purpose and the necessary effect of this law are to demean those persons who are in a lawful same-sex marriage. This requires the Court to hold, as it now does, that DOMA is unconstitutional as a deprivation of the liberty of the person protected by the Fifth Amendment of the Constitution.

*Windsor* at 2695.  The Equal Protection aspect of the decision concerns a right that exists as a subset of the overarching Due Process right:  "The liberty protected by the

Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." *Id*.[28]

It is widely but not universally accepted that marriage is a fundamental right. Christine Jax, *Same-Sex Marriage—Why Not?*, 4 Widener J. Pub. L. 461, 466–67 (1995). But Sevcik's claims do not rest on marriage in the traditional sense, but on a new conception of it not known or addressed by existing law. The district court correctly discerned the distinction and characterized the proffered right as the right to same-sex marriage.

Sevcik struggles to be precise about the right at interest. It is identified as "the fundamental right to marry, and the concomitant freedom to marry the spouse of their choice," but then recharacterized as a "fundamental right of liberty, privacy, and autonomy." Opening Brief at 30.

Sevcik's struggle with precision is due to the absence in precedent of the right.

---

[28] The Court's commingling of Due Process and Equal Protection analysis is denoted in Eric Berger, *Lawrence's Stealth Constitutionalism and Same-Sex Marriage Litigation,* 21 Wm. & Mary Bill Rts. J. 765, 778 (2013):

> Though the Court purported to decide *Lawrence* as a substantive due process case (with Justice O'Connor concurring on equal protection grounds), in reality it combined due process and equal protection reasoning. Rather than treating the case solely as a liberty issue, the Court blurred doctrinal categories, intertwining liberty and equality arguments.

If Sevcik's invitation to establish new substantive rights is accepted, there are others already in queue to press their own sincere desires for recognition, for respect and dignity. *Brown v. Buhman,* 947 F. Supp. 2d 1170 (D. Utah 2013) (pressing for polygamists' rights). *And see* Rose Cuison Villazor, *The Undocumented Closet*, 92 N.C. L. Rev. 1(2013) (pressing for immigrants' rights).

But new fundamental rights are seldom recognized. *Washington v. Glucksberg,* 521 U.S. 702 (1997) (assisted suicide).

> The Supreme Court has outlined the framework for evaluating a claim to the existence of a fundamental right. This "established method of substantive-due-process analysis has two primary features." *Glucksberg*, 521 U.S. at 720, 117 S.Ct. 2258. First, the asserted "fundamental right" (or "fundamental liberty") must be "deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* (internal citations and quotations omitted). Second, the analysis requires "a 'careful description' of the asserted fundamental liberty interest." *Id.*

*Kitchen v. Herbert,* 947 F. Supp. 2d 1170, 1194 (D. Utah 2013).

New substantive rights are seldom recognized, and for good reason. Substantive rights are not expressly stated in the Constitution. Lee Goldman, *The Constitutional Right to Privacy,* 84 Denv. U. L. Rev. 601, 614 (2006) (discussing the various standards used by the Court in privacy cases besides strict scrutiny). There are two "often conflicting" lines of Supreme Court precedent on how to determine what rights are fundamental.

46

> The more liberal Justices, seeking to protect minority interests, ask whether a right is central to personal dignity and autonomy or is at the heart of liberty. The more conservative Justices, fearing judicial activism at the expense of democratic preferences, insist that a right is not fundamental unless it is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty."

Edward J. Sullivan, "*Substantive Due Process Resurrected Through the Takings Clause: Nollan, Dolan, and Ehrlich*., 25 Environmental Law 155 (1995) (traces rise and fall of substantive due process). The amorphous nature of the rights serves as strong caution for their recognition, as a general rule, and as specifically applied in this case.

### D.    Marriage Lies Uniquely Within the State's Prerogative to Define.

"[W]hen a state recognizes same-sex marriage, it confers upon this class of persons "a dignity and status of immense import . . . ." *Windsor* at 2692.

Sevcik characterizes the desired remedy in this case as injunctive and declaratory. Complaint at 1. In effect, though, Sevcik seeks to compel Nevada's governmental infrastructure to confer a status. The relief sought is compulsory and its effect would result in arrogation of the State's governmental infrastructure. Sevcik seeks a status that *only* states can bestow. This pursuit is contrary to Nevada's own constitutional prerogative, and to the Constitution. *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408 (1992), *Printz v. U.S.*, 521 U.S. 898

(1997).  *Cf.*  Mae Kuykendall, *Equality Federalism: A Solution to the Marriage Wars*, 15 U. Pa. J. Const. L. 377, 391 (2013) ("The realization that halting the issuance of marriage licenses is a modest alternative to a mandate prescribing marriage law helps one see the radical nature of a rights-based direct constitutional mandate about marriage law").

*Windsor* acknowledges as much.  "[I]t is undeniable that [the majority's] judgment is based on federalism."  It rests upon the ". . . normal allocation of responsibility between State and Federal Governments."  133 S.Ct. at 2697 (Roberts, C.J., dissenting).

Sevcik's arguments should be rejected, therefore, because the objective of the action is an improper attempt to tether the State in a manner that offends the State's own, established policies.

### E.     Response to Amicus Briefs.

Seventeen amicus briefs were filed in support of Sevcik.  Most focus on equal protection, e.g. ACLU, NAACP.  Some discuss due process in addition to equal protection, *see e.g.* brief of Columbia Law School Sexuality and Gender Law Clinic (describing confluence of equal protection and due process).   With respect to these, the State's arguments already presented address their points and do not require elaboration.

A few amicus briefs make no legal argument, but instead present sociological or other published data for the Court's consideration.  *See e.g.* Brief of Amicus Curiae Gary J. Gates (presenting data about the "geography and demography of the lesbian, gay, bisexual, and transgender (LGBT) population," Brief at 1, in America); Brief of the American Psychological Association, et al. (presenting published scientific studies, argues policy points that should be presented to the legislature, not the court); Amicus Curiae Brief of the American Sociological Association on Behalf of Appellants, (addressing effect on children of same-sex parenting); Amici Curiae Brief of Bay Area Lawyers for Individual Freedom ("BALIF"), et al., (arguing by anecdote).  The State makes no quarrel with the presentation of published data itself, although it does not concede the policy conclusions which they purport to support. Furthermore, none of the data are relevant to the *legal* issues presented by this appeal.

There is some irony in the inconsistency in certain  arguments made by amici. A brief by the Family Equality Council, et al., posits that the policy issue is primarily about children, presenting "testimonials from the children raised in such families [those with same-sex parents]."  In a separate brief, Family Law Professors (who are "scholars of family law") argue that marriage is *not* about children.  Obviously different groups may have diverging viewpoints about the policy issues, all of which

reinforce the conclusion that the State's legislature is the democratic crucible where the issues should be debated and decided.

Massachusetts and a number of sister states likewise present numerous points in favor of same-sex marriage, all policy arguments. These are plausible arguments to present to state legislatures, the kinds of arguments that Hawaii's legislature—for example—may have heard before affirmatively deciding to expand the definition of marriage to include the LGBT community. These arguments, however, should be *reserved* for state legislatures; and with due respect to Massachusetts and the other states, they should not be propounded to take from Nevada's legislature and its electorate their prerogative to decide what the law will be in Nevada. Nevada can navigate its own course through the policy arguments as well as any other state.

The Anti-Defamation League presents interesting views about religion and the First Amendment. In response, the State first notes these considerations were not part of the proceedings below: there was no Establishment Clause challenge raised by Sevcik, and such arguments by the Amicus are not properly decided here on appeal. *Foti v. City of Menlo Park,* 146 F.3d 629, 638 (9th Cir. 1998). This is particularly true when, as here, the new argument presents questions of fact (i.e., the effect of religion on the electorate's choice) that were not aired below. *See Cold Mountain v. Garber*, 375 F.3d 884, 891 (9th Cir. 2004).

For many individuals there is no doubt a religious component to the argument about same-sex marriage. The State acknowledges such sincerely held beliefs, and does not take issue with the expression of any view in this respect. *See generally* Jack B. Harrison, *The Strange Intersection Between Law, Religion, and Government in the Regulation of Marriage,* 6 Charleston L. Rev. 547 (2012).[29]

But the State also does not concede the League's view that Nevada's law is sectarian; it denies that it is.

## CONCLUSION

Under an objective application of due process and equal protection analyses, there is no basis for heightened review of the State's purpose in defining marriage by its traditional meaning. There exists neither fundamental right, nor suspect or quasi-suspect class, justifying a different standard of review. Nor is there any unusual legislation justifying heightened scrutiny as there was in *Windsor*; to the contrary, the laws challenged here are those of the State of Nevada enacted consistently with its

---

[29] *See also* Hassan El Menyawi*, Same-Sex Marriage in Islamic Law*, 2 Wake Forest J.L. & Pol'y 375 (2012); Derek C. Araujo, *A Queer Alliance: Gay Marriage and the New Federalism,* 4 Rutgers J. L. & Pub. Pol'y 200 (2006) (presenting "an overview of Congress's treatment of marriage during the nineteenth century debate over Mormon polygamy. . . ."); and Allan W. Vestal, *To Soften Their Obdurate Hearts: The Southern Baptist Convention and Marriage Equality,* 21 Tul. J. L. & Sexuality 49 (2012).

own enduring custom as well of that of every other state except for a minority that have acted in the last decade.

The judgment of the district court was correct.  Both of Nevada's expressly challenged laws—Nev. Rev. Stat. 122.020 and NEV. CONST. art. 1, sec. 21—, as well as any implicitly challenged, should be confirmed as constitutional exercises of the State's prerogative to define marriage.  The judgment of the district court should be affirmed.

Respectfully submitted this 21st day of January 2014.

CATHERINE CORTEZ MASTO
Attorney General
By: /s/ C. Wayne Howle
     C. WAYNE HOWLE
     Solicitor General
     100 N. Carson Street
     Carson City, Nevada 89701
     (775) 684-1227; Fax (775) 684-1108
     whowle@ag.nv.gov
     *Attorneys for Appellee*
     *Governor Brian Sandoval*

## STATEMENT OF RELATED CASES

The undersigned asserts that to the best of his knowledge, there are no other related cases pending in the Ninth Circuit Court of Appeals.

Respectfully submitted this 21st day of January 2014.

CATHERINE CORTEZ MASTO
Attorney General

By: /s/ C. Wayne Howle
C. WAYNE HOWLE
Solicitor General

53

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system this 21st day of January 2014.

All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

s/ Vicki Beavers
Vicki Beavers, an employee of the office
of the Nevada Attorney General

## **CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. 32(a)(7)(C) and CIRCUIT RULE 32-1 FOR CASE NUMBER 12-17668**

Pursuant to Ninth Circuit Rule 32(e)(4), I certify that the attached answering brief is proportionately spaced, has a typeface of 14 points or more and contains 12,479 words.

Respectfully submitted this 21st day of January 2014.

CATHERINE CORTEZ MASTO
Attorney General

By: /s/ C. Wayne Howle
C. WAYNE HOWLE
Solicitor General